IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WESTPORT INSURANCE CORPORATION,

       Plaintiff,

       v.

KOWAN & CORDON, LLC and
AARON J. KOWAN.

       Defendants.

CIVIL ACTION FILE
NUMBER

## COMPLAINT FOR RESCISSION

Now Comes Plaintiff, Westport Insurance Corporation ("Westport"), by its undersigned attorneys, and for its Complaint for Rescission against Kowan and Cordon, LLC ("Kowan & Cordon") and Aaron J. Kowan ("Kowan"), alleges as follows:

## I.   NATURE OF ACTION

1.   Westport brings this action for leave to rescind and for a judgment declaring void *ab initio* three Lawyers Professional Liability Policies issued to Kowan & Cordon for the annual consecutive periods January 1, 2018 to January 1, 2019 ("2018 Policy"), January 1, 2019 to January 1, 2020 ("2019 Policy"), and January 1, 2020 to January 1, 2021 ("2020 Policy") (collectively, the "Policies")[1] because Kowan & Cordon materially misrepresented information in signed affirmations of outside business interests

---

[1] The 2018, 2019, and 2020 Policies are attached as Exhibits A, B and C.

during the application process for the Policies. Westport underwrote and issued the Policies in reliance upon signed statements that Kowan & Cordon submitted to it regarding its outside business interests. Westport recently discovered that Kowan & Cordon failed to disclose Kowan's involvement in several outside business interests. If Kowan & Cordon had accurately responded to Westport's multiple requests to identify its attorneys' outside business interests, Westport would have not issued the Policies.

2.    Additionally, Kowan, along with several of his former Kowan & Cordon partners, were recently sued in a putative class action lawsuit arising out of conservation easement legal services they allegedly provided to a putative class of plaintiffs (the "*Hoover* Lawsuit").[2]  According to the *Hoover* Lawsuit, Kowan and his former partners were involved in a scheme and knew that the conservation easement tax shelters, which they were providing advice about to the purported class, were prohibited under the law. Assuming that these allegations are true, then the Kowan & Cordon applications are again false because the firm would have failed to disclose an act, error, omission or circumstance which might be the basis of a claim or lawsuit. Moreover, Westport would not have agreed to provide insurance to Kowan & Cordon had it known

---

[2] A copy of the First Amended Complaint ("FAC") filed in the *Hoover* Lawsuit is attached as Exhibit "D."

that Kowan & Cordon might be sued in one or more class action lawsuits.

3.    Westport therefore seeks leave to rescind the Policies so that the Policies are deemed void *ab initio* and of no force and effect.

## II.   **PARTIES**

4.    Plaintiff Westport is a Missouri corporation with its principal place of business in Missouri. Westport is a citizen and resident of Missouri.

5.    Kowan & Cordon is a Georgia limited liability company with its principal office in Fulton County Georgia and its member Aaron Kowan is a citizen and resident of Georgia.  (The Marshall can serve Kowan & Cordon through its registered agent Sarah Leonard, 3854 Hunting Ridge Drive, S.W., Lilburn, Gwinnett County, Georgia  30047.  As a limited liability company, Kowan & Cordon has the citizenship of its members.

6.    While the Policies were in effect, Kowan & Cordon's members were Aaron Kowan, Jason Cordon, and Sean Honeywill. All of these individuals are domiciled in Georgia and are citizens and residents of Georgia.

7.    Aaron Kowan is a citizen and resident of Georgia and the Marshall can serve him at his residence.

### III. <u>JURISDICTION AND VENUE</u>

8.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because, as alleged in paragraphs 4 through 7, this action is between citizens of different states and complete diversity exists. Additionally, an actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201 with respect to the procurement and validity of the Policies.

9.   Moreover, where the substance of a declaratory judgment action seeks to determine the validity of an insurance policy, the policy limit is the amount in controversy. Because all of the Policies include limits of $5 million per claim and $5 million in the aggregate, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Kowan & Cordon's principal place of business was within the boundaries of the Northern District of Georgia, its applications for the Policies were completed within the boundaries of the Northern District of Georgia, and the Policies were entered into and delivered to Kowan & Cordon within the boundaries of the Northern District of Georgia. Additionally, Kowan and the other members of Kowan & Cordon, reside within the boundaries of the Northern District of Georgia.

## IV.   <u>THE INSURANCE APPLICATIONS</u>

**A.   The 2018 Policy Westport Application**

11.   Kowan & Cordon originally completed an insurance application with Westport for the 2018 Policy ("Original Application"), which was signed on December 16, 2017. The Original Application is attached as Exhibit E.

12.   Question 11 of the Original Application asked as follows:

11.   Does the firm or any lawyer proposed for this insurance:

A.   Act as an employee of any organization other than the applicant law firm?

B.   Does the firm or any lawyer proposed for this insurance or their spouse /domestic partner act as a director, officer, partner or trustee or exercise any form of managerial or fiduciary control over any for-profit business enterprise other than the applicant law firm?

C.   Does the firm or any lawyer proposed for this insurance or their spouse/domestic partner own, manage, have financial control over or equity interest in any for-profit business other than the applicant law firm?

**If any "yes" response, please complete the Outside Interest Supplement.**

13.   Kowan & Cordon responded "no" to Question 11.

14.   Additionally, Questions 28 and 29 of the Original Application asked as follows:

28.   After inquiry of all lawyers and non-lawyer employees, have any claims, suits, or demands been made during the past five years against the

Applicant, its predecessor firms or any of the lawyers proposed for this insurance?

29. After inquiry of each lawyer and non-lawyer employee, is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of any fact or circumstance, act, error, omission or personal injury which might be expected to be the basis of a claim or suit for lawyers or title agents professional liability?

15. Kowan & Cordon responded "yes" to Question 28 and "No" to Question 29. *See* Exhibit E.

16. As to its "yes" response to Question 28, Kowan & Cordon's retail insurance agent noted that this involved a claim at a prior firm under the prior firm's insurance policy. (Georgia law generally says the agent's knowledge imputed to the insurer. Does this matter?)

17. Kowan & Cordon competed a Warranty Statement dated December 20, 2017, confirming that the information provided on December 16, 2017, remained correct and coverage was bound as set forth in the 2018 Policy.

18. On or about July 17, 2018, Westport underwriting discovered that one (or more?) of the attorneys at Kowan & Cordon failed to disclose a relationship with Corvi Capital, LLC and Patrick Capital Markets, LLC.

19. Westport was concerned by this omission and instructed Kowan & Cordon to properly complete an Outside Interest Supplement ("OIS") formally identifying all outside business interests.

20.   Ultimately, however, the attorneys (singular?) with the outside business interests left Kowan & Cordon shortly after Westport discovered the omission, and Westport did investigate any further.

21.   In August 2018, several new attorneys joined Kowan & Cordon. One of those attorneys, Jeffrey Hatchew, completed an OIS identifying Hatchew & Associates as responsive to Question 11 of the Original Application. Westport also learned that Mr. Hatchew was connected to a software company, Enforce Global, LLC.  (is this a material misrepresentation or are you trying to show a pattern of misrepresentations?  Since he was not involved in the tax shelters, you may want to consider omitting this.)

22.   Effective August 13, 2018, Westport issued amendments to the 2018 Policy, which included exclusions for CLAIMS/WRONGFUL ACTS involving Enforce Global, LLC and Hatchew & Associates, LLC. *See* Exhibit F.

23.   Thus, through a plain reading of the Original Application and Kowan & Cordon's subsequent interactions with Westport, Kowan & Cordon was clearly aware that it was required to disclose to Westport all outside business interests of its attorneys.

**B.   The 2019 Policy Westport Renewal Application**

24.   Kowan & Cordon completed a Renewal Application for the 2019 Policy (the "2019 Application"), which was signed on October

16, 2018. *See* Exhibit G.

25.  Question 10 of the 2019 Application asked as follows:

10.  In the past 12 months, has your firm or any individual proposed for this insurance engaged in new business activities or changed interest in business ventures other than the private practice of law?

26.  Kowan & Cordon responded "no."

27.  Question 11 of the 2019 Application asked as follows:

11.  Other than for a not-for-profit entity, in the past 12 months, has the applicant or any individual proposed for this insurance or the spouse of any such individual done the following for any client or in any client's business enterprise?

Assumed a position as a director, officer, or partner

Assumed any form of managerial or fiduciary control

Obtained or changed any equity interest

28.  Kowan & Cordon responded "no" to Question 11.  Despite its negative response to Question 11, Kowan & Cordon provided an OIS for Question 11. In the OIS, it identified that lawyer Jeffrey S. Hatchew maintained a 100% equity interest in Hatchew & Associates, LLC.

29.  Moreover, Question 14 of the 2019 Application asked as follows:

14.  Is the applicant, predecessor firms or any individual proposed for this insurance aware of any circumstance, act, error, omission or personal injury which be expected to be the basis of a legal malpractice or suit that has **not previously been**

**reported to the carrier?**

30.   Kowan & Cordon responded "no" to Question 14.

31.   In reliance upon the completed Original and 2019 Applications, Westport agreed to provide the 2019 Policy.

**C.    The 2020 Policy Westport Renewal Application**

32.   Kowan & Cordon completed a renewal application for the 2020 Policy (the "2020 Application"), which was signed on October 31, 2019. *See* Exhibit H.

33.   The 2020 Application contained the same responses as the 2019 Application with respect to Questions 10, 11 and 14.

34.   In reliance upon the completed Original Application, 2019 Application, and 2020 Application, Westport agreed to provide the 2020 Policy.

**D.    The Non-Practicing Extended Reporting Period Request**

35.   The 2020 Policy contains a provision extending coverage under the 2020 Policy, without additional premium, to attorneys at Kowan & Cordon who retire from practice of law while the Policy was in effect.

36.   On December 18, 2020, Kowan advised Westport of his retirement from the practice of law, thereby extending coverage available to himself under the 2020 Policy pursuant to the Non-practicing Extended Reported Period endorsement.

## V.   THE UNDISCLOSED OUTSIDE ENTITIES

### A.   The Emerald Acquisition Entities

37.   Although these interests were never disclosed to Westport until after Westport was provided notice of the *Hoover* Lawsuit, Kowan was a managing member of the following entities:

    (1) Emerald Acquisitions 2013, LLC
    (2) Emerald Acquisitions 2014, LLC
    (3) Emerald Acquisitions 2015, LLC
    (4) Emerald Acquisitions 2016, LLC
    (5) Emerald Acquisitions 2017, LLC
    (6) Emerald Acquisitions 2018, LLC
    (7) Emerald Acquisitions Manager, LLC

38.   The Emerald Acquisition entities are (or were) investment funds that invested in conservation easement transactions sponsored by third-parties.

39.   Kowan was also an officer of Global Tax and Equity Solutions, LLC ("Global Tax").

40.   Global Tax was formed on October 8, 2014 and changed its name to Old Well Equity Advisors in January 2020.

## VI.   THE HOOVER LAWSUIT AND EMERALD ACQUISITION ALLEGATIONS

41.   On June 25, 2021, C. Jackson Hoover filed a 349 page First Amended Class Action Lawsuit against Strategic Capital Partners, LLC and approximately 23 other defendants, including Kowan, arising out of an alleged multi-year fraudulent tax shelter scheme involving the use of syndicated conservation easements. *See* Exhibit B.

42.   The *Hoover* Plaintiffs claim that the defendants utilized a Syndicated Conservation Easement ("SCE") Strategy to effect numerous transactions that differed in name, but not in substance. The *Hoover* Plaintiffs described the SCE Strategy through five representative transactions: (1) the DeSoto Syndicate Transaction; (2) the Turtle River Syndicate Transaction; (3) the Bear Creek Syndicate Transaction; (4) the Rock Spring Syndicate Transaction and (5) the Vista Hill Syndicate Transaction.

43.   In describing the SCE Strategy, the *Hoover* Plaintiffs claim that the defendants "had preplanned and predetermined each step of the SCE Strategy to generate large but improper tax deductions."

44.   The *Hoover* Plaintiffs allege that the defendants identified and purchased real estate, not for investment or conservation purposes, as represented, but instead to syndicate as many transactions as possible to generate "outlandish fees" and land interests for themselves.

45.   The *Hoover* Plaintiffs allege that the promoters of a transaction would obtain a Highest and Best Use (HBU) appraisal of the land. The *Hoover* Plaintiffs claim that HBU "facilitates the false premise that a property owner suffers 'lost profits' by a foregoing a hypothetical and implausible HBU and then by donating the property to a conservation organization."

46.   The *Hoover* Plaintiffs allege that defendants' HBU appraisal caused the land valuations to be higher than allowed by the IRS under the "Willing Buyer Willing Seller" test. As one example, the *Hoover* Plaintiffs alleged an appraiser valued a conservation easement at 100 times the value of the entire property arising from a sale that occurred only months earlier.

47.   More specifically, the *Hoover* Plaintiffs allege that the SCE Strategy involved the use of an entity taxed as a partnership under subchapter K of the Code (the "Syndicates."). The Syndicates were then formed as limited liability companies under state law, which are taxed as partnerships for federal tax purposes.

48.   The *Hoover* Plaintiffs claim that, under the SCE Strategy, a Sponsor obtains a majority interest in property from a third party ("Landowner"). The Sponsor creates an LLC ("PropCo"). At the time PropCo is formed, the Landowner is the 100% owner of the PropCo. The Landowner then deeds land into Propco, and the Sponsor purchases a majority interest (usually around 98%) in PropCo from the Landowner.

49.   The *Hoover* Plaintiffs claim that depending on the size of the property or properties, the defendants agreed to subdivide or combine the properties to create multiple parcels of several hundreds of acres each so that each parcel can be used in its own SCE Strategy transaction.

50.   The *Hoover* Plaintiffs claim that once the property is identified an agreement obtained from the Landowner, the Sponsor purports to conduct a "due diligence" period, "the true purpose of which is to put together the information and documents necessary to promote the SCE Strategy" to potential investors.

51.   The *Hoover* Plaintiffs claim that the defendants worked together to promote and implement each syndication. They claim defendants prepared documents crucial to making the "scheme" appear to be legitimate and legal "when, in fact, the Defendants knew that the scheme was fraudulent and the documents contained numerous misrepresentations and material omissions."

52.   In that regard, the *Hoover* Plaintiffs assert that as early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated. In 2004, Plaintiffs claim the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including the failure to substantiate the market value of the tax benefit. The IRS purportedly further advised professional advisors and promoters that it would aggressively pursue back-taxes and penalties. In 2006, the IRS allegedly placed professional advisors and promoters of

conservation easements on notice of what constitutes a "Qualified Appraisal."

53.   The *Hoover* Plaintiffs claim that in 2016, the IRS again explained to professional advisors that it was heavily scrutinizing conservation easement transactions and would disallow tax deductions if certain circumstances existed. Specifically, the *Hoover* Plaintiffs claim that in December 2016, the IRS issued Notice 2017-10, "which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions."

54.   The *Hoover* Plaintiffs allege that "[b]y 2019, the IRS added syndicated conservation easement transactions (like the SCE Strategy) to its Dirty Dozen list of tax scams to avoid."

55.   The *Hoover* Plaintiffs further allege that as of June 25, 2020, the IRS stated in IR-2020-130 that it "will continue to disallow the claimed tax benefits, assert civil penalties to the fullest extent, and consider criminal sanctions where appropriate."

56.   The *Hoover* Plaintiffs claim that although Defendants were aware the IRS' clear warnings to them and other conservation easement professionals that the SCE Strategy could not generate legitimate tax deductions, they advised the *Hoover* Plaintiffs "the diametric opposite." The *Hoover* Plaintiffs claim that defendants chose to continue to market, sell, and profit from the SCE Strategy, believing that they could evade or overcome IRS scrutiny.

57.   In the description of the parties, the *Hoover* Plaintiffs allege that Defendant Private Client Law Group ("PCLG") is a professional corporation. The *Hoover* Plaintiffs claim that Kowan "is or was during the relevant period an employee, officer and/or director of Private Client Law Group, PC." The same descriptions are alleged as to Defendants/PCLG attorneys Jason Cordon and Sean Honeywill, who collectively are defined as the "PCLG Defendants."

58.   The *Hoover* Plaintiffs claim that the PCLG Defendants had multiple roles and responsibilities in the SCE Strategy "but were also architects of the SCE Strategy."

59.   The *Hoover* Plaintiffs claim that for the Vista Hill Syndicate, the PCLG Defendants provided alleged due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected.

60.   The *Hoover* Plaintiffs allege that the PCLG Defendants failed to disclose material facts to clients, including the central issue of the appraisal's overvaluation. The *Hoover* Plaintiff further allege that "the PCLG Defendants hid behind various assumptions that it knew to be false and purported to disclaim any knowledge or responsibility for those assumptions in direct violation of its duties to its clients."

61.   The *Hoover* Plaintiffs claim that the PCLG Defendants issued due diligence reports for other Syndicates in which class

members participated. Plaintiffs claim that the PCLG defendants were paid a flat fee for each Syndicate for their role in helping develop the Strategy and their due diligence services.

62. The *Hoover* Plaintiffs alleges that PCLG, and in particular, Kowan, had a longstanding relationship with the developers of the SCE Strategy. The *Hoover* Plaintiffs claim that based on their relationship and reputations within the SCE industry, PCLG, Kowan and other PCLG attorneys, authored numerous due diligence reports and other documents in connection with implementing SCE Strategies between 2013 – 2016 and performed these services for at least dozens of Syndicates during this timeframe.

63. With respect to the Vista Hill Transaction (2015), the *Hoover* Plaintiffs allege that the PCLG Defendants provided "due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected.

64. The *Hoover* Plaintiffs allege that on October 22, 2015, Attorney Honeywill, in consultation with PCLG partners Kowan and Cordon, sent a Due Diligence Report "on PCLG's behalf" directly to plaintiff class members who participated in the Vista Hill Syndicate. Despite purporting to represent Plaintiffs' interests, the *Hoover* Plaintiffs claim that the PCLG Defendants were actually co-conspirators in the tax shelter scheme and provided yet another veneer of legitimacy to the Transaction.

65.   The *Hoover* Plaintiffs assert that the stated goal of the Due Diligence Report was to identify any material issues that may exist with respect to the transaction's legal agreements and tax structure and propose solutions to the extent any identified risks may be mitigated. Plaintiffs allege that the Due Diligence Report failed in material ways to do what it purported to do and, instead, it made numerous misrepresentations and omissions.

66.   The *Hoover* Plaintiffs claim, moreover, that the Due Diligence Report was supposed to come from an independent law firm, and PCLG failed to acknowledge its past work for Strategic on other conservation easement matters.

67.   Specifically, the *Hoover* Plaintiffs allege that PCLG, Kowan, and Cordon sponsored a series of SCE Funds commonly referred to as "**Emerald Funds**." The *Hoover* Plaintiffs assert that the Emerald Funds invested in SCE deals sponsored by a number of promoters, including the Strategic Defendants.

68.   The *Hoover* Plaintiffs allege that one of the entities used to invest in the Emerald Funds was a PCLG-sponsored **Emerald Acquisitions 2014 LLC**. The entity allegedly owned a 9.29% stake in Big Hill Partners LLC. The Big Hall Partners LLC transaction was purportedly identical to the Vista Hill Syndicate Transaction.

69.   The *Hoover* Plaintiffs claim that since the PCLG Defendants prepared a Due Diligence report on the Vista Hill Syndicate while at the same having an ownership stake in Big Hall

Partners, PCLG, Kowan, Cordon and Honeywill were interested parties. The *Hoover* Plaintiffs allege that the PCLG Defendants could not opine that the Vista Hill Syndicate Transaction violated the tax code without admitting that their own investments violated the tax code.

70.   The *Hoover* Plaintiffs claim that PCLG, Kowan, Cordon and Honeywill therefore had a disabling conflict of interest, even if they had disclosed the conflict. The *Hoover* Plaintiffs claim that the lack of independence "destroyed any penalty protection the Report might have purported to offer."

71.   The *Hoover* Plaintiffs allege that each of the defendants was a co-conspirator involved in the SCE Strategy, with the common purpose of misrepresenting the basis, terms, and consequences of the SCE Strategy or obscuring the defects in it.

72.   The *Hoover* Lawsuit alleges causes of action against Kowan and other defendants for violations of RICO, 18 U.S.C. § 1962(D) for conspiring to violate 18 U.S.C. § 1962(c), conspiracy to violate Georgia's RICO law (O.C.G.A. § 16-14-4(c)), professional malpractice, negligent misrepresentation, breach of fiduciary duty and disgorgement, and fraud.

## V.   CAUSE OF ACTION

### COUNT I

**[For Rescission of the Policies]**

73.   Westport   hereby   incorporates   and   re-alleges   the allegations in paragraphs 1 through 71 as if fully set forth herein.

74.   Georgia's   rescission   statute   provides   that misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract ***unless***:

(1) Fraudulent;

(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

O.C.G.A §

75.   Thus, Georgia law permits insurers to rescind a contract for insurance where an insured makes a material misrepresentation in the insurance application.

76.   Generally, a misrepresentation is material where it would influence a prudent insurer in determining whether or not to

accept the risk, or in fixing a different amount of premium in the event of such acceptance.

77.   Kowan & Cordon (and Kowan?) were required to disclose the numerous Emerald Acquisition entities to Westport, and any other outside business interests, as required by the Original Application, 2019 Application and 2020 Application.

78.   In addition to needing to fully understand the likelihood of potential lawsuits against an applicant, which could arise based on an insured's outside interest liabilities, outside interests may present an insured law firm with a conflict or potential conflict. Although the conflict may not be the actual cause of a loss, the mere allegation or appearance of a conflict may complicate (and increase the expense of) the defense of any resulting claim.

79.   Thus, it is Westport's (and the insurance industry's) custom and practice to scrutinize an insured's or applicant's outside business interests, particularly when the outside entity is in a high-risk industry or practice, such as tax shelters.

80.   Had Kowan & Cordon properly disclosed the Emerald Entities as outside business interests, Westport would have first requested additional information about the work performed by the entities.

81.   Westport would have discovered the Emerald Entities' business was investing in conservation easements transactions.

82.   Kowan & Cordon's professional legal services, moreover, involved providing legal opinions as to conservation easement tax shelter transactions.

83.   Had Kowan & Cordon properly answered the insurance applications, Westport would not have agreed to provide the Policies, including agreeing to the Kowan ERP Retirement, which extends coverage under the 2020 Policy.

84.   Specifically, Westport would have had concerns, among others, about a potential conflict between the Kowan & Cordon, the Emerald Entities, and a client of Kowan & Cordon—the very conflict which is alleged in the *Hoover* Lawsuit.

85.   Additionally, if the allegations of the *Hoover* Lawsuit are true that Kowan & Cordon had knowledge regarding IRS' position with respect to the type of conservation easement transactions alleged in the *Hoover* Lawsuit, but intentionally advised clients to the contrary, then Kowan & Cordon would have known of an act, error, omission or circumstances which might be the basis of a claim.

86.   Had such information been disclosed to Westport, as required by the insurance applications, Westport would not have agreed to issue the Policies, including providing the ERP Retirement option to Kowan.

87.  Westport has offered to return to Kowan & Cordon its policy premium, but Kowan & Cordon has not accepted Westport's offer or right to rescind.

88. As such, an actual controversy exists between the parties entitling Westport to a declaration of whether the Policies should be rescinded and declared void *ab initio.*

WHEREFORE, Westport respectfully requests that this Court enter judgment in its favor and against Kowan & Cordon and Kowan declaring that the Policies are rescinded and void *ab initio* and of no force or effect whatsoever.

> DENNIS, CORRY, SMITH & DIXON, LLP
>
> /s/ *Grant B. Smith*
> GRANT B. SMITH, ESQ.
> Georgia bar number 654345
> For the Firm
> Attorneys for Plaintiff

900 Circle 75 Parkway
Suite 1400
Atlanta, Georgia 30339
(404)364-4503
Gbs@dcplaw.com