## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

C. Jackson Hoover; Matthew S. Greiner; Heather Greiner; Edward William Spratt, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

Strategic Capital Partners, LLC, et al.,

      Defendants.

CIVIL ACTION FILE
1:21-CV-01299-SDG

## SCHEDULING ORDER

Having considered the May 28, 2021 consent proposal of the Plaintiffs and Defendant Morris, Manning & Martin, LLP, and with the consent of every Defendant who has appeared in the above-styled matter, it is hereby **ORDERED**:

1.  Plaintiffs shall file their First Amended Complaint on or before June 25, 2021.

2.  No Defendant is required to respond in any kind to the original Complaint [Dkt. 1]. All discovery is stayed until the resolution of every forthcoming Motion to Dismiss the First Amended Complaint or until the Court otherwise directs. This includes all pretrial activity and deadlines, such as the NDGa LR 16.1 conference, Joint Preliminary Report and Discovery Plan, initial disclosures, and

EXHIBIT D

commencement of discovery. Plaintiffs are not required to file their class certification motion under LR 23.1(B) until the Court directs, following its resolution of the Motions to Dismiss.

3. On or before July 9, 2021, the parties shall propose a schedule and plan for briefing the Defendants' anticipated Motions to Dismiss the First Amended Complaint. If agreement to a consent proposal is not reached, the parties shall file competing motions and proposed scheduling orders on or before July 9, 2021.

4. No response of any kind to the First Amended Complaint shall be required except as ordered by the Court.

**SO ORDERED** this 2nd day of June 2021.

Steven D. Grimberg
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| C. JACKSON HOOVER; MATTHEW ) <br> S. GREINER; HEATHER GREINER; ) <br> EDWARD SPRATT; RONALD ) <br> HEBERT; SANDI DOUGET; ) <br> SAMUEL AGNEW, on behalf of ) <br> themselves and all others similarly ) <br> situated, ) <br> ) | **CASE NO.  1:21-cv-01299-SDG** |
| *Plaintiffs*, ) <br> ) | **FIRST AMENDED CLASS ACTION** <br> **COMPLAINT** |
| v. ) <br> ) | |
| STRATEGIC CAPITAL PARTNERS, ) <br> LLC; RICKY B. NOVAK; JAMES ) <br> FREEMAN; BRIDGE CAPITAL ) <br> ASSOCIATES, INC.; MORRIS, ) <br> MANNING & MARTIN, LLP; ) <br> TIMOTHY POLLOCK; NELSON ) <br> MULLINS RILEY & ) <br> SCARBOROUGH LLC; JON R. ) <br> LANGFORD, CPA, PC; JON R. ) <br> LANGFORD; BENNETT ) <br> THRASHER, LLC; VAN SANT AND ) <br> WINGARD, LLC; MARTIN H. VAN ) <br> SANT; THOMAS F. WINGARD; ) <br> CLARK~DAVIS, PC; CLAUD ) <br> CLARK III; ATLANTIC COAST ) <br> CONSERVANCY, INC.; ROBERT D. ) <br> KELLER; GEORGIA-ALABAMA ) <br> LAND TRUST, INC. F/K/A ) <br> GEORGIA LAND TRUST, INC.; ) <br> AQUAFUSION, INC.; CREDO ) <br> FINANCIAL SERVICES, LLC; ) <br> OXYGEN FINANCIAL, INC.; ) <br> CHERRY BEKAERT LLP F/K/A ) | **JURY DEMANDED** |

EXHIBIT D

CONEXUS CPA GROUP, LLC;                        )
TRIANGLE LAND CONSERVANCY;   )
FOOTHILLS LAND                                          )
CONSERVANCY, INC.; PRIVATE           )
CLIENT LAW GROUP, PC; AARON         )
KOWAN; JASON CORDON; SEAN           )
HONEYWILL; BRYAN CAVE                   )
LEIGHTON PAISNER LLP F/K/A           )
BRYAN CAVE LLP; MCCALIP &             )
COMPANY, INC.; DANTIN                     )
FINANCIAL, LLC; CHRIS A.                  )
DANTIN; AND FRAZIER &                     )
DEETER, L.L.C.                                       )
                                                                )
                    *Defendants.*                       )
                                                                )

## FIRST AMENDED CLASS ACTION COMPLAINT

1.      This case involves a multi-year fraudulent scheme by a group of supposedly independent and respected professionals.  The tax-savings strategy at the heart of the scheme involved the donation of inflated real estate for purported conservation purposes—the Syndicated Conservation Easement Strategy (the "<u>SCE Strategy</u>").  Although the SCE Strategy was often structured using a donation of a conservation easement to generate a tax loss, the SCE Strategy sponsors sometimes donated a fee simple interest as opposed to a conservation easement.  Regardless of the precise structure used, the central premise was the same:  a donation of inflated real estate to generate a purportedly legal tax deduction.  This Complaint uses the term SCE Strategy broadly to encompass both conservation easement-structured transactions and fee simple-structured transactions.

2.      The Defendants used the SCE Strategy to effect numerous conservation easement transactions that differed in name and location but not in substance.  These professionals aggressively promoted and sold numerous SCE Strategy transactions to Plaintiffs and other Class members, who were told the transactions were legal and an entirely legitimate way to serve the environment and reduce their tax bill.  Because this complex scheme has been widespread, occurred over a number of years, and involved numerous transactions, Plaintiffs describe the scheme in this Complaint by way of five representative transactions:  (a) the DeSoto tract in Shelby

1

County, Alabama ("DeSoto Syndicate Transaction"), (b) the Turtle River tract in Glynn County, Georgia (the "Turtle River Syndicate Transaction"), (c) the Bear Creek tract in Coweta County, Georgia (the "Bear Creek Syndicate Transaction"), (d) the Rock Spring tract in Morgan County, Alabama (the "Rock Spring Syndicate Transaction"), and (e) the Vista Hill tract in Chatham County, North Carolina (the "Vista Hill Syndicate Transaction").[1]

3.     These representative examples are just the tip of the iceberg.  Often, the promoters of the scheme would purchase a large parent tract and subdivide that tract into separate syndications to maximize the fees for the Defendants and make it for easier for Defendants to sell a particular syndication in a year's time.  Subdividing tracts also had the effect of further concealing the gross overvaluations of the real estate—for example, a $20 million value increase is not as noticeable as a $140 million value increase.

4.     Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  Indeed, part of the sales pitch to Plaintiffs and Class Members was the noble goal of preserving valuable land for the greater public good.   When **_properly_** valued and implemented, conservation easements can and do confer legitimate tax advantages to the donor in additional to

---

[1] As described later in the Complaint, the Rock Spring Syndicate involved a donation of a fee simple interest as opposed to a conservation easement.  The fraudulent nature of the transaction is still the same, however.

2

environmental benefits to the public.  When such easements are placed on property *in strict compliance* with Section 170(h) of the Internal Revenue Code (the "Code"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.

5.      The SCE Strategy, however, was not properly and legitimately valued or implemented and was never intended to be.  Rather than guide Plaintiffs through a legitimate conservation easement transaction, the Defendants utilized a prepackaged collection of bogus, grossly inflated appraisals,[2] donations of easements that lacked a valid conservation purpose, deficient form documents, and faulty conservation easement deeds, all delivered via a mountain of misrepresentations and omissions to promote, sell, and implement the SCE Strategy and the tax savings it allegedly would legally provide.  Beneath these complex structures and financial shenanigans hid the truth (which was purposefully obscured from Plaintiffs, other Class members, and the Internal Revenue Service ("IRS")): the SCE Strategy was simply an attempt by Defendants to convey a substantial real estate interest to a co-conspiring charity, after fraudulently and grossly inflating its

---

[2]  These appraisals included numerous intentional misrepresentations and deficiencies, many of which emanate from a tortured interpretation of "fair market value" that ignores the IRS's valuation standard.  The value of the donated easement must meet the definition of fair market value as defined by Treasury Regulation § 1.170A-1(c)(2):  The fair market value is the price at which the property could change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.

EXHIBIT D

value, and sell the corresponding tax deduction to Plaintiffs and other clients for lucrative professional fees.

6.      As its name indicates, the SCE Strategy involves the syndication of a conservation easement transaction (or a conservation fee simple transaction) to multiple investors, which allows those who would be unable to individually participate in an otherwise capital-intensive transaction to do so.  While syndication itself is not problematic *per se*, many unscrupulous professionals like Defendants found ways, such as the SCE Strategy, to exploit for their own gain the tax deductions that could be generated from SCE Strategy transactions.

7.      As described further below, Defendants are a group of conservation easement professionals and other advisors and consultants who deliberately banded together to give only the *appearance* of legitimacy to the SCE Strategy for their own financial gain.  There were several reasons why the SCE Strategy presented an attractive money-making opportunity for Defendants.  The 2008-2009 recession left a rampant oversupply of devalued real estate, along with a group of underemployed real estate appraisers, at least some of whom were eager and willing to provide favorable valuations in exchange for the right sum.  This unproductive real estate could be purchased at a discount and sold to investors at a premium for the purported purpose of placing a conservation easement that would generate tax deductions that, due to provisions in the Code, could substantially reduce the individual participant's

4

tax liability.[3]  And because the rules and transactions involved were highly technical, they could not be understood by laypersons such as Plaintiffs and the Class who were unlikely to question the advice being offered by reputable professionals (including blue-chip law firms and accounting firms) who purported to be experts in this area.

8.      Defendants sought to capitalize on their respective expertise in conservation easements and related tax matters to lure successful individuals to participate in what they represented to be bona fide conservation easement transactions and thereby generate substantial fees and land interests for themselves. To do so effectively, each of the Defendants knew they needed the coordinated participation of various role players, including a sponsor, appraiser, mining or development consultant, attorney, land trust, accountant, and "Other Participants,"[4]

---

[3] The deduction for a qualified conservation easement under Code § 170(h) is a noncash charitable contribution deduction, which unlike most itemized deductions, is not subject to the alternative minimum tax ("AMT"). Without the risk of AMT, the tax benefits flowing from a § 170(h) deduction are especially valuable. For example, a taxpayer with $500,000 of adjusted gross income could use a § 170(h) deduction to reduce his tax to $25,000, thereby enabling the taxpayer to claim an effective tax rate of 5%. In addition to federal tax benefits, some states like Georgia offered a state tax credit for conservation easements, which would provide participants a dollar-for-dollar reduction of tax.

[4] "Other Participants" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, and others not named as Defendants herein who assisted in the design, promotion, sale, and/or implementation of the SCE Strategy.

5

EXHIBIT D

involved in every step of the SCE Strategy.  Defendants deliberately sought out and agreed to work with only those whom they knew through preexisting relationships and/or industry reputation to be willing partners in this improper endeavor.  Often, as here, the same or substantially similar group of professionals and advisors ended up working together to promote, sell, and implement SCE Strategy transactions.

9.      The appraisals were the lynchpin of the SCE Strategy and were egregiously inflated and defective to advance the goals of the scheme.  The most critical element of the bogus appraisals was an insupportable finding of Highest and Best Use ("HBU"). The HBU in these transactions facilitates the false premise that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU by donating the property to a conservation organization.  Such "lost profits" analysis is inconsistent with the actual test in determining fair market value—the willing-buyer-willing-seller test using the before- and after-valuations of the subject property as required in Treas. Reg. § 1.170A-1(c)(2).  To concoct a HBU that would support the valuation that the Defendants sought, the appraisers made false assumptions and ignored inconvenient facts that enabled them to determine a HBU for properties for which no objective and competent appraiser would concur. The bogus HBU determined by the appraisers relied on equally bogus land development and mining reports for the express purpose of assisting with scheme. These reports purported to provide a basis for improving the properties for mining or multi-use,

6

when, in reality, the development consultants and the other Defendants all knew that development or mining was neither legally permissible (since the required zoning was not in place and the permits were not in place and there was no showing of reasonable probability that they ever would be and certainly not anytime soon) nor economically feasible.

10.     In addition, neither the mining reports nor the appraisals met the tests under the then-existing case law and applicable regulations: where an asserted HBU differs from current use, that suggested use must be (i) reasonably probable and close in time and (ii) have real market value.  Where the suggested HBU is mining, the mineral must be present in a commercially exploitable amount and there must be a market for the mineral in the reasonably foreseeable future.  There must be some objective support for the future demand, including volume and duration.  In other words, the mere fact that you could build a mine, doesn't make mining the HBU for the property.  If these tests are not met, the proposed HBU is purely speculative and cannot form the basis for the appraised value of the subject property.

11.     The foregoing chicanery caused the valuation of the properties at issue to be exponentially higher than allowed by the IRS under the "Willing Buyer Willing Seller" test promulgated under Treas. Reg. § 1.170A-1(c)(2).  In one instance, appraisers valued a conservation easement at 100 times the value of the entire property arising from a sale that occurred only months earlier.  In another instance,

7

appraisers set the fair market value of a property at almost $26 million when only 13 days earlier the promoters of the SCE Strategy had purchased the property for $709,207.

12.     In accordance with the Defendants' pre-planned scheme, the appraisers took steps to obscure the inflated nature of the appraisals from Plaintiffs, the Class, and the IRS by intentionally omitting key facts from the appraisals, such as the presence of adjoining properties intended for the same "use" and recent comparable listings and recent sales.  For example, for properties subdivided from the same parent tract, the appraisers and other Defendants failed to disclose the fact that if investors chose to develop one tract for mining, but another set of investors chose to place a conservation easement on an adjoining tract, both the ability to develop and the conservation purpose would be undermined or destroyed. The Defendants' IRS filings further obscured the fact that these alleged valuation increases took place over a short period of time by fraudulently "tacking" their holding period to that of the prior owner of the same property many years prior and disclosing this falsified, misleading information on Form 8283, which is to be signed by the appraiser under penalties of perjury and attached as a part of the Form 1065 partnership tax return to substantiate the charitable contribution deduction claimed.

13.     Once the IRS began scrutinizing the fraudulent appraisals and other defects, they determined that the SCE Strategy, as structured and implemented, does

EXHIBIT D

not comply with the requirements of Section 170(h) of the Code, and other applicable regulations and case law and, therefore, does not and was never going to provide the promised legitimate charitable contribution deductions from the conservation easement donations. Now that the United States government has begun peeling back the layers of fraud underpinning the SCE Strategy, it has initiated enforcement actions and conducted criminal prosecutions related to nearly identical transactions implemented by other promoters of the SCE Strategy. *See, e.g., United States v. Zak, et al.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers—including Defendant Claud Clark III—of other SCE Strategy transactions, seeking permanent injunctions halting these transactions and seeking to disgorge defendants of their ill-gotten gains);[5] *United States v. Stein Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20-CR-129 (W.D.N.C.) (same).

14. As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiffs paid Defendants substantial fees for their participation in the fraudulent SCE Strategy, have been or are being assessed back taxes, penalties, and

---

[5] Nancy Zak, a prominent promoter of SCE Strategy transactions, recently settled the civil enforcement action against her after agreeing to leave the business permanently.

EXHIBIT D

interest, and have paid significant professional fees in connection with the IRS disputes. The Defendants also convinced what is believed to be over 1,000 other clients to execute the SCE Strategy. For these Class members, the IRS has now indicated it will disallow the charitable deductions and, in fact, has already begun disallowing the deductions at the partnership level.

15.     Unbeknownst to Plaintiffs and the Class, Defendants had preplanned and predetermined each step of the SCE Strategy to generate large but improper tax deductions, as detailed further below. From the outset, Defendants identified and purchased real estate, not for an actual investment or conservation purpose, as they had represented to potential SCE Strategy participants, but to syndicate as many conservation easement transactions as possible in order to generate outlandish fees and significant land interests for themselves. Defendants then worked together to promote and implement each syndication, including by drafting and preparing various transactional documents needed to execute a conservation easement that could be claimed as a charitable contribution deduction. These documents were crucial to making the scheme appear to be legitimate and legal, when, in fact, the Defendants knew the scheme was fraudulent and the documents contained numerous misrepresentations and material omissions. Plaintiffs and Class members, on the other hand, reasonably believed that the documents supported the SCE Strategy transactions and could not have recognized the misrepresentations and omissions

EXHIBIT D

because the documents' content and the applicable Tax Code provisions and accompanying regulations were highly technical.

16.     Although Defendants were well aware of the IRS's clear warnings to them and other conservation easement professionals and advisors that the SCE Strategy, as structured and implemented, could not generate legitimate tax deductions, they advised their trusting clients the diametric opposite. Defendants chose to continue to market, sell, and profit from the SCE Strategy, believing that they could evade or overcome any IRS scrutiny. And when the IRS began to zero in on the SCE Strategy as an abusive tax scheme, Defendants either minimized or deliberately kept silent about the IRS's unequivocal position that it would disallow the tax benefits promised to Plaintiffs and the Class. In fact, the IRS has now made clear that it will disallow these SCE Strategy deductions at the partnership level and has indicated its intent to disallow them at the individual level.

17.     This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to the assessment of back-taxes, interest, and penalties from the IRS, and incur additional accounting and legal fees and related expenses to deal with the IRS fallout. These damages are all the result of Plaintiffs and the Class entering into the SCE Strategy and claiming charitable contribution deductions on their federal and

state tax returns based on the defective SCE Strategy as well as Defendants' advice, recommendations, and assistance in connection therewith.

18.     There were only minor, if any, variations in Defendants' wrongful actions and resulting harm to Plaintiffs and the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and the concerted action and fraudulent misrepresentations by the Defendants and their co-conspirators about the SCE Strategy and its promised tax benefits predominate. Plaintiffs allege a common and mutual scheme for tax fraud, in which Defendants knew the SCE Strategy, as structured and implemented, would fail if challenged by the IRS despite Defendants' representations and actions to the contrary.

## I.
## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class (named or unnamed) is a citizen of a state that is different from at least one Defendant's state of citizenship; in fact, the class is currently known to include citizens of Georgia, Louisiana, North Carolina, South Carolina, and Tennessee.  Moreover, based on SEC filings, the Defendants solicited participants from over half of every state in the country, including, but not limited to Alabama, Arkansas, California, Colorado,

Florida, Georgia, Hawaii, Indiana, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Mississippi, Missouri, Nebraska, New Hampshire, North Carolina, North Dakota, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and West Virginia. Further, the aggregate amount in controversy exceeds $5,000,000. In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

20.     Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. § 1965(b) and (d).

21.     Without limiting the generality of the foregoing, each Defendant (directly or indirectly) has:

      (a)     transacted business in Georgia;

      (b)     contracted to supply or obtain services in Georgia;

      (c)     availed themselves intentionally of the benefits of doing business in Georgia;

(d)    produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

(e)    caused tortious damage by act or omission in Georgia;

(f)    caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(g)    committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Georgia to Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(h)    engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

EXHIBIT D

(i)     otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require the Defendants to come to Court to defend this action.

22.     Venue is proper under 28 U.S.C. § 1391(b)(2)-(3), because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of the Defendants' fraud and wrongful conspiracy were felt in, among other places, this District and, alternatively, because at least one defendant is subject to personal jurisdiction in this District.  In addition, venue is proper under 18 U.S.C. § 1965 because at least one Defendant resides in this District and the ends of justice require that the other Defendants be brought before the Court.

23.     Venue in this Division is proper under LR 3.1 because at least one Defendant resides in this Division.

## II.
## PARTIES

24.     Plaintiff C. Jackson Hoover ("Hoover") is an individual and a citizen of Cobb County, Georgia. This Plaintiff resides in Marietta, Georgia within this District.

25.     Plaintiff Matthew S. Greiner ("Matthew Greiner") is an individual and a citizen of Cobb County, Georgia.  This Plaintiff resides in Marietta, Georgia within

EXHIBIT D

this District.  Matthew and Heather Greiner are collectively referred to herein as the "Greiner Plaintiffs."

26.     Plaintiff Edward William Spratt ("Spratt") is an individual and a citizen of Cobb County, Georgia.  This Plaintiff resides in Powder Springs, Georgia within this District.

27.     Plaintiff Sandi Douget ("Douget") is an individual and a citizen of Fulton County, Georgia.  This Plaintiff resides in Atlanta, Georgia within this District.

28.     Plaintiff Samuel Agnew ("Agnew") is an individual and citizen of East Baton Rouge Parish, Louisiana.  This Plaintiff resides in Baton Rouge, Louisiana.

29.     Plaintiff Ronald Hebert ("Hebert") is an individual and citizen of Iberville Parish, Louisiana.  This Plaintiff resides in Plaquemine, Louisiana.  Hoover, the Greiner Plaintiffs, Spratt, Hebert, Douget, and Agnew are collectively referred to herein as the "Plaintiffs".

30.     Defendant Strategic Capital Partners, LLC ("Strategic") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1072 W. Peachtree Street NW #78646 Atlanta, Georgia 30357. Strategic, Novak, and Freeman are collectively referred to herein as the "Strategic Defendants."  Strategic has been served in this case.

31.     Defendant Bridge Capital Associates, Inc. ("Bridge Capital") is a corporation incorporated in Georgia with its principal place of business at 127 Main Street NW, Lilburn, GA 30047.   Bridge Capital, Novak, and Freeman are collectively referred to herein as the "Bridge Capital Defendants."   Bridge Capital has been served in this case.

32.     Defendant Ricky B. Novak ("Novak") is an individual and, upon information and belief, resides at 5217 Lake Forrest Dr., Atlanta, GA 30342-2220, Georgia.  This Defendant is or was during the relevant period a principal of Strategic and Bridge Capital.  Novak has been served in this case.

33.     Defendant James W. Freeman ("Freeman") is an individual and, upon information and belief, resides at 5388 Redfield Dr. Dunwoody, GA 30338-3733. This Defendant is or was during the relevant period a principal of Strategic and Bridge Capital.  Freeman has been served in this case.

34.     Defendant Morris, Manning & Martin, LLP ("MMM") is a limited liability partnership organized and existing under the laws of Georgia with its principal place of business at 1600 Atlanta Financial Center, 3343 Peachtree Road NE, #1600, Atlanta, Georgia 30326.  MMM has been served in this case.

35.     Defendant Timothy Pollock ("Pollock") is an individual and, upon information and belief, resides at 3827 Rockhaven Court, Marietta Georgia 30066. This Defendant is or was during the relevant period a partner in MMM.  MMM and

EXHIBIT D

Pollock are referred to herein as the "MMM Defendants."  Pollock has been served in this case.

36.    Defendant Nelson Mullins Riley & Scarborough LLC ("Nelson Mullins") is a limited liability company organized and existing under the laws of South Carolina with its principal place of business at Meridian, 17th Floor, 1320 Main Street, Columbia, SC 29201.  Nelson Mullins also maintains an office in this District at Atlantic Station, 201 17th Street NW, Suite 1700, Atlanta, GA 30363. Nelson Mullins has been served in this case.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia and maintains a regular place of business.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction

EXHIBIT D

of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

37.    Defendant Jon R. Langford, CPA, PC ("Langford PC") is a professional corporation incorporated in Georgia with its principal place of business at 300 Plantation Chase, St. Simons Island, GA 31522. Langford PC has been served in this case.

38.    Defendant Jon R. Langford ("Langford") is an individual and, upon information and belief, resides at 505 Palm Harbor Road, St. Simons Island, GA 31522. This Defendant is or was an employee or principal of Jon R. Langford, CPA, PC. Langford PC and Langford are collectively referred to herein as the "Langford Defendants." Langford has been served in this case.

39.    Defendant Bennett Thrasher, LLC ("Bennett Thrasher") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 3625 Cumberland Blvd., Suite 1000, Atlanta, GA 30339. Bennett Thrasher has been served in this case.

40.    Defendant Van Sant and Wingard, LLC ("Van Sant and Wingard") is a limited liability company organized and existing under the laws of South Carolina with its principal place of business at 7222 S Lake Marion Circle, Columbia, SC

19

29223.  Van Sant and Wingard has been served in this case.  This Court has personal

jurisdiction over this Defendant pursuant to the Constitution and laws of the United

States and the State of Georgia. At all relevant times, this Defendant has done and is

doing business in the State of Georgia.  This Defendant has committed torts, in whole

or in part, in the State of Georgia, including intentional tortious acts directed at a

resident of the State of Georgia, where the brunt of the harm was felt.  This

Defendant's conduct in the State of Georgia has been committed by officers,

directors, employees, and/or agents of this Defendant acting within the scope of

their employment or agency. This Defendant has purposefully availed itself of the

benefits and protections of the laws of the State of Georgia and could reasonably

anticipate being subject to the jurisdiction of courts of the State of Georgia. This

suit against this Defendant will not offend traditional notions of fair play and

substantial justice and is consistent with due process of law.  In addition, venue and

jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

41.    Defendant Martin H. Van Sant ("Van Sant") is an individual who, upon

information and belief, resides at 168 Lillian Street, Gilbert, SC 29054-9779. This

Defendant is or was an employee or principal of Van Sant and Wingard. Van Sant

has been served in this case.  This Court has personal jurisdiction over this Defendant

pursuant to the Constitution and laws of the United States and the State of Georgia.

At all relevant times, this Defendant has done and is doing business in the State of

EXHIBIT D

Georgia.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.   This  Defendant has purposefully availed himself of the benefits and protections of the laws  of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent  with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

42.    Defendant Thomas F. Wingard ("Wingard") is an individual who, upon information and belief, resides at 2408 Quinine Lane, Columbia, SC 29204.  This Defendant is or was an employee or principal of Van Sant and Wingard.  Wingard has been served in this case.  Van Sant and Wingard, Van Sant, and Wingard are collectively referred to herein as the "Van Sant and Wingard Defendants."  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This  Defendant has purposefully availed himself of the benefits and

21

protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

43. Defendant Clark~Davis, PC ("Clark Davis") is a professional corporation incorporated in Alabama with its principal place of business 1124 Palmetto St., Mobile, AL 36604. Clark Davis has been served in this case. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia. This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition,

EXHIBIT D

venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

44.     Defendant Claud Clark III ("Clark") is an individual who, upon information and belief, resides at 646 River Route, Magnolia Springs, AL 36555. This Defendant is or was an employee or principal of Clark Davis.  Clark has been served in this case.  Clark Davis and Clark are collectively referred to herein as the "Clark Defendants."  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.   This  Defendant has purposefully availed himself of the benefits and protections of the laws  of the State of Georgia and could reasonably anticipate being subject to the  jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent  with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

45.     Defendant Atlantic Coast Conservancy, Inc. ("ACC") is a nonprofit corporation organized and existing under the laws of Georgia with its principal place

of business at 72 South Main Street, Jasper, Georgia 30143. ACC has been served in this case.

46. Defendant Robert D. Keller ("Keller") is an individual who, upon information and belief, resides at 4805 Highway 53 West, Jasper, Georgia 30143. This Defendant is or was during the relevant period an employee and/or principal of ACC. Keller has been served in this case. ACC and Keller are referred to herein as the "ACC Defendants."

47. Defendant Georgia-Alabama Land Trust, Inc. f/k/a Georgia Land Trust, Inc. ("GALT") is a corporation incorporated in Georgia with its principal place of business in 226 Old Ladiga Road, Piedmont, AL 36272. GALT has been served in this case. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia. This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction

EXHIBIT D

of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

48.    Defendant AquaFUSION, Inc. ("AquaFUSION") is a corporation incorporated in Virginia with its principal place of business at 10711 Samaga Dr. Oakton, VA 22124. AquaFUSION has been served in this case. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia. This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

EXHIBIT D

49.     Defendant Credo Financial Services, LLC ("Credo") is a limited liability company organized and existing under Georgia law with its principal place of business at 3800 Mansell Road, Suite 150, Alpharetta, Georgia 30022. Credo has been served in this case.

50.     Defendant Oxygen Financial, Inc. ("Oxygen") is a corporation incorporated in Georgia with its principal place of business at 35 Old Canton Street Alpharetta, GA 30009.  Oxygen has been served in this case.

51.     Defendant Cherry Bekaert LLP (f/k/a Conexus CPA Group, LLC) ("Conexus") is a limited liability company organized and existing under Virginia law with its principal place of business at 200 S. 10th St., Richmond, VA 23219. Cherry Bekaert also has an office at 1075 Peachtree Street NE, Suite 2200, Atlanta, Georgia 30309.  In or around August 2020, Cherry Bekaert LLP acquired Conexus CPA Group, LLC, and through this acquisition assumed the liabilities of Conexus CPA Group, LLC, including the claims made in this case.  During the times relevant, Conexus CPA Group, LLC had its principal place of business in Atlanta, Georgia and did business in Georgia that is directly connected to this lawsuit.  Conexus can be served through its registered agent R. Paul Childress, Jr., 200 South 10th St., Suite 900, Richmond, VA 23219.

52.     Defendant Triangle Land Conservancy is a non-profit corporation organized and existing under North Carolina law with its principal place of business

EXHIBIT D

at 1101 Haynes Street, Suite 205, Raleigh, NC 27604.  Triangle Land Conservancy can be served through its registered agent, Chad Jemison, 514 South Duke St., Durham, NC 27701.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

53.     Defendant Foothills Land Conservancy, Inc. ("Foothills") is a Tennessee non-profit corporation with its principal place of business at 3402 Andy Harris Road, Rockford, TN 37853.  Foothills can be served through its registered agent William Clabough, 3402 Andy Harris Road, Rockford, TN 37853.  This Court

27

EXHIBIT D

has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

54.    Defendant Private Client Law Group, PC ("PCLG") is a professional corporation organized and existing under the laws of Georgia with its principal place of business in Atlanta, Georgia.  This Defendant may be served through its registered agent:  Midtown Registered Agent Services, Inc., 75 14th Street, Suite 2200, Atlanta, Georgia 30309.

55.     Defendant Aaron Kowan ("Kowan") is an individual and, upon information and belief, resides at 670 Park Drive, Atlanta, Georgia 30306.  This Defendant is or was during the relevant period an employee, officer and/or director of Private Client Law Group, PC.

56.     Jason Cordon ("Cordon") is an individual and, upon information and belief, resides at 1319 Briardale Lane, Atlanta, Georgia 30306.  This Defendant was during the relevant period an employee, officer and/or director of Private Client Law Group, PC.

57.     Sean Honeywill ("Honeywill") is an individual and, upon information and belief, resides at 458 Seminole Avenue NE, Atlanta, Georgia 30307.  This Defendant was during the relevant period an employee, officer and/or director of Private Client Law Group, PC.  PCLG, Kowan, Cordon, and Honeywill are referred to herein as the "PCLG Defendants."

58.     Defendant Bryan Cave Leighton Paisner LLP (f/k/a Bryan Cave LLP) ("Bryan Cave") is a limited liability company organized and existing under the laws of Missouri with its principal place of business at 211 North Broadway, Suite 3600, St. Louis, MO 63102.  Bryan Cave also operates an office in Georgia at One Atlantic Center, 14th Floor, 1201 W. Peachtree St., NW, Atlanta, Georgia 30309.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant

EXHIBIT D

has done and is doing business in the State of Georgia and maintains a regular place of business.  This Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

59.  Defendant McCalip & Company, Inc. ("McCalip") is a Texas corporation with its principal place of business at 3220 Port Royal Court, Plano, Texas 75093.  McCalip can be served through its registered agent Jerry McCalip, 3220 Port Royal Court, Plano, Texas 75093.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia.  As described hereafter, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional

tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

60. Defendant Dantin Financial, LLC ("Dantin Financial") is a limited liability company organized and existing under the laws of Louisiana with its principal place of business at 9214 Bluebonnet Blvd., Suite C, Baton Rouge, LA 70810. Dantin Financial can be served through its registered agent Stephen Waters, 9214 Bluebonnet Blvd., Suite C, Baton Rouge, LA 70810. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia. As described hereafter, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the

harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

61.    Defendant Chris A. Dantin ("Dantin") is an individual who, upon information and belief, resides at 12201 Myers Park Ave., Baton Rouge, Louisiana 70810. This Defendant is or was during the relevant period an employee and/or principal of Dantin Financial. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia. At all relevant times, this Defendant has done and is doing business in the State of Georgia. As described hereafter, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt. This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of

EXHIBIT D

their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia. This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965. Dantin Financial and Dantin are referred to herein as the "Dantin Defendants."

62.     Defendant Frazier & Deeter, L.L.C. ("F&D") is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1230 Peachtree Street, Suite 1500, Atlanta, Georgia 30308. F&D can be served through its registered agent Jeremy Sperring, 1230 Peachtree Street, Suite 1500, Atlanta, Georgia 30308.

63.     In additional the bases of personal jurisdiction outlined above, the Defendants conspired with one another to commit torts that were directed at and harmed Georgia residents. Consequently, the Defendants have purposefully availed themselves of the benefits and protections of the laws of the State of Georgia and could reasonable anticipate being subject to jurisdiction of court of the State of Georgia.

### III.
## FACTUAL BACKGROUND

64.     Plaintiffs, on their own behalf and on behalf of the Class, seek the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy by bringing claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, violations of the Georgia RICO statute, O.C.G.A. § 16-4-1, *et seq*., fraud, breach of fiduciary duty, professional malpractice, negligence, negligent misrepresentation, and civil conspiracy.     Plaintiffs and the Class seek compensatory and punitive/enhanced damages against Defendants for damages arising from the SCE Strategy that the Defendants and Other Participants jointly and in concert developed, promoted, sold, and implemented.

**A.     The history and purpose of conservation easements.**

65.     A conservation easement is an agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

66.     In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property.   The Code provides for certain exceptions where a

deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

67.    A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes.  Before a deduction can be claimed, however, certain criteria must be met.  As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**B.    The IRS warns the Defendants regarding potential abuses of syndicated conservation easements.**

68.    As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated (IRS News Release, IR-81-122).  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  And because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and attempt to rely on the "audit lottery" to conceal the inflated charitable contribution deduction from the IRS. Because of these concerns, the Senate Finance Committee made it clear to

professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

69. Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA"). DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under § 170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under § 170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations.

70. The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA § 155(a). The relevant regulation reiterates that no deduction under IRC § 170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary (Form 8283) must include, specifically including the identification of the cost basis of the property.

EXHIBIT D

71.     These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

72.     In 2004,[6] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues.  At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

73.     In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

---

[6] *See* IRS Notice 2004-41 (July 12, 2004).

37

74.     Even in the face of these warnings, the Defendants and the Sponsors continued to aggressively promote and heavily profit from conservation easements. In fact, Defendants eventually moved into syndicated conservation easements, which greatly expanded the "market" for these Defendants by now making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

75.     In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price.  In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions.  Specifically, the Notice listed transactions where members in pass-through entities receive promotional materials offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution. Although the MMM Defendants did not advise Plaintiffs that they anticipated the IRS would designate the SCE Strategy as a listed transaction, in December 2016, after the Notice was issued, the MMM Defendants, and specifically Tim Pollock, indicated that the "listed transaction announcement was always anticipated."  As later described herein, the Strategic Defendants, Bridge Defendants, Nelson Mullins and the accountants and firms that prepared Plaintiffs' tax documents also knew in

advance of and after the issuance of Notice 2017-10 that it would have a significant and negative impact on the SCE Strategy.

76.    By 2019, the IRS added syndicated conservation easement transactions (like the SCE Strategy) to its "Dirty Dozen" list of tax scams to avoid.  *See* https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid.

77.    Most recently, on June 25, 2020, the IRS stated in IR-2020-130 that it "will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

**C.    Defendants jointly develop, promote, sell, and implement the SCE Strategy.**

78.    In the face of IRS warnings and escalating government scrutiny, Defendants were undeterred in their commitment to develop, promote, sell, and implement the SCE Strategy.  Defendants believed, erroneously, that they could use their collective expertise to structure and implement the SCE Strategy in a way that would evade or at least overcome IRS scrutiny.  To that end, Defendants agreed to a particular structure for the SCE Strategy and to each carry out their assigned roles in implanting the SCE Strategy.

39

EXHIBIT D

1.      **The structure of the SCE Strategy.**

79.      The SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (*i.e.*, the "Syndicates").   To achieve this end, Defendants formed the Syndicates as limited liability companies ("LLCs")[7] under state law, which are taxed as a partnership (*i.e.* a pass-through entity) for federal tax purposes.  The Defendants' use of LLCs allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate in a conservation easement transaction.

80.      An entity taxed as a partnership (like an LLC) is not liable for income tax.  Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to the partners from the partnership.  Under the Code, charitable contributions are one item that flow through to the individual partners.

81.      Although a partnership does not pay federal income tax, it still has filing and reporting requirements.  Specifically, a partnership is required to file an annual

_____

[7] Though uniformly employed in the SCE Strategy transactions, the LLCs used here were not essential to the conservation easement transactions, which could have been structured differently, such as by using "fractional undivided interests" in the eased real estate. *See Clamping Down on Conservation Easement Shelters*, TAX NOTES (Sept. 8, 2020) ("A partnership is a handy vehicle to whack up ownership of a parcel of land into smaller salable pieces. But there's nothing in a conservation easement shelter that requires a partnership. …. Investors could just as easily accomplish the goal using an agent, or as tenants in common in the parcel.").

return on Form 1065 that reports the partnership's income, deductions, gain, losses, etc.  The partnership is also required to furnish statements, called K-1s, to its members (with copies to the IRS) that report *inter alia* each member's distributive share of partnership income or loss and separately stated items.

82.     The members are then required to report on their individual tax returns their share of the partnership income, loss, and/or separately stated items as they are contained on the K-1s provided to them by the partnership.  In the case of the SCE Strategy, the Plaintiffs and the Class (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the K-1 they received from the respective Syndicate in which they were a member, as required by law.  Certain co-conspiring accountants and accounting firms prepared the Syndicate returns and the K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants and the Other Participants.

### 2.     The steps of the SCE Strategy.

83.     The Defendants planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in virtually every material way:

(a)     A "Sponsor" (including but not limited to the Strategic Defendants or a Strategic-owned affiliate) obtains a majority interest in property from a third party ("Landowner").  This is accomplished through a

series of steps: (1) the Sponsor creates a limited liability company ("PropCo");
(2) at the time PropCo is formed, Landowner is the 100% owner of PropCo
and Landowner then deeds land into PropCo; and (3) the Sponsor (or its
affiliate) purchases a majority interest (usually around 98%) in PropCo from
Landowner.[8]

(b)     Depending on the size of the property or properties, these
Defendants agree to subdivide or combine the properties to create multiple
parcels of several hundreds of acres each so that each parcel can be used in its
own SCE Strategy transaction and multiple SCE Strategy transactions can be
promoted from a single piece of property.

(c)     Once the property is identified and agreement obtained from the
landowner, the Sponsor purports to conduct a "due diligence" period, the true
purpose of which is to put together the information and documents necessary
to promote the SCE Strategy (the "Promotional Materials").  The tasks that
are performed include:

      i.     The Sponsor obtains an initial appraisal ("Initial
Appraisal") of the land from one of its hand-picked appraisers (the
"Appraiser") to assess the land for its alleged intended purpose, as

---

[8] In some instances, as described in more detail below, the Strategic Defendants did
not employ the extra step of using a PropCo; rather, they purchased the property
through a single LLC, which owned the land and sold interests to investors.

EXHIBIT D

explained below.  The Initial Appraisal purports to provide a valuation based on the Highest and Best Use (also referred to as the "HBU") of the land.  But the Sponsor predetermines and directs the Appraiser to provide a valuation in a range that will coincide with an amount that will generate tax savings in excess of the amounts invested by the Syndicate members or to use a specific methodology (*e.g.,* HBU based on mining) that will accomplish that same goal.  The Appraiser uses his expertise to manipulate applicable rules and concepts for land appraisals to reach the desired valuation.  The Appraisers were fully aware the Initial Appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs and members of the Class.

ii.    The Sponsor engages consultants (*e.g.,* a land development or mining consultant) to purportedly assess the property for possible development.  The development plan is a ruse, intended to substantiate the overstated HBU conveyed to the Syndicate members in the Initial Appraisal and for Defendants to deceive the IRS as to a purportedly legitimate land-use option.

iii.    The hand-picked tax attorney prepares a tax opinion letter affirming the legality of the SCE Strategy and the promised tax

benefits.  The attorney also prepares and assists with the preparation of the necessary corporate, real estate, and other transactional documents needed to implement the SCE Strategy.[9]

iv.     The Sponsor (or its affiliate), in most cases, forms a second limited liability company (the "Syndicate") and sends glossy marketing materials for distribution to potential participants.  These Promotional Materials include the Initial Appraisal and are intended to lure potential targets into participating in the SCE Strategy.  In the Promotional Materials, the Defendants also specifically tout the tax benefits of a conservation easement for potential participants, promising them a legal return of more than 2.5 times the amounts paid into the Syndicate.

(d)     The Sponsor, either directly or through a trusted local professional who agrees to refer SCE Strategy participants to the Sponsor, promotes the SCE Strategy and sends the jointly prepared Promotional Materials and other communications to convince potential participants to undertake the transaction.

---

[9] For some of the Syndicates, the Sponsor also had another law firm prepare a "due diligence report" for each Syndicate member purporting to analyze and identify any issues with the opinion letter and appraisal.

44
EXHIBIT D

(e)     The Sponsor obtains for the Syndicate the subject property from the Landowner in a series of steps and usually through the use of a PropCo.

(f)     After the participants join their respective Syndicate, the Sponsor (or its affiliate) offers all but a small portion of its interest in PropCo to the Syndicate in exchange for cash.  The end-result is PropCo (which holds the critical property) is owned mainly by the Syndicate and partially by the Sponsor (or its affiliate) and Landowner.

(g)     The Sponsor prepares a purported development plan for the property and presents it to the Syndicate members.  The Syndicate members are asked to vote on whether to pursue a development plan or a conservation plan.  Based on material misrepresentations by the Defendants, the fact that only the conservation plan offers an immediate return that requires no additional capital outlay, and the bogus Initial Appraisal's valuation of the easement donation, the Syndicate members vote in favor of the conservation plan.

(h)     The following Defendants finalize the necessary implementation documents for the SCE Strategy, all purportedly on behalf of the Syndicate:

    i.     The Appraiser prepares an allegedly qualified appraisal, which supports the decision in favor of the conservation plan and determines the value of the conservation easement.  The Appraiser

45

represents that the qualified appraiser meets certain requirements in the Code and IRS regulations when, in fact, it does not, and the Appraiser knows that fact.

ii.   The Defendants prepare a Conservation Easement Deed.

iii.   The Defendants prepare a Baseline Documentation Report for the Syndicate, which allegedly ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

(i)   PropCo (or the Syndicate in some cases) then donates a conservation easement or a fee simple interest in the land with the easement already attached to a land trust (the "Land Trust").

(j)   The Conservation Easement Deed is executed by the grantor and grantee and recorded with the relevant State.

(k)   The Land Trust issues to the Syndicate or PropCo a contemporaneous written acknowledgment of the conservation easement donation and represents that no goods or services were provided in exchange.

(l)   A hand-picked accountant prepares the Syndicate's tax return, reporting the donation of the conservation easement as a charitable contribution deduction and representing its value (the purported decrease in the property's appraised value resulting from the restriction placed on the

46

property by the conservation easement) according to the Appraisal. The accountant allocates this deduction to each Syndicate member on a Schedule K-1 based on his respective ownership interest in the Syndicate and directs each Syndicate members to report their allocated deduction on their individual tax return.

**3.    The SCE Strategy "players."**

84.    <u>The Sponsor – The Strategic Defendants</u>:  The Strategic Defendants, and specifically Novak and Freeman, were the developer and sponsor of SCE Strategy transactions at issue in this lawsuit.

85.    Novak and Freeman are the managing partners of the Strategic Group of Companies, which includes Strategic.  Over the years, Novak and Freeman purport to have marketed tax solutions that promote green, sustainable, and socially responsible initiatives.  Freeman and Novak advertised that they have served numerous banks, investors, and Fortune 500 companies.

86.    Novak earned a degree from Georgia Institute of Technology and a JD from Emory University's School of Law with a concentration in tax and real estate law.  He previously worked at top-notch accounting firms like Arthur Andersen and Deloitte & Touche.  Novak worked on numerous tax-deferred like-kind exchanges under Section 1031 and was, thus, familiar with tax-advantaged real estate deals.  He

is a member of the Georgia Bar and has served on the Board of Directors for the Atlanta Bar Association.

87.    Freeman earned a degree from the University of North Carolina at Chapel Hill as well as a Master of Accounting from North Carolina's Keenan-Flagler School of Business with a concentration in tax and real estate.  He later received an MBA from Duke University's Fuqua School of Business.  He is a licensed CPA in various states.  He, like Novak, previously worked at Arthur Andersen and Deloitte & Touche.  Freeman has served as the Chairman of the Georgia Society of CPAs.

88.    Novak and Freeman touted their expertise and credentials to convince potential investors to undertake SCE Strategy transactions and to further provide a veneer of legitimacy to the transactions.

89.    As the Sponsor, the Strategic Defendants worked on every aspect of each Syndicate's transaction, including:   the acquisition of real estate and preparation of all legal documents related thereto; preparation of the legal documents used to implement the transaction; preparation of the Promotional Materials; promotion and sale of the SCE Strategy to potential participants, including advising Novak and Freeman's referral sources (among others Credo and Oxygen) to refer clients to the Strategic Defendants and communications with potential participants and/or their advisors to convince the potential client to participate; preparation of legal opinions issued to Syndicates; review and approval of the reports from

AquaFUSION and other consultants; structure of the conservation easement; preparation of the Conservation Easement Deed, Baseline Documentation Report, Appraisals (including the Appraisal methods, HBU, and valuation of the property and conservation easement), and Appraisal Summary (Form 8283); and review and approval of the reporting of the charitable contribution deduction on the partnership returns and K-1s.

90.     The Strategic Defendants also helped assemble the cast of professionals that would purport to advise and guide Plaintiffs and the Class through the SCE Strategy.

91.     Each Syndicate paid Strategic two consulting fees—one for developing the SCE Strategies and the second for management consulting services for five years.  Each Syndicate also paid Strategic a percentage of operating reserves for Strategic's ongoing escrow services.  In addition, each Syndicate reimbursed the Strategic Defendants for certain expenses incurred in the development and implementation of the Syndicate.

92.     <u>The Placement Agent – The Bridge Capital Defendants</u>:  The Strategic Defendants used their affiliate entity, Bridge Capital, to act as the placement agent for the Strategy.  Novak and Freeman are or were principals of Bridge Capital.  The Bridge Capital Defendants helped prepare the Promotional Materials and coordinated the investment by Plaintiffs and other Class Members in the Syndicates.

49

93.     Each Syndicate paid Bridge Capital a commission based on the gross proceeds of the investment, which in most cases amounted to hundreds of thousands of dollars.  The principals of Bridge Capital, including Novak and Freeman, were entitled to receive the bulk of these commissions.  Bridge Capital also received an interest in the Syndicate upon closing and could sell that interest or assign it to Bridge Capital principals, including Novak and Freeman.

94.     <u>The Attorneys – The MMM Defendants, PCLG Defendants, Nelson Mullins, and Bryan Cave</u>:  The MMM Defendants and PCLG Defendants had multiple roles and responsibilities in the SCE Strategy but were also architects of the SCE Strategy.  Nelson Mullins and Bryan Cave also had multiple roles and responsibilities in the SCE Strategy.

(a)     <u>The MMM Defendants</u>.  In approximately 2008, Pollock, a partner of MMM at the time, developed a tax product that used a partnership with third-party members to monetize deductions and state tax credits from the donation of a conservation easement on real estate owned by the partnership.  This product was the SCE Strategy.  According to Pollock, "if a land owner does not have taxable income sufficient to utilize the full benefit of a conservation easement, the unused deductions and state tax credits can be converted into cash by creating a partnership with third-party investors or

50

admitting investors into an existing partnership that owns the land and specially allocating the deductions and credits to the investors."

(b)    After developing the SCE Strategy, the MMM Defendants aggressively promoted it at seminars and workshops around the country to landowners, professional advisors who could serve as referral sources, and potential participants.  The MMM Defendants became the "go to" law firm for the SCE Strategy.  Their early promotional efforts spawned an entire industry and a robust market for the SCE Strategy.  These efforts also generated large revenues for MMM from 2009 through 2018.

(c)    Pollock also personally participated in the SCE Strategy through transactions offered by promoters other than Strategic.  In fact, he was a member of several Syndicates alongside other members whom he played a role in convincing to participate.  Despite this clear conflict of interest, Pollock did not disclose to participants of the SCE Strategy that he was also a participant in other similar transactions.

(d)    For many of the Syndicates, the MMM Defendants prepared a legal opinion letter, which purported to provide the legal justification for the SCE Strategy.  The MMM Defendants also served as legal counsel for certain Syndicates.  In this role, the MMM Defendants provided legal advice and services to the Strategic Defendants and members of the Syndicates (*i.e.*,

EXHIBIT D

Plaintiffs and Members of the Class) regarding the SCE Strategy, including structuring and implementing the transaction, preparing and reviewing transactional documents, and providing other due diligence on the bona fides of the purported tax benefits of the SCE Strategy.  The MMM Defendants also served as the escrow agents for investment funds wired by certain Plaintiffs and Members of the Class.

(e)     MMM was paid a flat fee for each Syndicate for its role in helping develop the Strategy, its due diligence services, and its legal opinion letter.  In most cases, this flat fee amounted to over $100,000.  MMM was also paid an hourly fee for the time it spent provided additional legal services.

(f)     <u>Nelson Mullins</u>.  For the DeSoto Syndicate, Nelson Mullins provided alleged "due diligence" and issued a report for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected.  Although it purported to identify issues with the main opinion letter and Appraisal, it failed to disclose material facts to the clients, including the central issue of the Appraisal's overvaluation.  Instead, Nelson Mullins hid behind various assumptions that it knew to be false and purported to disclaim any knowledge or responsibility for those assumptions in direct violation of its duties to its clients.  Upon

information and belief, Nelson Mullins issued due diligence reports for other Syndicates in which Class members participated.

(g)     For the Rock Spring Syndicate, Nelson Mullins prepared the main legal opinion letter, which purported to provide the legal justification for the SCE Strategy.  When it functioned as the main legal opinion letter writer, Nelson Mullins simply copied large portions of the opinion letters written by the MMM Defendants without disclosing that fact to the clients and while charging the clients or Syndicate as if they had prepared the letter from scratch.  Nelson Mullins issued legal opinion letters for other Syndicates in which Class Members participated.

(h)     Nelson Mullins was paid a flat fee for each Syndicate for its role in helping develop the Strategy, its due diligence services, and its legal opinion letters.  In the case of their due diligence reports (as described later in the Complaint), the applicable Syndicate paid Nelson Mullins their fee out of the proceeds from the transaction closing.  Nelson Mullins was also paid an hourly fee for the time it spent provided additional legal services.

(i)     PCLG Defendants.  For the Vista Hill Syndicate, the PCLG Defendants provided alleged due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected.  Although it

53
EXHIBIT D

purported to identify issues with the main opinion letter and Appraisal, it failed to disclose material facts to the clients, including the central issue of the Appraisal's overvaluation.  Instead, the PCLG Defendants hid behind various assumptions that it knew to be false and purported to disclaim any knowledge or responsibility for those assumptions in direct violation of its duties to its clients.   The PCLG Defendants issued due diligence reports for other Syndicates in which Class members participated.

(j)     The PCLG Defendants were paid a flat fee for each Syndicate for its role in helping develop the Strategy and its due diligence services.  The PCLG Defendants were also paid an hourly fee for the time it allegedly spent providing additional legal services.

(k)     <u>Bryan Cave</u>.  For the Vista Hill Syndicate, Bryan Cave prepared the main legal opinion letter, which purported to provide the legal justification for the SCE Strategy.

(l)     Bryan Cave was paid a flat fee for its role in drafting and issuing the main opinion letter for the Vista Hill Syndicate.  Bryan Cave was also paid an hourly fee for the time it spent provided additional legal services.

95.   <u>The SCE Appraisers – The Van Sant Defendants and the Clark</u> <u>Defendants</u>:   The SCE Appraisers include but are not limited to the Van Sant

54

Defendants and the Clark Defendants (the Van Sant Defendants and the Clark Defendants are collectively the "Appraisal Defendants").

96.     The Appraisal Defendants provided the following services to each Syndicate: determined the HBU for the properties based on implausible consulting reports about a hypothetical development of the land; prepared the appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates); permitted the front-line promoters of the SCE Strategy to utilize their appraisals in the Promotional Materials for the purpose of convincing potential participants that the SCE Strategy provided legal and legitimate tax savings through the contribution of a conservation easement; and signed the Appraisal Summary (Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction in the years in which their appraisal was used to support the charitable contribution deduction provided by the SCE Strategy.

97.     The Appraisal Defendants received substantial fees for their appraisal work and their work on the Forms 8283.

98.     The Clark Defendants:  Clark is an Alabama-based real estate appraiser. Clark advertises that he and his firm have completed over 200 conservation easement appraisals.   He promotes his services through speaking engagements and conservation easement seminars.

(a)     In recent years, the Clark Defendants have come under heavy scrutiny from the federal government over their role as Appraisers for the SCE Strategy.  For example, the United States government filed a lawsuit against Clark (and other SCE Strategy sponsors and promoters), seeking to enjoin them from organizing, promoting, or selling SCE Strategies that inflate the appraised value of the underlying real estate.  *See United States v. Zak, et al.*, No. 1:18-cv-5774-AT, in the United States District Court for the Northern District of Georgia, Atlanta Division.  The lawsuit, filed in this Court, alleges that since 2009, Clark organized, promoted, or sold (or assisted in the organization, promotion, or sale of) 70 SCE Strategy transactions that resulted in over $3 billion worth of federal tax deductions.  The lawsuit also alleges that Clark's average fee was over $43,000 per conservation easement appraisal, which amounts to over $3 million in fees for the 70 SCE Strategy transactions identified by the lawsuit.

(b)     On or about January 11, 2019, the Alabama Real Estate Appraiser Board filed a disciplinary action against Clark related to his appraisal for a conservation easement syndicate located in Alabama.  *See In the Matter of the Complaint against Claud Clark, III*, No. AB 16-15, State of Alabama Real Estate Appraiser Board.  The disciplinary complaint alleged that he made a number of egregious errors in his appraisal, including, *inter*

*alia*: (a) improperly using a Discounted Cash Flow Analysis for the "before" valuation to overstate the value of the real estate, (b) failing to use comparable sales of real estate in the area as a method of valuation, and (c) failing to consider the amount of capital needed to extend existing sewer/public utilities and roads to the property.  On or about May 16, 2019, Clark voluntarily surrendered his Alabama real estate appraiser license in response to the disciplinary action and in lieu of a hearing on the action.

(c)     On or about February 27, 2020, the Florida Real Estate Appraisal Board revoked Clark's license based on the Alabama disciplinary proceeding and voluntary surrender of his license there.

99.     <u>The Van Sant and Wingard Defendants</u>:  The Van Sant and Wingard Defendants are no strangers to litigation regarding conservation easements.  Van Sant and Wingard have both testified to inflated values of conservation easements in United States Tax Court which were roundly discredited and rejected by the Tax Court.

(a)     In *Plateau Holdings, LLC, et al. v. Commissioner*, Docket No. 12519-16, Van Sant and Wingard submitted a joint report and testimony at trial regarding the value of the conservation easements at issue in that action. Consistent with their falsely inflated Appraisal at issue in this action, Van Sant and Wingard selected four purportedly "comparable" properties, only one of

which was located in the same state as the subject property. Tax Court Memo 2020-93, filed June 23, 2020. The Tax Court noted that "Messrs. Wingard and Van Sant adjusted [the] sales prices [of the comparable properties] to reflect the differences between the four properties and the subject Property in terms of location, size, road frontage, topography, and other factors." It went on to conclude that "[m]ost of these adjustments appeared subjective and arbitrary, lacking any solid support in market data." Van Sant and Wingard asserted that the comparable properties were inferior to the subject property. The Tax Court concluded that such an assertion was unfounded. Van Sant and Wingard further ignored a 98.99% change in ownership in the entity that owned the subject property which was effectively a sale of the property shortly before the conservation easements at issue were donated, which transaction should have been considered as a sale of the subject property. But Van Sant and Wingard never included that sale in their Appraisal. Van Sant also admitted that he was aware of prior sales of acreage included within the subject property but excluded them from his analysis. In completely rejecting their analysis, the Tax Court stated that [w]e give no weight to the opinion of [Van Sant and Wingard]", noted that they were aware of the prior sales but addressed none of them, and that "[w]e found their explanations for that failure to be wholly unpersuasive." It further noted that "[t]hree of the

properties that Messrs. Wingard and Van Sant chose as comparables were anything but comparable" and that their price adjustments were "mostly beneficial to the petitioner" and "struck the Court as subjective and arbitrary, lacking any solid basis in market data."

(b)     In *TOT Property Holdings, LLC, et al. v. Commissioner*, Docket No. 5600-17, Wingard submitted a report and testimony at trial regarding the value of the conservation easement at issue in that action. Wingard asserted in *TOT Property Holdings* that that the highest and best use of the subject property was "low density, destination mountain resort residential development." Order dated December 13, 2019, adopting Bench Opinion dated November 22, 2019. However, the Tax Court stated that "[t]he evidence in the record contradicts Mr. Wingard's conclusion regarding the property's use", explaining that "[t]he evidence—including the photographs in his own report—showed that the subject land is not mountainous and has no significant physical features such as vistas or lake views that would lend itself to such a purpose." The Tax Court rejected Wingard's comparisons to his chosen "comparables". Further, the Tax Court noted critically that Wingard was aware of a change in ownership of 99 percent of the entity that owned the subject property days before the contribution of the conservation easement but did not take that sale into consideration when determining the value of the

subject property.  Rejecting Mr. Wingard's valuation, the Tax Court stated that "[w]e found his valuation to be greatly inflated."  The Eleventh Circuit has recently affirmed the Tax Court's decision.

100.  <u>The Land Trusts – The ACC Defendants, GALT, Triangle Land Conservancy, and Foothills</u>:  The Land Trusts—who include but are not limited to the ACC Defendants, GALT, Triangle Land Conservancy, and Foothills—are nonprofit organizations that accepted the conservation easement or fee simple donations and prepared or coordinated preparation of various transactional documents necessary to substantiate the SCE Strategy (the ACC Defendants, GALT, Triangle Land Conservancy, and Foothills are collectively the "<u>Land Trust Defendants</u>").

101.  The ACC Defendants had a long-standing relationship with the MMM Defendants.  Based on information and belief, ACC's business from approximately 2010 through 2018 was almost exclusively related to conservation easement syndications.  Pollock had hand-picked Keller and ACC to work on Pollock's team. This relationship, and later the relationship between the ACC Defendants and the Strategic Defendants was highly lucrative for ACC.  Keller has been labeled by one national publication as the "[m]ost prominent among the renegade land-trust leaders," as well as someone known to accept easements that other groups had

refused due to excessive valuations.[10] That same publication indicates that "ACC oversees 80,000 acres of conserved land in 11 states" and that "a sampling of deal documents suggests it took easements and land donations responsible for as much as $1 billion in write-offs in 2017."  ACC's application to become an accredited member of the Land Trust Alliance—a Washington DC-based association of old-guard land trusts who are critical of syndicated transactions—was withdrawn.  In the words of Keller himself, he withdrew the application because "it was clear 'they were not going to let us through,'" due to disagreements about ACC's failures to question appraisers about excessive valuations being done in a short period time on easements ACC had been accepting.[11]

102.   The Land Trust Defendants provided the following services to each Syndicate:

(a)    worked with the Strategic Defendants as well as the MMM Defendants, Nelson Mullins, and other legal counsel to prepare the Conservation Easement Deeds;

---

[10]   *See* "The Billion-Dollar Loophole" (December 20, 2017) at https://www.propublica.org/article/conservation-easements-the-billion-dollar-loophole/amp (written in collaboration with *Fortune*) ("Billion Dollar Loophole").

[11] The Billion Dollar Loophole.

EXHIBIT D

(b)     prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of the "conservation purposes" defined under § 170 of the Code;

(c)     allowed the other Defendants to use the conclusions reached in these preliminary studies in the Promotional Materials sent to potential participants;

(d)     worked with the Strategic Defendants as well as the MMM Defendants, Nelson Mullins, and other legal counsel to prepare the Baseline Documentation Reports, which were filed with each Syndicate's Appraisal Summary (Form 8283) and tax return;

(e)     provided a letter to each Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated; and

(f)     countersigned the Appraisal Summaries (Form 8283) verifying that the charitable contribution deduction complied with Code Section 170(h) of the Code.

103.   The Land Trust Defendants received the conservation easement donations, fee simple donations, and, in some cases, stewardship fees for their role in the scheme.

104.   <u>The Return Preparers – The Langford Defendants, Bennett Thrasher, F&D, and Conexus</u>:  The Return Preparers—who include but are not limited to the Langford Defendants, Bennett Thrasher, F&D, and Conexus—are the accounting firms and accountants who prepared the partnership returns for each of the Syndicates used in the SCE Strategy, as well as the K-1s that were sent to each Plaintiff and member of the Class that set forth each such individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns (the Langford Defendants, Bennett Thrasher, F&D, and Conexus are collectively the "<u>Return Preparer Defendants</u>").   These firms and accountants prepared these partnership tax returns and K-1s with full knowledge of the fact that these documents were being used in connection with the SCE Strategy and would result in the Plaintiffs and members of the Class claiming charitable contribution deductions from the SCE Strategy on their individual tax returns.

105.   Bennett Thrasher was no stranger to the SCE Strategy when it began preparing returns for the Syndicates at issue in this lawsuit.   Indeed, Bennett Thrasher had previously and aggressively referred many of its existing clients to participate in SCE Strategy transactions with a different sponsor than Strategic by misusing the clients' confidential financial information to identify potential targets. For those transactions, Bennett Thrasher emphasized to its clients that it had performed purported due diligence on the SCE Strategy and concluded that the

EXHIBIT D

Strategy complied with applicable laws and that the deductions generated were specifically allowed by the Tax Code. Bennett Thrasher also provided advice and recommendations to the other sponsor about how to structure the transaction and value the underlying mineral assets used to improperly inflate the appraisals.

106. The Return Preparer Defendants were paid substantial fees by the Syndicates for their accounting work.

107. <u>The Consultants – AquaFUSION and McCalip</u>: The Consultants—who include but are not limited to Defendants <u>AquaFUSION</u> and McCalip—are the professionals and firms that purportedly completed assessments of certain parcels of land used in the SCE Strategy to determine the merits of a purely hypothetical development of each such parcel and/or to support the HBU for the property. These consulting reports were then blindly relied on by the Appraisal Defendants to determine an implausible HBU for the relevant property, which was used in the Appraisals and for determining the value of the conservation easement.

108. <u>The Local Promoters – Oxygen, Credo, and the Dantin Defendants</u>: These are the professional firms who worked with the Strategic Defendants and other Defendants to identify and refer their clients to Strategic for participation in an SCE Strategy transaction. These firms leveraged their trusted status as a long-time advisor to these clients to dupe them into undertaking an SCE Strategy. In many cases, the clients would not have undertaken an SCE Strategy without the

recommendation and blessing of these Local Promoters.  Specifically, Oxygen referred the Greiners to Strategic for the Turtle River Syndicate and other transactions, Credo referred Spratt to Strategic for the Turtle River Syndicate and other transactions, and the Dantin Defendants referred Agnew to Strategic for the Vista Hill Syndicate and other transactions.  Oxygen, Credo, and the Dantin Defendants referred other clients to the Strategic Defendants for SCE Strategy transactions.

109.   Credo was paid referral fees or other consideration for its referrals.

110.   The PropCos:   These are the entities that, in some Syndicates, purchased the real estate used in the SCE Strategy.  All of the PropCos were originally formed by the Strategic Defendants or their affiliates.  The PropCos for the transactions in which the Plaintiffs participated were DeSoto Holdings, LLC (property in Shelby County, Alabama), Bear Creek LH Holdings, LLC (property in Coweta County, Georgia), and Rock Spring, LLC (property in Morgan County, Alabama).  For some of the Syndicates, such as the Turtle River Syndicate and the Vista Hill Syndicate, the Strategic Defendants did not use a separate PropCo but instead used the Syndicate to purchase and hold the real estate.

111.   The Syndicates: These are the entities through which Plaintiffs and the Class participated in the SCE Strategy.  All of these Syndicates were originally formed by the Strategic Defendants or one of their affiliates.  The Syndicates for the

transactions in which the Plaintiffs participated were DeSoto Investors, LLC (the "DeSoto Syndicate"); Turtle River Properties, LLC (the "Turtle River Syndicate"); Bear Creek Investors, LLC (the "Bear Creek Syndicate"); Rock Spring Investors, LLC (the "Rock Spring Syndicate"); and Vista Hill Investments, LLC (the "Vista Hill Syndicate").

112.    The Managers:  These were all entities created by, affiliated with, and controlled by the Strategic Defendants or one of its affiliates to act as managers for each Syndicate and take the necessary actions on behalf of each such Syndicate to effectuate the steps of the SCE Strategy.  The Managers for the transactions in which the Plaintiffs participated were Strategic Red Mountain, LLC and Strategic Fund Manager, LLC (for the DeSoto and Rock Spring Syndicates), Strategic Fund Manager, LLC and Harold Barry (for the Bear Creek Syndicate), MM Bulldawg Manager, LLC (for the Turtle River Syndicate), and Bobby A. Branch (for the Vista Hill Syndicate).

113.    In accordance with their pre-planned scheme, the Defendants and Other Participants worked together to promote and sell the SCE Strategy to potential clients, including Plaintiffs and the Class Members, and then jointly worked together to execute the steps of the SCE Strategy.  The Defendants and the Other Participants never disclosed to Plaintiffs that they had conspired to fraudulently, recklessly, or

negligently design, promote, sell, and implement the SCE Strategy.  Nor did they

disclose to the Plaintiffs that they were in no way independent from each other.

**D.      The Plaintiffs engage in the SCE Strategy.**

      **1.      Hoover engages in the DeSoto Syndicate Transaction in 2016.**

114.   The Strategic Defendants were the chief promoters of the DeSoto

Syndicate Transaction and marketed and coordinated all aspects of the transaction.

The individuals and entities listed below were part of Strategic's "team" (and co-

conspirators with the Strategic Defendants) to the transaction and undertook the

following roles:

| Participant | Role |
|---|---|
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| ACC Defendants | Accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deeds of conservation easement, signed the Form 8283, and acknowledged acceptance of the donation. |
| The Clark Defendants | Provided an appraisal of the property for the conservation easement donation, which appraisal relied solely on the conclusions from AquaFUSION's consulting report regarding the |

| | purported feasibility of developing the property for mining. |
|---|---|
| MMM Defendants | Provided due diligence, reviewed transactional structures, and issued a legal opinion letter purporting to support the bona fides of the transaction. |
| Defendant Nelson Mullins | Provided alleged due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected. |
| Defendant Bennett Thrasher | Provided tax preparation services in connection with the transaction.[12] |
| Defendant AquaFUSION | Prepared a Preliminary Greenfield feasibility report, purporting to describe certain factors affecting the development of the property into a limestone mine, which report was relied upon by the Clark Defendants as the sole support for their |

---

[12] Based on the facts currently known, it is also likely that Bennett Thrasher prepared tax returns for the two adjoining tracts described later in this section.

EXHIBIT D

| | conclusion that mining was the HBU of the property. |
| --- | --- |

### a. Background on the DeSoto Property.

115. The DeSoto Syndicate Transaction involved a 161-acre tract located in Shelby County, Alabama, near the Coosa River and the Town of Harpersville (about 35 miles from Birmingham) (the "DeSoto Property"). At the time of its acquisition and the Appraisals, Baseline Documentation Report ("BDR"), and Deed discussed later, the DeSoto Property was cultivated farmland (or "greenfield" property as noted in the title of and throughout the Preliminary Mining Report). The DeSoto Property was part of a 500-acre property, which was ultimately subdivided to yield three contiguous properties. These same Defendants syndicated those three properties into separate SCE Strategy transactions. The other two properties were tracts of roughly the same size—the Bradford tract (to the west), acquired and syndicated on the same timeline as the DeSoto Property, and the Tanyard tract (to the east), acquired at the same time but not "eased" until November of 2017. Each of these tracts adjoins the DeSoto Property. All three tracts were derived from two contiguous properties[13] totaling 500 acres that were purchased from Merrell Brothers, Inc., an Indiana farming corporation, by DeSoto Holdings and two other

---

[13] The DeSoto and Tanyard tracts were subdivided out of the same parent tract.

EXHIBIT D

Strategic affiliates (Tanyard Farm and Bradford Resources). Merrill had acquired the acreage for $1.2 million (or $2,400 per acre) in 2010.[14] The Defendants obliquely mentioned the original 500-acre tract in some of the Promotional Materials but wholly failed to explain how the presence of the subdivided, adjacent tracts that were purportedly for the same use as the DeSoto Property on roughly the same timeline could negatively impact the ability to develop the DeSoto Property into a mine or establish a conservation easement on the Property.

116.    The Defendants also did not disclose that White Rock Quarries, LLC— a professional mining company based in Florida with a 25-year history, and a major provider of high-quality DOT-certified crushed limestone—had acquired in 2009 a 900-acre site that was only 4.5 miles away (and closer to Birmingham) for the purpose of limestone mining. This fact was highly relevant given that the alleged HBU of the DeSoto Property was limestone mining.[15] Although re-zoning was approved the next year, litigation ensued over that approval and the impact of the proposed mine over certain historical sites, resulting in lengthy litigation that went

---

[14] Undisclosed to Plaintiffs and the Class, each of the participants listed in the chart above performed virtually identical services in 2016 and 2017 for the adjoining Bradford and Tanyard properties.

[15] Based on the facts currently known, this was likely also the alleged HBU for the Bradford and Tanyard tracts. If it was difficult to justify mining as the HBU and the resulting valuation for one tract, how much more difficult is it to justify each of these for all three tracts?

EXHIBIT D

to the Alabama Supreme Court.  After that litigation was resolved in favor of the quarry and its supporters, hearings on the required water and air permits were held in 2014.  Residents of nearby Vincent and Harpersville attended the hotly contested hearings and focused on a number of issues with the proposed mining operation, including pollution to the Coosa River, potential generation of the carcinogen benzene by the mining process which could infiltrate groundwater, sinkholes generated by the mining, and the fact that 75 large trucks carrying hazardous cargo were projected to traverse local roads daily.  By 2016, the permitting process had been pending for years, at considerable expense.[16]  As of two months ago, White Rock had almost all of its permits but had still not built out for operations.  As of today, White Rock has temporarily abandoned the project.  Thus, after 11 years, White Rock, an experienced mining operator, is not up and running yet and may never be.

**b.    The Defendants market the DeSoto Syndicate Transaction to Hoover and some other members of the Class.**

117.   As part of its promotional pitch, Novak held a conference call on or about November 2, 2016, with Hoover and Hoover's CPA.  During this call, Novak discussed the SCE Strategy, including the basic steps of the transaction and how it was implemented.  He indicated that a specific Tax Code provision provides for a

---

[16] This included a $1.65 million commitment by the quarry to invest in the Town of Vincent.

EXHIBIT D

charitable deduction when a conservation easement is structured and implemented in full compliance with its requirements and applicable regulations. Novak stated that Strategic and its "team" were experts in and very experienced and successful with the SCE Strategy. He explained that his team included not only the experts at Strategic, but also law firms, accounting firms, appraisers, and other consultants who have specific expertise and substantial experience with the SCE Strategy. As a result of this team of experts, he explained that Strategic's SCE Strategy transactions were structured and implemented to meet each and every requirement of the Tax Code.

118. Novak explained that Strategic and its team had already done approximately eighty syndicates and of those, there had only been approximately ten audits, several of those audits ending in "no change" and none with an adjustment in excess of 17%. In addition, he indicated that because of the structure and implementation of the SCE Strategy, a participant in an SCE Strategy would not incur any penalties. Ultimately here, the IRS Final Partnership Administrative Adjustment ("FPAA") has mandated a 100% adjustment—wiping out any deductions for the clients—and assessed significant penalties, in large part due to the gross overvaluations of the Property, as discussed herein.

119. Novak also emphasized that Strategic got two completely independent appraisals for each Syndicate. Further, Novak indicated that Strategic got these two appraisals because it wanted to make sure two independent appraisers had appraisal

EXHIBIT D

values that were very close to one another, which would be evidence that the appraisal used for the syndicate was a legitimate, competent appraisal that would provide strong support for any audit and, if ever audited, the two appraisals would result in the deductions holding up in an audit. In the case of DeSoto Syndicate Transaction, Hoover was unaware of any second appraisal (besides that of the Clark Defendants) and as noted, the IRS FPAA has mandated a 100% adjustment, wiping out any deductions for the clients attributable to conservation easement.

120.   Novak also emphasized that Strategic obtains two legal opinions from prominent law firms for each Syndicate. Here, there was no second tax opinion letter, just the Nelson Mullins "comfort letter", which states on its face that "[a] fully-reasoned legal conclusion…is beyond the scope of this report…."

### c.   The Strategic and Bridge Capital Defendants send Hoover Promotional Materials.

121.   Hoover received Promotional Materials and other solicitations described in detail below from the Strategic and Bridge Capital Defendants in the last quarter of 2016 about participating in the SCE Strategy through the DeSoto Syndicate, a company formed and managed by Strategic or a Strategic-affiliated entity.

122.   The Promotional Materials were designed to convince potential participants that the SCE Strategy provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in

full compliance with Section 170(h) of the Code. The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the DeSoto Syndicate, thus generating enormous fees for the Defendants and Other Participants.

123. Novak sent Hoover a follow-up email to the conference call on November 2, 2016, attaching a "Frequently Asked Questions" .pdf concerning SCE Strategies. The Frequently Asked Questions attachment contained a number of false representations, including:

(a) That "Federal benefits [of SCEs] are typically priced between a 3.5-to-1.0 and a 4.5-to-1.0 ratio," and

(b) That the increased risk of audit from participating in an SCE is not substantial and that if an audit occurs, these factors will mitigate any risk:

i. Strategic's "tax attorneys and CPAs ensure that taxpayers are provided complete, accurate documentation for their tax returns"; and

ii. Strategic's "projects undergo a two-step valuation process which includes having a qualified, experienced, and knowledgeable conservation appraiser prepare the valuation and then

have that appraisal reviewed by a second outside conservation

valuation expert."

124.  The Strategic Defendants knew that these representations in the

Frequently Asked Questions document were false and omitted material information.

For example, they knew that if the IRS audited the transaction, it would disallow the

promised tax benefits.  Moreover, the Strategic Defendants knew that an audit was

a near certainty because of the way they and the other Defendants inflated the

appraised value of the property on the face of the Appraisal Summary.  They also

knew that none of the purported mitigation factors would actually decrease the odds

of an audit and would not actually mitigate against the risk that the IRS would

disallow the deductions.

125.  Novak sent another email to Hoover on December 12, 2016 (on behalf

of Strategic and Bridge), (i) attaching a glossy brochure entitled, "DeSoto Investors,

LLC Offering Summary," and (ii) providing instructions for how to complete the

investment.  The brochure falsely informed Hoover and other members of the Class

that:

> (a)    The business of DeSoto Holdings, LLC was to "hold, mine, and
>
> operate real property," even though the LLC had been formed in October
>
> 2016, held no properties at the time, and once it acquired the DeSoto Property
>
> on December 12, 2016, it only held it for less than two weeks before granting

a conservation easement, and in that period, the Strategic Defendants took no steps to proceed with mining.[17]  It is, thus, reasonable to infer that the Strategic Defendants never intended to develop the Property into a mine; and

(b)    The Strategy would result in "greater free cash," and "philanthropic goodwill from the conservation of natural resources," as well as "mitigate[] [a taxpayer's] overall effective tax rate and tax payments," when the Strategic Defendants knew that none of these results would actually occur unless the IRS did not audit the DeSoto Syndicate Transaction.  In other words, the Strategic Defendants caused Hoover and the Class members to participate unwittingly in the audit lottery.

---

[17] In September of 2016, before even acquiring the Property, the manager of the DeSoto Syndicate received a letter promising zoning from the Mayor of Harpersville. Aside from the non-binding nature of this "promise," the City has no control over the permitting process, which is a state process, and as seen by the White Rock experience described above, far more difficult than the zoning.  In addition, the letter is not clear, but appears to reference the entire 500 acres being purchased, thus bringing into question the issue of whether the alleged economics supporting the DeSoto Syndicate Transaction could possibly apply to all three 150+ acre properties to be mined.

76

EXHIBIT D

126.   The Offering Summary and Case Study also falsely represented that a participant would be entitled to the following tax benefits if they joined the DeSoto Syndicate even though the Strategic Defendants knew the IRS would likely audit and disallow the deductions claimed by Plaintiffs and the other Class members:

| Investment and Benefit Summary | | | | | |
|---|---|---|---|---|---|
| UNITS | INVESTMENT | ALLOCATED FEDERAL DEDUCTION | ESTIMATED CASH VALUE | ESTIMATED CASH RETURN | ESTIMATED NOMINAL RETURN |
| INVESTMENT | | | | | |
| 190 Class A | ($5,415,000) | $22,884,697 | $9,840,420 | $4,425,420 | 82% |
| PER UNIT INVESTMENT | | | | | |
| 1 Class A | ($28,500) | $120,446 | $51,792 | $23,292 | 82% |

127.   Also on December 12, 2016, the Strategic and Bridge Capital Defendants sent an email to Hoover that included a DocuSign link for him to review and sign certain documents in a Private Placement Subscription package.   The package of documents provided to Hoover included at least the following documents:

- A Private Placement Memorandum with various transactional agreements attached;

- A Private Placement Offering; and

- A Subscription Agreement.

128.   The Private Placement Memorandum purported to describe the DeSoto Syndicate Transaction in detail.   The Private Placement Memorandum informed

Hoover and other Class members that the DeSoto Syndicate could choose from one of four options for use of the subject property: (1) establish a limestone quarry on the property, (2) market the property for sale for mining development, (3) hold the property for long-term investment, or (4) conserve the property by contributing a conservation easement to a tax-exempt land trust allegedly resulting in a charitable contribution deduction equal to $25,341,000 for the Syndicate (which would be equal to almost five times the total investment).  The last option was called the conservation easement option.

      **d.**    **The Promotional Materials incorporate a Preliminary Valuation of the minerals by AquaFUSION.**

129.  The Private Placement Memorandum "incorporated in full" AquaFUSION's Preliminary Greenfield Property Aggregate Valuation and Quarry Feasibility Analysis, dated November 30, 2016, for the purpose of purportedly supporting the bona fides of a charitable contribution deduction from the donation of a conservation easement to a land trust.

130.  AquaFUSION's report[18] was prepared by Yvonne Sanders, PE, and David R. Buss, PhD, PG of AquaFUSION.  AquaFUSION sent this report via email or U.S. mail on or around November 30, 2016, to *inter alia* the Clark Defendants.

---

[18] AquaFUSION's expertise is in water resource permitting and such related matters, not actual mining operations.  In addition, the type of report issued is designed to evaluate the indicated resource value, which is not the fair market value of the Property.

AquaFUSION was employed to buttress the bonus findings of the Clark Defendants that mining was physically and economically viable, thought it wasn't.  DeSoto Holdings or another Strategic-affiliated entity paid AquaFUSION for the report.

131.   AquaFUSION's report forms the basis for the inaccurate conclusion that the HBU of the DeSoto Property was as a quarry for mining of limestone. The report contains numerous undisclosed and gross deficiencies, some of which amount to outright fraud.  The Clark Defendants then relied wholesale, without examination, on those fraudulent representations and deficiencies in their appraisals.   The following are some examples of the fraudulent misrepresentations, omissions, and gross deficiencies contained in the AquaFUSION report:

(a)   The report obliquely mentions that the DeSoto Property is part of a 500-acre tract (though it erroneously says it is the westernmost parcel, when it is the center of the three).  But the report does not otherwise disclose the Bradford or Tanyard tracts, examine the impact of those tracts on the legal permissibility (such as zoning and permitting) or economic feasibility of the DeSoto Property.  For example, it is highly doubtful that all three tracts could have independently obtained permits and entered the market profitably within only two years under any circumstances.

(b)   AquaFUSION indicates that the Property was in the process of being preliminarily permitted for limestone mining operations and that it was

"reasonably likely" that rezoning of the Property and permitting for mining could be obtained.  But it does not specify exactly how quickly.  The report's economic assumptions are premised upon the quarry being capable of mining in its second year; however, no efforts were ever made to secure the zoning, other than a letter from the Mayor of Harpersville (that appears non-binding, has nothing to do with permitting, and seems to apply to not just the DeSoto Property but also the adjoining tracts as well).  Furthermore, the White Rock Quarry and its decade-long odyssey to obtain zoning and permitting is not mentioned, nor is there any consideration of the economic impact on the DeSoto Syndicate's ability to profitably operate if an experienced, professional company had just started a mine only 4.5 miles away.

(c)    More significantly, AquaFUSION fails to detail any steps that were ever made to apply for the necessary permits on the DeSoto Property or the adjoining tracts.[19]  Based on the experience of White Rock, a quarry

---

[19] The information that forms the basis for the belief that the Bradford and Tanyard tracts were also sold as mining SCE Strategy transactions is:  (i) SEC filings that an almost identical amount of money was raised from investors for each; (ii) the statement near the start of the AquaFUSION report that "[a]n initial investigation area of nearly 500 acres was identified," which is the size of all three tracts together; (iii) the inclusion in the AquaFUSION report of Appendix D, which is data relating to the Tanyard tract, not the DeSoto Property; and (iv) the Tax Court filings regarding the Bradford tract and the SCE Strategy associated with it.  Discovery will undoubtedly yield much more confirmation.

EXHIBIT D

operator with considerable experience in limestone mining,[20] it was not "reasonably probable" that the DeSoto Syndicate could obtain this permitting in the near future. The White Rock experience shows that even the zoning, which AquaFUSION characterizes as "assured," might never occur or, at the least, would take years if the DeSoto Syndicate ran into the same type of community opposition at hearings and in litigation. Despite the highly publicized White Rock saga that occurred only two years earlier for a site only four miles away and which also involved the Town of Harpersville, it is never mentioned in the report. Finally, the report indicates that $1.5 million should suffice for zoning and permitting, despite the published reports that White Rock spent more than this amount just to seek community goodwill in the small town of Vincent.

(d)    The report assumes that the required infrastructure (such as roads and utilities) is all in place subject only to minor adjustments. But the report gives no analysis in support of that conclusion, such as (i) that the surrounding country roads could handle the frequency or the weight of trucks transporting limestone or (ii) that utilities sufficient for agricultural purposes would also be sufficient for a quarry. The report also fails to budget any amount for

---

[20] Nothing in the materials furnished the Plaintiffs or the Class indicates that the Strategic Defendants possessed any, much less comparable, experience in the field.

EXHIBIT D

improvement of utilities or for development of infrastructure, including for development of a rail loading facility that is mentioned.[21]

(e)     The report assumes annual production of 700,000 tons of crushed aggregate with no analysis or supporting objective data of either the production or market for this amount[22] (nor any analysis beyond a conclusory figure as to the cost of trucking the aggregate to Birmingham, 35 miles away). And the report assumes such production to start in Year 2 at 500,000 tons and be fully "ramped up" by Year 3, despite the indications that zoning and permitting would likely take years.

(f)     The report refers to its analysis being based on a "limestone proven reserve," when it is just an estimate of possible mineral reserves and production.

(g)     The report is misleading in reporting that "the proposed operation is the only limestone quarry located south and east of Birmingham," when the proposed White Rock Quarry was east of Birmingham.

---

[21] The railroad is about 4 miles away, and White Rock was required to build a "spur" to the existing railway lines.

[22] The report does, however, casually mention, without attribution, "that the Federal government is expected to fund a very large infrastructure bill." Presumably, this relates to promises in the 2016 Presidential election, which has not yet come to pass.

EXHIBIT D

(h)    The report does not discuss whether it is feasible that the Strategic Defendants or the Syndicate itself could operate a limestone mine, when most mines in the southeastern United States are operated by experienced professionals such as Martin Marietta, Vulcan Industrial and Mining Corporation, and White Rock.

(i)    The report fails to explain that the Property hadn't even been acquired yet (as of November 30, 2016) and that the whole venture was purely hypothetical and speculative.

(j)    The AquaFUSION report falsely and materially concludes that "[t]his feasibility analysis demonstrates that a financially viable construction aggregate operation is possible for the DeSoto Holdings site" when, in fact, mining was neither legally permissible (since the required zoning and permitting were not in place and there was no showing of reasonable probability that they soon would be) nor economically feasible under the circumstances.

132.    According to the AquaFUSION report, the discounted value that a limestone quarry might offer was estimated to be $35 million.[23]  However, this $35 million figure is based on a flawed discounted cash flow analysis ("DCF") prepared

---

[23] It bears repeating that the report is a valuation of indicate resources, not a valuation of the Property itself (and certainly not a fair market value analysis).

by AquaFUSION in section 7 of its report.  To begin with, discounting the cash flows in Years 2-30 back to Year 0 should have yielded an EBITDA of $32,870,000, versus the reported discounted EBITDA[24] of $47,120,000, a difference of -$14,250,000; this lower discounted EBITDA results in a valuation after capital expenditures of $21,067,000, versus the reported valuation of $35,316,000.  Even more significantly, if the analysis were to take into account some reasonable time estimate for permitting, rather than assuming it was immediate and minerals could be mined in Year 2, the numbers would be even smaller: for example, assuming (based on the White Rock experience) the project takes nine years to complete the requisite permitting, permitting expenses of $1,500,000 occur in Year 0, remaining start-up expenses occur in Year 10, and revenue begins in Year 11, then the discounted EBITDA falls to $13,940,000 in Year 0, the start-up expenses fall to $5,278,000, and the valuation drops to $8,662,000.  Correcting either of these flaws would have, in turn, reduce the Clark Defendants' valuation proportionately.

133.   In conclusion, the AquaFUSION report wholly fails to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time and (iii) that based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the

---

[24] Meaning, "earnings before interest, taxes, depreciation, and amortization."

reasonably foreseeable future). The report fails to take into account any of these factors, particularly as to "closeness in time" (considering the White Rock saga) and the failure to provide sufficient objective data of the market for the proposed mine. Thus, the proposed HBU was purely speculative, despite AquaFUSION's and the other Defendants' representations to the contrary. And even if the report were to be considered, and all of the AquaFUSION assumptions accepted as true except for the time for permitting, its DCF analysis overstates the real numbers by between 40-75%.

> e.   **The Promotional Materials include an Initial Appraisal drafted by the Clark Defendants.**

134.   The Private Placement Memorandum attached a summary of an Initial Appraisal (the summary itself is dated December 9, 2016, though the Initial Appraisal is apparently dated December 12),[25] purportedly supporting the "options" for use of the Property. The Clark Defendants and the other Defendants knew and intended that the potential investors in the DeSoto Syndicate, including Hoover, would rely on this summary, the Initial Appraisal, and the later Qualified Appraisal Report in deciding to undertake the SCE Strategy. Regardless of its title, and as indicated on the first page of the summary Initial Appraisal, that document is subject to, and allegedly written in accordance with, USPAP. The Initial Appraisal and

---

[25] Both the summary and all copies of the Initial Appraisal are dated *before* the date that the DeSoto Syndicate acquired the Property.

EXHIBIT D

Qualified Appraisals likewise state that they were written in accordance with USPAP.

135.   The Initial Appraisal summary indicates the Clark Defendants estimate the value of a conservation donation of 146.63 acres of the DeSoto Property to be $25,341,000 (or roughly $173,000 per acre), valuing the real estate at its purported HBU of limestone mining.  However, the Clark Defendants and the other Defendants knew that this appraisal was grossly overstated, did not comply with USPAP or IRS fair market value principles, and was based on a HBU that was never intended to occur and speculative in nature.

136.   As further support for their valuation, the Strategic Defendants and the Clark Defendants incorporated AquaFUSION's mineral feasibility and engineering report dated November 30, 2016, for the purpose of purportedly supporting the bona fides of a charitable contribution deduction from the donation of a conservation easement to a land trust.  And like the AquaFUSION report, the Initial Appraisal and summary letter drafted by the Clark Defendants contain numerous fraudulent misrepresentations and gross deficiencies, including but not limited to the following:

(a)   The Clark Defendants relied wholesale and without examination on the AquaFUSION report.  Thus, their Appraisals incorporate all of the gross inadequacies and frauds found in that report.  The Comments to USPAP Standards Rule 2-3 state, "When a signing appraiser(s) has relied on work

done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work. The signing appraiser(s) is required to have a reasonable basis for believing that those individuals performing the work are competent. The signing appraiser(s) also must have no reason to doubt that the work of those individuals is credible." The Clark Defendants failed to state any basis (let alone a reasonable basis) for uncritically relying on the AquaFUSION report.

(b)     Although the Clark Defendants were aware that the DeSoto Property was part of a 500-acre tract being acquired, the Initial Appraisal does not mention the Bradford or Tanyard tracts or examine their impact on the legal permissibility (such as zoning and permitting) or economic feasibility of the DeSoto Property.

(c)     The Initial Appraisal relies on several hypothetical assumptions, including that zoning and permitting could be obtained without ever examining when that might occur and why (and demonstrating it would be soon). In addition, it also relies on several unexplained assumptions, such as that adequate funds exist for the infrastructure needed for a physical plant and a quarry when there is no such showing that such funds existed or that the members of DeSoto would contribute them. There is no evidence that the Clark Defendants investigated the possibility of permitting or any of these

other hypotheticals, in violation of USPAP Standards Rule 1-1(b) (which requires diligence on matters that would have a "significant effect" on the results). A simple "google search" would have disclosed the difficulties White Rock has had in obtaining zoning and permitting, as it was highly publicized in the local press.

(d)     Although the Initial Appraisal defines "fair market value" on pages 2-3, the Clark Defendants do not use fair market value in their analysis. Instead, they relied on an improper HBU analysis, which was supported by the false assumption that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU when the owner donates a conservation easement to a conservation organization. In order to employ the HBU methodology, the Clark Defendants ignored comparable sales of mines in Alabama in violation of the USPAP Ethics Rule (Section on Conduct) and USPAP Scope of Work Rule. Although these comparables were for existing mines, their values could have been adjusted downwards to account for that difference. The appraisal should have analyzed all sales of the subject property that occurred within the three years prior to the effective date of the appraisal. Failure to do this constitutes a violation of USPAP Standard Rule 1-5(b).

EXHIBIT D

(e)     Similarly, under USPAP, an appraiser must consider all approaches to value applicable to an appraisal assignment, then include in the appraiser's report the reason for excluding any approach to value and describe the methods and techniques for supporting the appraiser's opinions and conclusions. USPAP Standards Rule 1-4.  The Clark Defendants failed to do so.

(f)     To be considered a qualified appraiser, the appraiser must have a demonstrated competency in valuing the type of property being appraised.  In the Appraisals, the Clark Defendants did not demonstrate any experience or education in valuing minerals or mineral properties, yet they purported to value the DeSoto Property based on an HBU of mining by blindly relying on AquaFUSION's false conclusions, including its flawed DCF projections (USPAP Standard Rule 2-3).

(g)     On page 33, the Initial Appraisal indicates that the DeSoto Syndicate owns the Property and that the Property was not for sale.  But DeSoto acquired the Property *a week later*.  It also refers to the 146.63 acres, the amount that was subject to the easement, rather than the 161 acres that was acquired.  The Clark Defendants never explain the disposition of the missing 14.51 acres (though the AquaFUSION report that was attached to the Appraisal obliquely mentions it).

89

EXHIBIT D

(h)     Based on the misrepresentations and deficiencies described above, none of the Clark Defendants' summary letter, Initial Appraisal, and Qualified Appraisal could be considered a "Qualified Appraisal," as that term is defined under Treas. Reg. § 1.170A-17(a)(1).  The Appraisals do not conform to generally accepted appraisal standards (USPAP), as required by I.R.C. § 170(f)(11)(E)(i), or Treas. Reg. § 1.170A-1(c)(3)(ii)(I), which requires that the appraisal value be the fair market value of the property.  The Clark Defendants knew this but never disclosed this fact to Hoover or the other Class members.

(i)     As discussed subsequently, none of these frauds/deficiencies are correct or supplemented in the Clark Defendants' Qualified Appraisal a few months later.

137.   In conclusion, the Clark Appraisals are based on a flaw DCF projection and wholly fail to demonstrate that (i) the asserted HBU of mining is legally permissible, (ii) the asserted HBU of mining is reasonably probable at a period close in time, and (iii), based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future). None of the Clark Defendants' Appraisals demonstrate any of these factors, particularly as to "closeness in time" (considering the White Rock saga) and the

absence of sufficient objective data of the market for the proposed mine. Thus, the proposed HBU is purely speculative and cannot form the "before value" component of the valuation.

### f. The MMM Defendants issue a legal opinion letter.

138. In December 2016, the MMM Defendants prepared and issued a draft legal opinion letter by email or U.S. mail to the DeSoto Syndicate. In the letter, the MMM Defendants made multiple misrepresentations and omission of material fact, including but not limited to:

| Representation or omission | Reason for falsity |
|---|---|
| "In rendering the opinions set forth below, we have made the following assumptions (and, to our knowledge and based on our review of the Documents, there are no facts inconsistent with these assumptions): … The Appraisal was prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(11) of the Code." | The MMM Defendants knew (or reckless disregarded the fact) that the Appraisal was grossly and fraudulently inflated and was not prepared in accordance with generally accepted appraisal standards, such as USPAP, within the meaning of Section 170(f)(11)(E)(i)(II) of the Code. The MMM Defendants knew or (or recklessly disregarded the fact) that the HBU analysis was legally insufficient |

EXHIBIT D

| | because it was entirely based on a hypothetical and speculative set of facts not in existence and had numerous other material omissions and deficiencies. |
|---|---|
| "Assuming the conclusions in the Baseline Report are accurate, the Property Owner's execution and delivery of the Easement Deed to the Land Trust will qualify as a Qualified Conservation Contribution in accordance with Section 170(h) of the Code" | The MMM Defendants knew or (or recklessly disregarded the fact) that (i) the BDR had so many deficiencies in that it failed to demonstrate that the Property had a true "conservation purpose," and (ii) the contribution would not be in accordance with Section 170(h) of the Code, *inter alia*, because the donor impermissibly retained rights in the property subject to the conservation easement including to use 20 unspecified acres of the Property for solar and windmills. |
| "we cannot opine on whether the value determined in the Appraisal reflects the | The MMM Defendants knew or (or recklessly disregarded the fact) that the Appraisal was grossly and fraudulently |

**EXHIBIT D**

| fair market value of the Conservation Easement" | inflated and did not qualify as a Qualified Appraisal for the reasons stated herein and that the HBU analysis was legally insufficient. |
|---|---|
| "we do not express an opinion as to the dollar amount of any deduction attributable to the grant of the Conservation Easement to the Land Trust" | The MMM Defendants knew (or recklessly disregarded the fact) that the value of the deduction attributable to the grant of the conservation easement to ACC was dependent upon the value of the Property in the Appraisal, which was grossly and fraudulently inflated, and which featured a legally insufficient HBU analysis. |
| It was more likely than not that "the Appraiser will be treated as a Qualified Appraiser for purposes of Section 170(f)(11)(E) of the Code." | The MMM Defendants knew (or recklessly disregarded the fact) that the Clark Defendants were not a Qualified Appraiser due to lack of independence and relevant education and experience in mining, which caused them to |

| | |
|---|---|
| | improperly rely wholesale on the AquaFUSION report. |
| "in the course of our representation, nothing has come to our attention that would cause us to question the accuracy of the facts assumed for our opinions" | The MMM Defendants knew (or recklessly disregarded the fact), *inter alia*, that the Appraisal was grossly and fraudulently inflated, that the Appraisal's stated HBU of a mine for the Property was neither legally permissible (since they knew that the required zoning and permitting was not in place and there was no showing of reasonable probability that they ever would be) nor economically feasible. The MMM Defendants also knew (or recklessly disregarded the fact) that the HBU analysis was legally insufficient, and that the Clark Defendants were not independent. |
| The letter makes numerous other assumptions and states "to our | The MMM Defendants knew (or recklessly disregarded the fact) that |

EXHIBIT D

| knowledge and based upon review of the Documents, there are no facts inconsistent with these assumptions." | these assumptions were either false or unreasonable and that there were inconsistent facts that should have been disclosed to the investors. |
|---|---|

139.  These representations and omissions in the letter were not simply opinions. The MMM Defendants knew when they wrote their letter that it contained materially false statements and omitted key facts, including the near certainty of an audit and disallowance of the claimed deductions as well as the high likelihood of the IRS imposing numerous penalties and interest on Hoover and other members of the Class.

140.  Hoover and the Class members either directly received and relied on the draft opinion letter (or another version of the tax opinion letter) or reasonably relied on it through summaries of it contained in Promotional Materials, marketing presentations, and the Nelson Mullins' Due Diligence Report (described later).

### g.  Hoover undertakes the DeSoto Syndicate Transaction.

141.  Based on the Promotional Materials (including the Initial Appraisal and the summary letter) and the Defendants' advice and representations, Hoover paid $135,000 to purchase an interest in the DeSoto Syndicate.  According to the instructions given in the Promotional Materials by the Strategic Defendants and the Bridge Capital Defendants, Hoover wired the funds to an IOLTA account held by

Schulten Ward Turner & Weiss, a law firm hired to advise the Strategic and Bridge Capital Defendants.

142.   In order to complete the investment in the DeSoto Syndicate, the Strategic Defendants and Bridge Capital Defendants sent certain transaction documents to Hoover and other Class Members via email or U.S. mail in late 2016. The Strategic Defendants and Bridge Capital Defendants instructed Hoover and other Class Members to use DocuSign to electronically (and through the wires) fill out and execute the necessary transactional documents.  Hoover and the other Class Members completed the transactional documents and executed them using DocuSign as they had been instructed.

### h.   DeSoto Holdings acquires the property.

143.   On or about December 16, 2016, the Strategic Defendants (through DeSoto Holdings, LLC ("DeSoto Holdings"), a Strategic-affiliated entity) acquired the DeSoto Property for $709,207.00.  This acquisition occurred months after the Strategic Defendants and other Defendants marketed the transaction and less than two weeks before DeSoto Holdings donated a conservation easement on the property to ACC.

### i. The Strategic and Bridge Capital Defendants purport to disclose Notice 2017-10 but omit key facts and make numerous misrepresentations in doing so.

144.  On or around December 26, 2016, Novak (on behalf of the Strategic and Bridge Capital Defendants) emailed Hoover and other Class members a supplement to the Private Placement Memorandum.  The email purported to disclose to the DeSoto Syndicate members IRS Notice 2017-10,[26] which designated certain conservation easement transactions as listed transactions subject to disclosure requirements.   The email and supplemental Private Placement Memorandum significantly and intentionally downplayed the impact of this IRS Notice on the DeSoto Syndicate Transaction and contained numerous materially false or misleading representations and omissions.  These fraudulent misrepresentations and omissions included, but are not limited to, the following:

---

[26] Although the Notice was issued on or about December 23, 2016, the likelihood of such a Notice had been well-known and discussed throughout the preceding fall among the professionals involved in conservation easement transactions and was undoubtedly known to the Defendants.

| Representation | Reason for falsity |
|---|---|
| "Please note that this listed transaction guidance <u>does not</u> invalidate any compliant conservation easement donation or change the tax or conservation benefits; rather, the IRS has chosen to designate already highly disclosed charitable contributions as <u>possible</u> 'tax avoidance transactions.' This is based on the IRS incorrectly asserting that anyone conserving property is likely inflating appraisals, combined with a partisan view that the President-elect has inappropriately benefitted from conservation donations." | The Defendants knew at the time that the DeSoto Syndicate Transaction did not comply with the law or IRS regulations and was in fact using inflated appraisals |
| "As a reminder, this project not only hired independent, well-experienced conservation appraisers, but also retained a second independent appraiser | The Clark Defendants were not independent. Moreover, there was no independent peer review of the |

| | |
|---|---|
| to perform a peer review of that appraisal. This two-step, checks-and-balances process helps to ensure that the value being claimed in the appraisal is both accurate, supportable, and defendable." | Appraisals or any second appraisal as to the DeSoto Syndicate Transaction. |
| "Further, a reputable law firm provided a tax opinion after their diligence followed by another reputable law firm providing investor comfort letters to further diligence the project." | The MMM Defendants and Nelson Mullins were not independent, and their opinion letters would not protect the investors from the IRS assessing back taxes, penalties, and interest. Additionally, the Nelson Mullins due diligence report was not a second opinion letter but merely confirmed the fraudulent conclusions reach by the MMM Defendants. |

145.   The Strategic and Bridge Capital Defendants then asked Hoover and the other Class members to acknowledge receipt of the supplemental Private Placement Memorandum and elect to either (a) "rescind and withdraw" their subscription or (b) "waive rescission and reaffirm" their subscription. The members

99

were only given two days to respond. The Strategic and Bridge Capital Defendants never intended for any member to actually rescind the transaction as evidenced by (a) the short time window, (b) the false representations and omissions contained in the email and supplemental Private Placement Memorandum, and (c) Novak's statement in his email that "[a]fter this issue is addressed, we will go forward expeditiously with either conserving or mining the property."

146.   Further, the Strategic Defendants downplayed the effect of IRS Notice 2017-10 by soliciting investments in additional transactions for 2017 within days or weeks of the Notice.  For example, in early 2017, Novak and Freeman sent out a letter to Hoover and other members of the Class in which they both discussed Notice 2017 and touted their 2017 projects that they would "begin offering...starting in late April/early May [of 2017].[27]

147.   In reliance on the materially false and misleading representations and omissions contained in the fall 2016 emails and supplemental Private Placement Memorandum, Hoover and the other members of the Class reaffirmed their subscription to the DeSoto Syndicate Transaction.

148.   Being woefully underinformed for the various reasons set forth herein, the DeSoto Syndicate, pursuant to a notice dated December 23, 2016, voted to place a conservation easement on the real estate and to donate the conservation easement

---

[27] Tanyard SEC filings indicate that sales activities may have begun as early as 2016.

EXHIBIT D

to ACC.  Prior to this date, Hoover and the other members of the Class had never been informed *inter alia*:

      (a)     That the DeSoto Property, which was sold to the members of the DeSoto Syndicate for over $5 million (of which only about $1.5 million went to acquire the interests and that held the Property, the rest being for expenses and "holding costs") and was being valued at over $25 million for purposes of the conservation easement, had been purchased only a few days before by the Strategic Defendants for the price of $709,207;

      (b)     That these actual sales, neither disclosed nor analyzed by the Clark Defendants, are far closer to the actual "fair market value" of the Property as opposed to the HBU "discounted cash flow" analysis done by Clark;

      (c)     That the purported HBU of limestone mining for the Property was not legally permissible (since the required zoning and permitting was not in place and there was no showing of reasonable probability that they would anytime soon), economically feasible, or intended to be pursued by the Defendants.

      (d)     That the Clark Defendants were not, for the reasons stated herein, a Qualified Appraiser, and that their Appraisals were not Qualified Appraisals;

(e)     That being declared a "listed transaction" by the IRS made it a virtual certainty that the DeSoto Syndicate Transaction would be audited;

(f)     That even before the DeSoto Transaction had been declared a "listed transaction" by the IRS, there was a high likelihood of such an audit;

(g)     Of the disposition of the 14.5 acres that were not being included in the conservation easement; and

(h)     That the predictions in the Clark Defendants' appraisals and the AquaFUSION report that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]" were false for the numerous reasons previously described as well as because if there were truly environmentally sensitive features of the Property such as to justify a conservation easement on this parcel (such as discussed in the Deed and the BDR hereinafter), the permitting process might take much longer and permitting may not occur at all.

### j.     The Strategic, MMM, and ACC Defendants prepare and approve the Conservation Easement Deed.

149.   The Conservation Easement Deed, dated on or about December 29, 2016, was jointly prepared and approved by the Strategic, MMM, and ACC Defendants.  The Conservation Easement Deed was verified and signed by Robert Lewis of Strategic (as the grantor) and by the CEO of ACC (on behalf of ACC). This was approximately a week after the Strategic Defendants learned of the

102

impending issuance of IRS Notice 2017-10 and the fact that the DeSoto Syndicate

Transaction, because of the way it was structured, was now a "listed transaction."

150.   The Deed conveyed a conservation easement on 146.63 acres of the

Property to ACC on December 29, 2016.  The Deed states in relevant part:

> WHEREAS, the Property in its present state is undeveloped and
> possesses significant agricultural, scenic vistas, open space, and aquatic
> habitat features to include hydric soils, converted wetlands associated
> with Old Glade Swamp, and water quality enhancement and protection.
> The Property has no dwellings or structures, and is predominantly
> composed of agricultural lands on flat Southern Limestone/Dolemite
> Valleys and Low Rolling Hills subregion lands of the Ridge & Valley
> ecoregion leading two first-order freshwater streams (Walthall Branch
> and its unnamed tributary) (collectively, and together with the
> preceding sentence, the "Conservation Values") that are of great
> importance to the Conservancy, the people of Shelby County, and the
> people of the State of Alabama and are worthy of preservation; and
> WHEREAS, the protection of a relatively natural habitat of fish,
> wildlife, or plants, or similar ecosystem, meets the conservation
> purpose of Section 170(h)(4)(A)(ii) of the Internal Revenue Code of
> 1986, as amended (the "Code")….

151.   Among the numerous rights that the Deed reserved for the grantor was

the ability to develop and maintain facilities for the generation of renewable power,

which included solar arrays and windmills.  The Deed permitted renewable power

facilities on up to 20 acres of the total ground coverage anywhere on the Property.

This broad renewable power reservation violated IRS Regulation § 1.170A-14(g)(1)

because it was inconsistent with the conservation purpose of the donation.  Future

construction of solar arrays and windmills would undoubtedly kill wildlife

(especially the birds identified in the BDR) and impact scenic views.  The Strategic,

MMM, and ACC Defendants knew or recklessly disregarded the fact that this broad reservation could and would result in disallowance of the conservation easement contribution deduction. Further, because the 20 acres was not a fixed location on the Property, Defendants were also well aware that the conveyance might also be attacked by the IRS as a "perpetuity issue that impacted the entire Property and caused the easement to fail *in toto*. They chose to include it regardless.

### k. The ACC Defendants provide DeSoto Holdings with a letter confirming the donation and falsely representing that the donation is "fully tax deductible."

152. Also, on December 29, 2016, Keller, on behalf of ACC, provided DeSoto Holdings with a letter documenting the conveyance and advising the DeSoto Holdings that its contribution to ACC "is fully tax deductible." The ACC Defendants knew this statement was false when they made it. The ACC Defendants also knew that they had not attempted to question or verify the Clark Defendants' appraisal, in gross disregard of industry standards.

**l.   Nelson Mullins prepares Due Diligence Reports for the members of the DeSoto Syndicate.**

153.   On December 29, 2016, Nelson Mullins issued their "Due Diligence Report"[28] for Class members who had participated in the DeSoto Syndicate via email or U.S. mail.

154.   The stated goal of the Report was to "identify any material issues that may exist with respect to the Transaction's legal agreements and tax structure and propose solutions to the extent any identified risks may be mitigated."  The Report, however, did not do this in many material respects.   Instead, it made misrepresentations and omissions of material fact, including but not limited to:

---

[28] Much like the various SCEs themselves, the Nelson Mullins' due diligence reports (which were often referred to by the Strategic Defendants as "comfort letters") seem to be "cookie cutter" with large portions of each being "copied and pasted."

EXHIBIT D

| Representation or omission | Reason for falsity |
|---|---|
| "we do not see anything out of the ordinary in the Appraisal, and the methodology that was used seemed reasonable" | Nelson Mullins knew (or recklessly disregarded the fact) that (i) the $25,341,000 value of the donation claimed in the Appraisal was grossly and fraudulently inflated, (ii) the Clark Defendants could not uncritically and without explanation rely on the AquaFUSION report, and (iii) the HBU analysis set out above contained numerous misrepresentations and material deficiencies. |
| "Nor can we opine on the feasibility or probability of the Property being developed as a mine and quarry in the absence of the conservation easement being place [sic] on the Property" | Nelson Mullins knew (or recklessly disregarded the fact) that it was not feasible to develop the Property as a mine and that no efforts were being made to do so.  Further, Nelson Mullins knew (or recklessly disregarded the fact) that there were significant legal deficiencies in the HBU analysis, |

| | including that there was no showing of "closeness in time." |
|---|---|
| "The Appraisal found the 'before' value of the Property to be $25,824,825 and the 'after' value of the Property to be $483,420" | Nelson Mullins failed to disclose that the "before" value of the Property was grossly and fraudulently inflated for the reasons set forth earlier. |
| "the Appraiser concludes on page 61 of the Appraisal that development of the property as a mine and quarry is highly probable" | Nelson Mullins knew (or recklessly disregarded the fact) that it was not feasible or legally permissible to develop the Property into a mine and that no legitimate efforts were being made to do so. Further, they knew (or recklessly disregarded the fact) that there were significant legal deficiencies in the HBU analysis, including that the Clark Defendants could not uncritically rely on the AquaFUSION report. |
| "the Tax Opinion [referring to the MMM Opinion, although the Report curiously refers to the Tax Opinion | Nelson Mullins knew (or recklessly disregarded the fact) that the Appraisals did not follow applicable appraisal |

| | |
|---|---|
| writer only as 'an experienced tax lawyer with a prominent law firm in Atlanta'] indicates that the Appraisal meets the requirements of a 'qualified appraisal' for tax purposes" | standards and grossly inflated the value of the easement. Further, they knew (or recklessly disregarded the fact) that there were significant legal deficiencies in the HBU analysis, including that the Clark Defendants could not uncritically rely on the AquaFUSION report. |

155.   Although the Report recommended that the Tax Opinion letter include a discussion and analysis of Notice 2017-10, it did not conclude, as Nelson Mullins knew or should have known, that the Notice meant a near certain chance of audit and disallowance by the IRS.  Instead, the Report advised that:

> this potential investment is well documented and appears to be properly structured. While the Notice raises the possibility of an IRS review of the Transaction, many aspects of the Transaction are supported by the Tax Opinion, which was prepared by a tax attorney at a reputable law firm with specific experience structuring conservation easement transactions.

Nelson Mullins knew that the MMM opinion letter contained numerous material misrepresentations and was fatally flawed.

156.   Although the Report was supposed to come from an independent law firm, it acknowledged that Nelson Mullins (a) had done work for Strategic and Bridge Capital on other conservation easement transactions and had issued similar

opinion letters for those transactions (*i.e.,* Strategic and Bridge Capital were important and valuable clients of the firm), and (b) was being paid out of the closing proceeds from the closing of the Transaction. These two facts destroyed any independence that Nelson Mullins had, and thus, any penalty protection the Report might have purported to offer Hoover and the Class members. It also meant that Nelson Mullins' fee was contingent on the closing of the DeSoto Syndicate Transaction, which fee would not have been paid in its entirety if some or all of the members had decided to back out of the Transaction.

> ### m. The ACC Defendants prepare a Baseline Documentation Report.

157. On December 30, 2016, Keller on behalf of ACC prepared and provided a Baseline Documentation Report ("BDR") to DeSoto Holdings, which was verified as accurate by ACC. ACC was paid $9,356.25 for preparation of the BDR, the purpose of which is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose. However, the BDR fails to demonstrate that the DeSoto Property has a true conservation purpose. Moreover, the Deed does not fully protect whatever that purpose may be. Instead, the ACC Defendants set out in a vague, conclusory, and misleading manner—as part of the overall fraudulent scheme—those conditions on the Property that would allegedly be preserved by the conservation easement and summarily concluded that

these conditions met the conservation purpose of § 170 of the Code.  Echoing the

language in the Deed, the BDR states:

> The Property in its present state is undeveloped and possesses
> significant agricultural, scenic vistas, open space, and aquatic habitat
> features to include hydric soils, converted wetlands associated with Old
> Glade Swamp, and water quality enhancement and protection. The
> Property has no dwellings or structures, and is predominantly
> composed of agricultural lands on flat Southern Limestone/Dolemite
> Valleys and Low Rolling Hills subregion lands of the Ridge & Valley
> ecoregion leading two first-order freshwater streams (Walthall Branch
> and its unnamed tributary) (collectively, and together with the
> preceding sentence, the "Conservation Values") that are of great
> importance to the Conservancy, the people of Shelby County, and the
> people of the State of Alabama and are worthy of preservation; and
> The protection of a relatively natural habitat of fish, wildlife, or plants,
> or similar ecosystem, meets the conservation purpose of Section
> 170(h)(4)(A)(ii) of the Internal Revenue Code of 1986, as amended (the
> "Code")….

158.   There were numerous severe deficiencies in the BDR.  To begin with,

the BDR does not include the minimal items required to document the condition of

the Property at the time of the donation. Important items that are missing from the

BDR include: (i) a map showing where the man-made improvements on the Property

are located (although the report says there are none, aerial photographs show an

interior network of field roads, a culvert, bridge, fencing and some utility rights-of-

way on the perimeter, all of which should be clearly identified and "mapped"), (ii) a

list of the flora and fauna on the property, which is needed to show their significance

and what is allegedly being protected, (iii) signatures acknowledging the condition

EXHIBIT D

of the property at the time of the donation, and (iv) the date of the field work and photos.

159.   According to the recitation of the conservation easement deed language in the BDR, permitted uses of the Property after the easement include some new access roads (p. 14), agricultural production (with some exceptions for industrial or factory-type livestock operations – p. 14), new trails that include steps, bridges and culverts (p. 17), new fences and fence maintenance (p. 17 and p. 20), hunting stands and platforms (no size limit is provided) (p. 17), alternative energy including wind and solar (p. 18), and agricultural buildings and improvements (p. 20).  Some of these allowable uses could interfere with the scenic/open space purpose and the intended conservation purpose; the BDR fails to analyze how they do not.

160.   The BDR also fails to document the disposition of the 14.5 acres not encumbered by the conservation easement; moreover, in this same vein, the BDR fraudulently fails to disclose the neighboring Bradford and Tanyard tracts, which Keller and ACC knew about as ACC received the conservation easements on each of those properties as well (Bradford's contemporaneously with DeSoto's).  The BDR fails to explain how the intended use of these adjoining properties might affect the intended conservation purpose of DeSoto, such as whether alternative energy development on those properties (particularly if the 20 acres on one property adjoins the 20 acres on another) might affect the alleged scenic views being conserved and

whether proposed or actual mining on those properties (particularly Tanyard, which was not "eased" until the following year) might affect the alleged conservation purposes.

161.   Most importantly, the easement allows for up to 20 acres of the total ground coverage to be used for alternative energy development.  The BDR fails to analyze how this broad renewable power reservation is compatible with IRS Regulation § 1.170A-14(g)(1) to "prevent uses of the retained interest inconsistent with the conservation purposes of the donation"; on its face, the reservation is inconsistent with the conservation purpose of the donation, given that any construction of solar arrays and windmills would undoubtedly both kill wildlife (especially the birds identified in the BDR) and impact scenic views, particularly since the arrays can be built anywhere on the Property.

162.   Finally, the photographs in the BDR do nothing to demonstrate any scenic views that are worthy of being preserved and unique in its context.  For example, farmland that possesses scenic views might be worthy of protection in an urban setting, but here the farmland is surrounded by other farmland and the BDR fails to establish anything special about it in that context.

163.   In sum, the BDR lacks sufficient detail to fully present the natural and man-made features of the property and verify any conservation purpose being served.  It thus wholly fails in its intended purpose to document the condition of the

land at the time the Deed was signed or to reflect the public benefit and conservation purposes of the conservation easement.  This was simply a boilerplate document designed to further the fraudulent scheme.

### n. The Clark Defendants prepare an Appraisal Summary, which is verified by ACC.

164.   On or about May 18, 2017, the Clark Defendants prepared the Appraisal Summary (Form 8283).  Clark (as the appraiser) and a representative of ACC (on behalf of ACC) verified the Appraisal Summary as accurate and signed it.  The Clark Defendants and the ACC Defendants represented to the IRS in the Appraisal Summary that the easement was placed on the property to protect the property.

165.   The Appraisal Summary represented that DeSoto Holdings had acquired the property by deed in December 2016 and had a cost basis of $709,207 but that the conservation easement donation had a fair market value of over $25 million—a 35X appreciation in value in less than two weeks.[29]  The Clark Defendants and ACC Defendants (with the knowledge of the other Defendants) then advised Hoover that the Appraisal Summary would substantiate the charitable contribution deduction and allow him to claim the charitable contribution deduction on his individual tax returns.

---

[29] The Defendants attempted to get around this issue by tacking on the acquisition date by the previous owner who acquired the property in 2010 and by being vague about whether it was they or the previous owner who had paid the $709,207.

EXHIBIT D

166.   The Appraisal Summary falsely represented that the appraised fair market value of the conservation easement was $25,334,000, when, in fact, no independent appraiser would have appraised the easement at such a high value.

  **o.**  **The Clark Defendants prepare the final Qualified Appraisal Report.**

167.   The Clark Defendants prepared and sent the final Qualified Appraisal Report to DeSoto Holdings on or around June 15, 2017, via U.S. mail or email.  The Clark Defendants knew and intended that the Qualified Appraisal would be shared with and relied upon by members of the DeSoto Syndicate, including in connection with tax filings, as evidenced by the statement in the Appraisal that, "[t]he intended users are the donors and the IRS for the purpose of estimating the fair market value of an easement donated to the Atlantic Coast Conservancy . . . ."

168.   This Qualified Appraisal, unlike the summary letter included in the Promotional Materials and the Initial Appraisal, contained the full Qualified Appraisal, including all exhibits.  However, the Qualified Appraisal had, in form and substance, the same fraudulent misrepresentations and gross deficiencies identified above for the summary letter and Initial Appraisal.

169.   The Qualified Appraisal falsely and materially stated that the fair market value of a conservation donation of 146.63 acres of the Property was $25,341,000.

EXHIBIT D

170.   The Qualified Appraisal falsely and materially represented that the Clark Defendants were qualified appraisers under IRS regulations and that "[m]y compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event" when, in fact, the Clark Defendants, as part of the fraudulent scheme, had used their flawed HBU analysis to produce a value to coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirator Defendants would not have continued to use the Clark Defendants if they had not come to the specific value requested by the co-conspirators (*See* USPAP Scope of Work Rule, on Acceptability—"An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased.").

171.   The Qualified Appraisal falsely and materially represented that "I am a Qualified Appraiser as defined under Section 170(f)(11)(E)(ii)…. [and] [t]he attached report is a 'qualified appraisal report' as that term is defined in applicable Internal Revenue Service regulations (Section 170(f)(11)(E)(ii) ) and was prepared for your use," when, in fact, the Clark Defendants knew they were not a qualified appraiser because, among other reasons, they lacked experience and education in mining, they uncritically relied upon the defective AquaFUSION report, and they were persons whose relationship with the co-conspirators "would cause a reasonable

person to question the independence of such appraiser." Moreover, the opinions and conclusions offered by the Clark Defendants in the Qualified Appraisal did not follow applicable codes of professional conduct including USPAP (though it falsely states otherwise in the Appraisal).

172.   The certification in the Qualified Appraisal also contained numerous false statements, including but not limited to:

| Representation or omission | Reason for falsity |
|---|---|
| "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, unbiased professional analysis, opinion, and conclusion" | The Clark Defendants, as part of the fraudulent conspiracy, used their flawed HBU analysis to come to an appraisal value within a predetermine range needed for the SCE Strategy to work. |
| "[W]e have no personal interest or bias with respect to the parties involved" | The Clark Defendants were biased in favor of an appraisal value within a range set by their co-conspirators |
| "[m]y compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the | The Clark Defendants, as part of the fraudulent conspiracy, used their flawed HBU analysis to come to an appraisal |

EXHIBIT D

| value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event" | value within a range needed for the SCE Strategy to work. |
|---|---|

173.   The Qualified Appraisal again relied wholly on AquaFUSION's November 30, 2016, Preliminary Aggregate Valuation and Quarry Feasibility Analysis for the property without giving any reasonable explanation as to why this was permissible under USPAP.

174.   Further, both the Clark Defendants' appraisals and the AquaFUSION report state that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]."  This fails to take into account the issues that an experienced professional mining operator like White Rock had encountered a mere 4.5 miles away, as well as that if there are truly environmentally sensitive features of the Property (or the adjoining tracts) so as to justify a conservation easement on this parcel, the permitting process might take much longer or might not occur at all.  In any event, both the Clark Defendants' Appraisals and the AquaFUSION report fail to demonstrate that the permitting was reasonably probable and would occur close in time.

   **p.**  **Bennett Thrasher prepares the Syndicate's tax return and corresponding K-1s for the members, which Hoover uses to prepare his tax return.**

175. On or about June 23, 2017, Bennett Thrasher prepared the tax return for the DeSoto Syndicate.  The tax return reported a charitable contribution deduction from the donation of the conservation easement of $25,334,000.  As required, Bennett Thrasher attached to the DeSoto Syndicate's return a copy of the Clark Defendants' Appraisal, the Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation.  Thus, Bennett Thrasher adopted and incorporated the misrepresentations described above.

176. In addition, Bennett Thrasher prepared a K-1 for each of the participants in the DeSoto Syndicate, including Hoover, which reported the amount of charitable contribution deduction allocated to the applicable member of the DeSoto Syndicate.  Bennett Thrasher sent or caused to be sent these K-1s to the members of the DeSoto Syndicate via email or U.S. mail at some point shortly after completing the Syndicate's tax return.  The charitable contribution that was allocated to Hoover was more than four times the amount he paid into the DeSoto Syndicate.  The K-1 prepared for Hoover reported a charitable contribution deduction of $421,799.  Bennett Thrasher advised Hoover to report this charitable contribution deduction on his individual tax returns for 2016.

EXHIBIT D

177.   Hoover followed the advice of the Defendants and reported the charitable contribution deductions set forth above on his individual tax returns for 2016.

### q.   The Strategic Defendants send a photo book of the DeSoto Property, which contains additional misrepresentations.

178.   On or about October 3, 2017, Freeman and Strategic sent via email or U.S. mail a photo book of the DeSoto property to members of the Class who had participated in the DeSoto Syndicate.  In addition to the colorful pictures, the book contained these misrepresentations and omissions:

(a)   That a "desk audit review of the [Clark Defendants'] appraisal was performed….conclud[ing] the appraisal is reasonable and in compliance with the IRS and US Treasury guidelines."  This alleged review has never been identified, and Hoover never received a copy, despite this alleged second appraisal being frequently touted by the Strategic Defendants.

(b)   The disposition of the 14.5 acres not encumbered by the conservation easement was still not identified.

(c)   Although the book touts that "[conservation easement]s have been widely used for decades and are well recognized by many government authorities," no mention is made of IRS Notice 2017-10 and its likely impact—that this conservation easement and all others are now almost certain to be audited.

119
EXHIBIT D

179.   The photo book was intended as a "deal gift" for participating in the DeSoto Syndicate Transaction but it was also intended to serve as a marketing document for future transactions for both Hoover and any colleagues, friends, or family members who might be interested in a SCE Strategy.

> **r.    The 2016 DeSoto Holdings tax return is audited, and the IRS disallows the charitable contribution deduction at the partnership level.**

180.   Thereafter, DeSoto Holdings, via its Tax Matters Partner ("TMP") DeSoto Investors, received an IRS Notice indicating that DeSoto Holdings' partnership tax return for the 2016 tax year was selected for audit.

181.   In August 2020, the IRS made its final determination, via the issuance of an FPAA, that DeSoto Holdings' partnership tax return for the 2016 tax year suffered from *inter alia* the following defects: (i) failure to make a charitable contribution in compliance with all of the requirements of Code § 170 and corresponding regulations, thus leading to disallowance of the *entire* $25,341,000 deduction for the conservation easement; and (ii) a gross valuation misstatement (resulting in a 40% penalty) or alternatively a substantial valuation misstatement (resulting in a 20% penalty).

182.   The TMP has filed a lawsuit in Tax Court to contest the IRS's conclusions, which lawsuit remains pending.

## 2. Spratt and the Greiner Plaintiffs engage in the Turtle River Syndicate Transaction in 2013.

183. The Strategic Defendants were the chief promoters of the Turtle River Syndicate Transaction and marketed and coordinated all aspects of the transaction. The individuals and entities listed below were the advisors (and co-conspirators with the Strategic Defendants) to the Transaction and undertook the following roles:

| Participant | Role |
|---|---|
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| GALT Defendants | Accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deed of conservation easement, signed the Form 8283, and acknowledged acceptance of the donation. |
| Van Sant and Wingard Defendants | Provided an appraisal of the property for the conservation easement donation. |
| MMM Defendants | Provided due diligence and was the law firm that "handled the transaction". |
| Langford Defendants | Provided tax preparation services in connection with the transaction. |

121

| Defendant Credo | Referred Spratt to Strategic, helped convince him to do the deal, and misrepresented the tax savings that Spratt would obtain from the deal. |
| Defendant Oxygen | Referred the Greiner Plaintiffs to Strategic, helped to convince them to do the deal, and misrepresented the tax savings that the Greiner Plaintiffs would obtain from the deal. |

### a. Background on the Turtle River Property.

184. In 2013, the Strategic Defendants and the Bridge Capital Defendants, either directly or through their affiliates including Defendant Credo and Defendant Oxygen, approached individuals about participating in the SCE Strategy through the Turtle River Syndicate, a company formed and managed by Strategic or a Strategic-affiliated entity. The Turtle River Syndicate owned real estate located in Glynn County, Georgia (the "Turtle River Property"). The Turtle River Property was 380 acres of land, 370 acres of which were made subject to a conservation easement and 10 acres that were retained by the Turtle River Syndicate for development.

185. Turtle River's 380 acres started out as a portion of a larger property called St. Andrews Plantation. Parcels that made up St. Andrews Plantation were previously purchased in 2003—2,500 acres for $9.1 million (approximately $3,600 per acre) and in 2005—1,000 acres for $3 million (approximately $3,000 per acre).

122

The Strategic and Bridge Capital Defendants subdivided this property into at least seven different syndicates: including Habitat Green, Green Creek, Cabbage Bluff, Georgetown Rivermont, Salt Marsh Holdings, College Creek, and (described further below) Turtle River.   In all, 3,500 acres of property that were purchased in 2003 and 2005 for $12.1 million were subdivided into syndicates that had gross offering prices (purchase prices for members) totaling $37 million and that generated an incredible $141 million in fraudulently inflated deductions for their members based upon fraudulently inflated appraisals.

### b.     Steps of the Turtle River Syndicate Transaction.

#### i.     Marketing of the Syndicate.

186.   In 2013, the Strategic Defendants (through Turtle River Properties, LLC, a Strategic-affiliated entity) obtained an Initial Appraisal of an interest in real estate from the Van Sant and Wingard Defendants dated December 15, 2013, which was sent by the Van Sant and Wingard Defendants to the Turtle River Syndicate via U.S. mail and/or email on or about December 15, 2013.  The interest was owned by Turtle River Properties, LLC and located in Glynn County, Georgia.

187.   The Strategic Defendants, either directly or through its referral sources, approached individuals about participating in the SCE Strategy through the Turtle

River Syndicate, a company formed and managed by Strategic or a Strategic-affiliated entity.[30]

188.   Defendant Credo Financial Services, LLC was Plaintiff Spratt's financial advisor.  On October 29, 2013, Dan Lucas of Credo sent an email to Spratt and other Credo clients soliciting their participation in the Strategic SCE Strategy. Credo represented (through Lucas) that taxpayers could obtain "a $130,000 tax write off (both federal and state) for a purchase price of $37,500", that the deal had "[n]o catch or gimmicks", and that Lucas and Credo had "done these with many other clients."  Credo thereafter obtained Spratt's signature on a confidentiality agreement with Strategic, which Lucas forwarded to Brooke Freeman of Strategic via email on December 5, 2013, and sent Spratt an article titled Allocating Charitable Conservation Easement Deductions to Equity Investors via email on December 5, 2013.

189.   On December 17, 2013, Lucas sent an email to Spratt on behalf of Credo again urging his participation in the Strategic SCE Strategy and stating "[w]e are still comfortable with all the projects that we are putting our clients in and are ready to move forward".

---

[30] The Strategic Defendants used the Turtle River Syndicate as both the PropCo and InvestCo.  This, however, did not functionally impact the way the transaction worked or how the fraud was perpetrated on Plaintiffs and the Class.

EXHIBIT D

190.   Credo urged Spratt to purchase an interest in the Turtle River Syndicate by email from Lucas to Spratt dated December 26, 2013.  The email stated "[a]ll projects are closed with the exception of one, 'Turtle River'".  Lucas explained that a $28,500 investment would result in "a tax deduction of $121,125."

191.   On December 27, 2013, Brooke Freeman of Strategic emailed Lucas of Credo and stated that Spratt did not respond to emails from Strategic regarding another Strategic SCE Strategy and noted that Strategic might be able to put Spratt into Turtle River or another Strategic SCE Strategy.  Lucas immediately emailed Spratt on behalf of Credo asking, "what's the deal…let me know," and stating, "I'm working hard here to get you in these but you need to step up brother…. I'd love to see you knock out a majority of your 2013 and 2014 tax bill right now and make a big profit while doing it".  Lucas continued, "[t]his stuff is no joke and they have a long waiting list so if you don't close, they just move on."

192.   Spratt also had multiple telephone communications with Dan Lucas of Credo prior to purchasing an interest in the Turtle River Syndicate.  The first call took place in or about October 2013.  In that call, Lucas represented that Spratt's investment in a conservation easement Syndicate through the Strategic Defendants would yield a federal tax benefit of three to four times the amount of Spratt's investment.  Lucas further told Spratt that he had done "lots" of conservation easement deals with the Strategic Defendants and that "lots" of prominent people

EXHIBIT D

were doing them.  He also told Spratt that Defendant Novak of Strategic "knows what he is doing" with respect to conservation easements.

193.   Defendant Lucas and Spratt had at least two additional calls at the end of December 2013.  In those calls, Lucas told Spratt that Spratt could benefit from the tax deductions offered by the SCE Strategy because of Spratt's growing business. Lucas pressured Spratt to agree to the Turtle River Syndicate and pressured Spratt to invest or lose out.  Lucas also explained, falsely, that the tax benefits from the Turtle River Syndicate would occur because the property would continue to be appraised at higher values and return tax benefits over time.

194.   Credo either knew or should have known that the Strategic SCE Strategy was based upon fraudulently inflated appraisals and that the promised tax benefits would fail if challenged by the IRS.  In the alternative, Credo failed to properly vet and investigate the Strategic SCE Strategy, including but not limited to Turtle River, as required by its professional responsibilities before recommending them to its clients.

195.   Defendant Oxygen Financial, Inc. was the Greiner Plaintiffs' financial advisors.  Oxygen also solicited its clients to participate in the Strategic SCE Strategy, including but not limited to the Greiner Plaintiffs.  On Tuesday, December 17, 2013, Christina Briboneria of Oxygen emailed Defendants Novak and Freeman of Strategic, stating "Matt and Heather Greiner… are also my clients" and asked

"[d]o you have any land conservation easements available for them/that we could use?".  Freeman responded that same day via email on his own behalf and on behalf of Strategic and stated "[w]e would love to help them" and asked whether the Greiners were accredited investors.  Briboneria responded that same day via email and described the Greiners' net worth.

196.   Later, on December 17, Freeman, on behalf of himself and Strategic, emailed Briboneria, stating that the Greiners' $28,500 investment would yield them "an estimated $120,000 in charitable contribution deduction subject to 50% AGI limitation", and to "[l]et us know if that will work".  That same day, Briboneria, on behalf of Oxygen, forwarded Freeman's email to the Greiners, stating that "[t]he project below will give us a $120k deduction, which could potentially save ~$45k in taxes (state and federal)" and that "[y]ou would have to invest $26k to purchase the easement, but it would still net ~$20k in savings."

197.   On December 19, 2013, Briboneria, on behalf of Oxygen, emailed the Greiners and stated, "I just want to follow up on this email that I forwarded you [from Freeman and Strategic] on Tuesday" and asked "[L]et me know if you are open to moving forward."

198.   On December 20, 2013, Briboneria, on behalf of Oxygen, sent the Greiners a Land Conservation Easement Strategy illustration which Oxygen

127

EXHIBIT D

prepared.  Among other things, the illustration falsely represented that the Greiner Plaintiffs' $28,500 investment in Turtle River would yield a deduction of $120,650.

199.  On December 22, 2013, Brooke Freeman of Strategic sent an email attaching subscription documents and instructions on how to view additional information to Briboneria and Oxygen and asked Briboneria to forward them the Greiners.

200.  On December 23, 2013, Briboneria, on behalf of Oxygen, forwarded Freeman's email and its attachments to the Greiners via email, stating "[s]ee attached paperwork", that "[i]f we decide to move forward, then you would sign both documents and have to wire cash to the named account", and that "I'll give you a call at 9:30 to discuss."

201.  The Greiner Plaintiffs also had multiple in-person and telephone communications with Christina Briboneria of Oxygen regarding the Strategic SCE Strategy in general and specifically regarding the Turtle River Syndicate during the last quarter of 2013.  During an in-person meeting in the fall 2013, Briboneria falsely told the Greiner Plaintiffs that Oxygen had vetted the Strategic SCE Strategy, that Oxygen had been doing them for a long time, and that they were a perfectly legal strategy.  Briboneria further reiterated these statements in a subsequent phone call in the Fall 2013 with the Greiner Plaintiffs that the Strategic SCE Strategy is a completely legitimate strategy, that Strategic had been in business for a long time,

128

and that Oxygen would not recommend Strategic if Oxygen had not "fully vetted" Strategic. Briboneria coordinated with Novak of Strategic either during the call or sometime thereafter, and Briboneria, Novak, or someone else from Strategic then falsely represented that the Strategic SCE Strategy is safe and completely accepted.

202.   On or about December 10, 2013, the Greiner Plaintiffs had a telephone call with Briboneria during which Briboneria discussed the Turtle River Syndicate. Briboneria represented during that call that Oxygen had "fully vetted" (which was false) the Turtle River Syndicate transaction and that Strategic had done this type of transaction "over-and-over again." Briboneria falsely stated that the Turtle River Syndicate transaction was "legitimate," "completely on the up and up," and said that she recommended it to the Greiner Plaintiffs.

203.   Oxygen either knew or should have known that the Strategic SCE Strategy was based upon fraudulently inflated appraisals and that the promised tax benefits would fail if challenged by the IRS. In the alternative, Oxygen failed to properly vet and investigate the Strategic SCE Strategy, including but not limited to Turtle River, as required by its professional responsibilities before recommending them to its clients.

204.   On December 26, 2013, the Greiner Plaintiffs received an email from Brooke Freeman on behalf of the Strategic Defendants, which attached the First

Supplement to the Turtle River Private Placement Memorandum, dated December 23, 2013.

205.   On December 27, 2013, Spratt received an email from Brooke Freeman of Strategic, which attached the First Supplement to the Turtle River Private Placement Memorandum.

206.   The First Supplement to the Turtle River Private Placement Memorandum stated that Turtle River Properties, LLC owned a real estate property in Glynn County, Georgia consisting of approximately 370 acres and was offering an opportunity to invest in order to raise a total of $6,127,500.

207.   The First Supplement to the Turtle River Private Placement Memorandum, which was prepared jointly by the Strategic Defendants, Bridge Capital Defendants, and MMM Defendants, informed Plaintiffs that the Turtle River Syndicate could use the property for timber harvesting, hunting, and residential housing or that it could sell the property to one or more developers.   The First Supplement also falsely stated that the Turtle River Syndicate could conserve the majority of the property (all but approximately 10 acres, which would be retained by the Turtle River Syndicate) by contributing a conservation easement to a tax-exempt land trust resulting in a charitable contribution deduction equal to $28.5 million for the Syndicate.   The Strategic Defendants, Bridge Capital Defendants, and

EXHIBIT D

MMM Defendants knew at the time they made this statement that the contribution deduction was fraudulently inflated.

208.   The First Supplement also represented that "value of the conservation donation under consideration has been estimated at $28,500,000."   The Strategic Defendants, Bridge Capital Defendants, and MMM Defendants knew at the time they made this statement that the conservation donation was far less than $28,500,000 and that such estimate was fraudulently inflated.

209.   The First Supplement also included an Initial Appraisal prepared by the Van Sant and Wingard Defendants and personally signed by Van Sant and Wingard, dated December 15, 2013, which was sent to the Strategic Defendants via U.S. mail and/or email on or about December 15, 2013, and which was approved by the Strategic Defendants.   The Van Sant and Wingard Defendants knew and intended that the Initial Appraisal would be sent to all potential Turtle River Syndicate members, including the Greiner Plaintiffs and Spratt and that the potential members would rely on this Initial Appraisal and the later Qualified Appraisal Report in deciding to undertake the SCE Strategy.   Among other things, the Initial Appraisal falsely stated that:

- The fair market value of the Turtle River property before placement of the conservation easement was $29,260,000,

EXHIBIT D

- The fair market value of the Turtle River property after placement of the conservation easement was $760,000,

- The fair market value of the conservation easement was $28,500,000,

- That the report was a "qualified appraisal as defined in US Treasury Regulation §1.170A-13(c)(3)", and

- That the Van Sant and Wingard Defendants "appl[ied] the appropriate valuation methodologies and techniques".

210. The foregoing documents were designed to convince potential participants that the SCE Strategy, through the Turtle River Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code. The sole purpose of the materials was to convince potential participants to participate in the SCE Strategy through the Turtle River Syndicate, thus generating enormous fees for the Defendants and Other Participants.

> ii. **In reliance on Defendants' recommendations and advice, the Greiner Plaintiffs and Spratt agree to purchase an interest in the Turtle River Syndicate and vote for the Turtle River SCE Strategy.**

211. In reliance upon the recommendations and advice of the Strategic Defendants, Credo (for Spratt), and Oxygen (for the Greiner Plaintiffs), regarding the Turtle River Syndicate and Defendants' representations in the First Supplement to the Turtle River Private Placement Memorandum, the Conservation Appraisal

Summary, and elsewhere, the Greiner Plaintiffs and Spratt executed subscription documents and purchased an interest in the Turtle River Syndicate in late December 2013.  Spratt and the Greiner Plaintiffs each paid a total of $28,500 into the Turtle River Syndicate.  According to the instructions given in the subscription documents by the Strategic Defendants and the Bridge Capital Defendants, Spratt and the Greiner Plaintiffs each wired $28,500 to an escrow account held by the MMM Defendants.  Bridge acted as the placement agent for the Turtle River Syndicate.

212.   In reliance upon the Strategic Defendants' recommendations in favor of the Turtle River Syndicate and SCE Strategy and in reliance upon Defendants' representations in the First Supplement to the Turtle River Private Placement Memorandum, the Conservation Appraisal Summary, and elsewhere, the Greiner Plaintiffs and Spratt also voted for the Turtle River SCE Strategy as members of the syndicate.

### iii.   Defendant GALT accepts the conservation easement donation and represents that it is valid.

213.   On or about December 31, 2013, GALT prepared a Conservation Easement Baseline Documentation Report and provided it to the Turtle River Syndicate via U.S. mail and/or email.  The Report was verified as accurate by GALT and later filed with the Turtle River Syndicate's tax return.  GALT set out the conditions on the property that would be preserved by the conservation easement

EXHIBIT D

and falsely misrepresented that these conditions met the conservation purpose of §
170(h) of the Code.

214.   Turtle River Syndicate conveyed the conservation easement to GALT
on December 31, 2013.  The Deed of Conservation Easement, dated December 31,
2013, was jointly prepared by the Strategic Defendants, Bridge Capital Defendants,
MMM Defendants, and GALT and was sent for filing on or about December 31,
2013, electronically and/or via U.S. mail.  The Deed of Conservation Easement was
verified and signed by Stephen Stutts, GALT's Board President, on December 31,
2013, on behalf of GALT and attested by Katherine Eddins, GALT's Board
Secretary.

215.   On December 31, 2013, GALT issued a letter to the Turtle River
Syndicate acknowledging receipt of the Turtle River conservation easement on
December 31, 2013, which was sent via U.S. Mail and/or email.  GALT knew and
intended that the letter would be forwarded to all members in the Turtle River
Syndicate, which it was by email and/or U.S. mail on or about December 31, 2013.
Despite knowing that the members would rely upon its letter acknowledging receipt
of the conservation easement, GALT was aware but did not disclose that the
purported values of the Turtle River property and easement in the Conservation
Appraisal Summary were fraudulently inflated and that the members of the Turtle
River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs, were

expecting tax deductions from the donation of the conservation easement that were fraudulently inflated and invalid and would not withstand IRS scrutiny.  GALT also knew but did not disclose that the conservation easement fails to protect the conservation purpose in perpetuity as required by as required by § 170(h)(5)(A) of the Code.

216.   On April 9, 2014, GALT signed the Appraisal Summary (Form 8283) for Turtle River, verifying that it was a qualified organization under § 170(c) of the Code, that it received the donation of a conservation easement that was qualified under § 170(h) of the Code (which it knew was false), and that the appraised fair market value of the property was $28,500,000 (despite knowing that the appraised amount was fraudulently inflated).[31]  On or about April 9, 2014, GALT sent its signed copy of the Appraisal Summary via U.S. mail and/or email to the Turtle River Syndicate and/or its accountants, the Langford Defendants, for filing with Turtle River's tax return.

217.   As a result of the donation of the conservation easement, charitable contribution deductions flowed through and were allocated to each of the participants in the Turtle River Syndicate, including Spratt and the Greiner Plaintiffs, in proportion to their relative ownership interest in the Turtle River Syndicate.

---

[31] As set for the below, the Van Sant and Wingard Defendants also signed the Appraisal Summary and verified their $28,500,000 appraised value of the property therein.

135

218.   The charitable contributions that were allocated to Spratt and the Greiner Plaintiffs were more than four times the amounts they paid into the Turtle River Syndicate.

> **iv.    The Van Sant and Wingard Defendants issue a final appraisal for the Turtle River property and sign the Appraisal Summary.**

219.   The Van Sant and Wingard Defendants sent a final Qualified Appraisal Report to Turtle River Properties, LLC on or about January 24, 2014, via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Turtle River Syndicate, including but not limited to the Spratt and the Greiner Plaintiffs.  Wingard and Van Sant jointly prepared the Appraisal and signed it on behalf of Van Sant and Wingard, LLC (as indicated on the cover page).  The Strategic Defendants selected the Van Sant and Wingard Appraisal to support a charitable contribution deduction for the Turtle River Syndicate.

220.   This Appraisal, unlike the one included in the First Supplement to the Turtle River Private Placement Memorandum, contained the full Appraisal, rather than simply the summary cover letter.  The Appraisal falsely and materially stated that the Turtle River property had a fair market value of $29,260,000 prior to the placement of the conservation easement.  The Appraisal falsely and materially stated that the conservation easement had a fair market value of $28,500,000, or an

incredible $77,027 per acre – over 22 times the value of the property just a decade before.  In fact, no independent appraiser would have appraised the property or the easement at such high values.

221.  The Van Sant and Wingard Defendants' Qualified Appraisal Report was falsely inflated at the instruction of the Strategic Defendants (and with the knowledge of the other Defendants) in order to meet their pre-determined "value" for the Turtle Rive property.  *Inter alia*, the Qualified Appraisal Report, which listed the property's highest and best use as "multi-use development," was falsely and fraudulently, or in the alternative negligently, inflated and attempted to conceal this fact by failing to consider relevant information and by deviating from the applicable standard of care (including USPAP), including but not limited to the following:

(a)     The Appraisal Report states that "[a]ccording to Glynn County public records, the conveyance of the subject property occurred on December 18th, 2013 [just days before the conservation easement donation] and the total consideration/sale price was reported as $10.00, however no real estate excise tax was delineated so a consideration was not available.  Additionally, there is no affidavit for the true consideration of the conveyance."  The Appraisal Report makes a substantially similar statement regarding a December 27, 2013, conveyance of 59.00 acres that were also part of the subject property. USPAP Standards Rules required an appraiser to analyze all sales of the

subject property that occurred within three years prior to the effective date of the appraisal.  If sales history information is unattainable, USPAP Standards Rules further require an appraiser to include a commentary on the efforts taken by the appraiser to obtain the information.  By failing to require the Turtle River Syndicate and the other Defendants to provide the sales prices of the foregoing conveyances, the Van Sant and Wingard Defendants hid the sales price.  The Van Sant and Wingard Defendants were further ethically required to withdraw from the engagement if the Turtle River Syndicate refused to provide the sales price information.

(b)     In violation of USPAP Standards Rules, the Appraisal states that "[t]he submitted plat on the subject property does not delineate the location of any jurisdictional wetlands on the subject property."  In fact, the Baseline Documentation Report (which the Appraisal acknowledges Van Sant and Wingard Defendants had) shows that 31 percent of the property is wetlands or marsh that could not be developed.  The Appraisal did not have any adjustment for these wetlands and the property was instead valued as a developable property in its entirety.

(c)     The Appraisal Report utilized grossly dissimilar comparable sales in violation of USPAP Standards Rules because, among other things: (1) only one of the "comparable" sales is in Georgia, the other five were instead

in Florida and South Carolina; (2) the Turtle River Property (appraised for multi-use development) lacked water and sewer utilities while four of the five comparables had utilities; (3) unlike the Turtle River Property, two of the comparable sales were bordered by boulevards that comprised four lanes and one of them was nearby to "heavy commercialization," one of the comparable sales was near the Orlando airport, and another comparable sale was in proximity to an established residential area, all of which made those properties more viable and valuable as multi-use development; (4) the adjustments to the prices of the comparables should have been proven by graphs or paired sales that occurred and are widely dissimilar—for example, at $122,958 per acre unadjusted sale number 2 is 3.12 times more per acre than sale number 4.

222.   The Appraisal further falsely and materially represented that the Van Sant and Wingard Defendants "engagement in this assignment was not contingent upon developing or reporting predetermined results," when, in fact, the Defendants had instructed the Van Sant and Wingard Defendants to produce an appraisal value to roughly coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirators Defendants would not have continued to use the Van Sant and Wingard Defendants if they had not come to the specific value requested by the co-conspirators. The Appraisal falsely and materially represented that the report "is considered a qualified appraisal as defined in US Treasury

139

Regulation § 1.170A-13(c)" and that "[a]s defined in the US Treasury Regulation § 1.170A-13(c)(5), we are qualified appraisers …"  The Van Sant and Wingard Defendants, however, knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser." Moreover, the opinions and conclusions offered by the Van Sant and Wingard Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal).

223.   The certification in the Appraisal also contained numerous false statements, including but not limited to:

| Representation | Reason for falsity |
|---|---|
| "The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions" | The Van Sant and Wingard Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |
| "I have no bias with respect to the property that is the subject of this report | The Van Sant and Wingard Defendants were biased in favor of an appraisal value within a range set by their co- |

EXHIBIT D

| or to the parties involved with this assignment" | conspirators, which could only be arrived at by selecting mining as the HBU. |
|---|---|
| "my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrent of a subsequent event directly related to the intended use of this appraisal" | The Van Sant and Wingard Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |

224.   On April 2, 2014, Defendants Van Sant and Wingard each also signed the Appraisal Summary (Form 8283) for Turtle River on behalf of the themselves and Defendant Van Sant and Wingard, verifying the false and fraudulent gross overstatement of the value of the property listed in the Appraisal Summary - $28,500,000 - and representing, *inter alia*, that "I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and

abetting the understatement of tax liability)" and that "I understand that I may be subject to a penalty under section 6695A if I know, or reasonably should know, that my appraisal is to be used in connection with a return or claim for refund and a substantial or gross valuation misstatement results from my appraisal." The Appraisal Summary was sent by the Van Sant and Wingard Defendants to the Turtle River Syndicate and/or its accountant, Langford, on or about April 2, 2014, via U.S. mail and/or email and which was filed with Turtle River's tax return for 2013.

> **v.** **The Langford Defendants prepare the Syndicate's tax return and corresponding K-1s for the members, which the Greiner Plaintiffs and Spratt uses to prepare his tax return.**

225.   In or about April 2014, the Langford Defendants prepared the tax return for the Turtle River Syndicate, sent the tax return and its attachments to the Turtle River Syndicate via U.S. mail and/or email in or about April 2014, and filed the tax return with the IRS electronically.

226.   On or about April 9, 2014, the Turtle River Syndicate's manager, Joseph N. McDonough of MM Bulldawg Manager LLC sent a letter via email and/or U.S. mail to each member of the Turtle River Syndicate, including but not limited to the Spratt and the Greiner Plaintiffs, enclosing the member's copy of the Turtle River 2013 Schedule K-1.  The K-1s were prepared by the Langford Defendants in or about April 2014 and sent by the Langford Defendants to the Turtle River Syndicate's manager in or about April 2014 via one or more U.S. mailings and/or

emails with their knowledge and intent that they would be forwarded to and relied upon by the members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs.  For each member's investment of $28,500 in Turtle River, the member was allocated a conservation easement donation charitable deduction of $120,333 and a charitable deduction of $35 in cash.  As the Strategic Defendants acknowledged in Brooke Freeman's March 4, 2014, email to Turtle River's members on behalf of the Strategic Defendants, including but not limited to Spratt and the Greiner Plaintiffs, Strategic reviewed the K-1s for accuracy and provided their sign-off prior to having them sent to Turtle River's members, thereby reiterating the false statements therein.  The Langford Defendants also prepared the Turtle River Syndicate's federal tax return for 2013.

227.   The Langford Defendants and Strategic Defendants knew that the conservation easement charitable deduction listed in each of the K-1s the Langford Defendants prepared was based upon a fraudulently inflated appraisal and was therefore invalid.  The members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs, relied upon the accuracy and legitimacy of the deductions listed in the K-1s and each claimed the deductions on their individual tax returns for 2013.

228.   Defendant Oxygen prepared the Greiner Plaintiffs' 2013 tax return, which claimed the deductions in the Greiners' K-1.  Despite knowing that the

EXHIBIT D

conservation easement charitable deduction listed in the Greiners' K-1 was based upon a fraudulently inflated appraisal and was therefore invalid, Oxygen included that deduction in the Greiners' tax return, signed the return on April 24, 2014, forwarded it to the Greiners via U.S. mail and/or email on or about April 24, 2014, recommended that the Greiners file the return and K-1 with the IRS, and filed it for the Greiners via efile. The Greiner Plaintiffs relied upon the accuracy and legitimacy of the deductions listed in the K-1 and on their tax return in filing the tax return with the IRS.

229.   Defendant Credo prepared Spratt's 2013 tax return, which claimed the deductions in Spratt's K-1. Despite knowing that the conservation easement charitable deduction listed in the Spratt K-1 was based upon a fraudulently inflated appraisal and was therefore invalid, Credo included that deduction in Spratt's tax return, signed the return, and filed it electronically with the IRS via efile, and sent it to Spratt via U.S. mail and/or email in or about October 2014. Spratt relied upon the accuracy and legitimacy of the deductions listed in the K-1 and on his tax return.

### c.   The IRS disallows the Turtle River Syndicate's charitable contribution deduction.

230.   On or about April 17, 2017, the IRS sent the manager of the Turtle River Syndicate a notice of FPAA regarding Turtle River's 2013 tax return. The FPAA concluded that the conservation easement charitable contribution deduction did not meet all of the requirements of § 170 of the Code and disallowed the Turtle

EXHIBIT D

River Syndicate's $28,500,000 conservation easement deduction in its entirety and imposed a gross valuation misstatement 40% penalty and a substantial valuation misstatement 20% penalty in the alternative.

### d. Defendants continue their fraud.

231.    Following Turtle River's donation on the Conservation easement at the end of 2013 and the distribution of Turtle River K-1's to its members in April 2014, Defendants continued their fraudulent communications and scheme.  For instance, on May 12, 2017, Turtle River sent a letter to the Turtle River Members discussing the IRS' audit and recent FPAA and the legal strategy on how to proceed.  The letter was cc'd to Strategic and to MMM lawyers Timothy Pollock and Lillian Martin.  In fact, the letter was drafted by the Strategic Defendants and the MMM Defendants. The letter noted that the IRS denied the entire Turtle River conservation easement deduction based "on a disagreement over the valuation of the Conservation Easement" and on the IRS' position that here may be other technical issued that would cause the value of the allowable deduction to be 'zero.'"  The letter further stated that "we strongly disagree with the IRS' determination and we suggest that you not be overly alarmed."   Although the Strategic Defendants and MMM Defendants knew that the claimed value for the conservation easement was fraudulently inflated, they fraudulently concealed and failed to advise the Turtle River Members of this fact in the letter.

145

232.   A memorandum from the MMM Defendants to the Turtle River members dated May 12, 2017, regarding the audit was also attached to the foregoing letter.   Though the MMM Defendants knew that the claimed value for the conservation easement was fraudulently inflated and that the conservation easement would not survive IRS scrutiny, they fraudulently concealed and failed to advise the Turtle River Members of this fact in the memorandum.

233.   On November 2, 2017, Strategic's Chief Operating Officer, Mike Fields sent an email on behalf of the Strategic Defendants to the Turtle River members which attached a letter from Turtle River's Tax Matters Partner.   The email and letter updated the members regarding the retention of litigation counsel and the filing of Turtle River's Tax Court petition.   Although Strategic knew that the claimed value for the conservation easement was fraudulently inflated and that the conservation easement would not survive Tax Court scrutiny, Strategic fraudulently concealed and failed to advise the Turtle River Members of this fact in its email.

e.   **The Tax Court holds that the IRS properly disallowed Turtle River's conservation easement deduction.**

234.   The Turtle River Syndicate filed a Tax Court petition on June 30, 2017, where the case remains pending.   By order dated June 30, 2020, the Tax Court entered a partial summary judgment order holding that the Deed of Conservation Easement fails to protect the conservation purpose in perpetuity as required by as

required by § 170(h)(5)(A) of the Code and that the IRS therefore properly disallowed the Turtle River conservation easement deduction.

### 3.      Hebert engages in the Bear Creek Syndicate Transaction in 2016.

235.   The Strategic Defendants were the chief promoters of the Bear Creek Syndicate Transaction and marketed and coordinated all aspects of the transaction. The individuals and entities listed below were Strategic's advisors to the Bear Creek Syndicate Transaction and undertook the following roles:

| Participant | Role |
| --- | --- |
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| ACC Defendants | Accepted the donation of the conservation easement, provided the BDR for the property, prepared deeds of conservation easement, signed the Form 8283, and acknowledged acceptance of the donation. |
| Van Sant and Wingard Defendants | Provided appraisals of the property for the conservation easement donation, which appraisals relied solely on the conclusions from AquaFUSION's consulting report regarding the valuation of mineral resources and the feasibility of developing the property for mining. |

**EXHIBIT D**

| MMM Defendants | Provided alleged due diligence, reviewed transactional structures, and issued a legal opinion letter purporting to support the bona fides of the transaction. |
|---|---|
| Defendant Nelson Mullins | Provided due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected. |
| Defendant F&D[32] | Provided tax preparation services in connection with the transaction. |
| Defendant AquaFUSION | Prepared a feasibility report supporting the development of the property into a mine, which was used by the Van Sant and Wingard Defendants to support their conclusion that mining was the HBU of the property. |
| Dantin Defendants | Referred Hebert to Strategic and helped to convince him to do the deal using numerous fraudulent representations and omissions. |

---

[32] Based on the facts currently known, it is also likely that F&D prepared tax returns for the adjoining tracts described later in this section.

EXHIBIT D

### a. Background on the property

236. In 2016, the Strategic Defendants (through Bear Creek LH Holdings, LLC, a Strategic-affiliated entity) facilitated the acquisition of an interest in 185 acres of real estate located in Coweta County, Georgia (the "Bear Creek Property"). The contributing owners of the property acquired by Bear Creek LH Holdings, LLC were Hal and Linda Barry.[33]  The Barrys also own adjacent real estate that used to be part of a contiguous, 1,000-acre parent tract known as the Barry Fox Hunting Property.  The Barrys had been listing these portions of the 1,000-acre parent tract since 2011 for high-end residential development at prices in the $10,000-per-acre range.

237. Another parcel of the parent tract directly across the road from the Bear Creek Property was likewise used in a SCE Strategy transaction (owned by Bear Creek SK Holdings, LLC).  This tract is directly across a road from the Bear Creek Property.  And a parcel further south was also used in a separate SCE Strategy transaction (owned by Bear Creek LKB Holdings, LLC).  These properties are illustrated on the following map:

---

[33] The abbreviation "LH" stands for "Linda" and "Hal."

EXHIBIT D



238.    To the immediate west of the Bear Creek Property are two parcels that are each owned by an individual (Wendy Owens and Larry Sellers) and have existing houses on the properties, which were completed in or around 2016 and 2020, respectively.   Another property south of the Bear Creek Property is owned by Zachary Watts and likewise contains a home built in 2016 or 2017.   All of these homes are high-end (worth at least $1 million).   Moreover, Hal and Linda Barry still own a parcel south and west of the Bear Creek Property, which contains a multi-million-dollar home, stables, and other improvements.   The Barry property was last listed for sale in 2019 for $4.8 million.

EXHIBIT D

239.   As described in more detail below, the proximity of multi-million-dollar estates, including one owned by the Barrys who contributed the Bear Creek Property, made it highly unlikely that a mine—which was chosen as the HBU by the appraiser—would ever be developed.   It also indicates that the Barrys (as contributing owners of the parcel and part owners and managers of Bear Creek LH Holdings) as well as the Defendants never intended for the Property to ever be developed as a mine.   The Barrys would have never contributed the Bear Creek Property if they knew a strip mine might be developed on it.   A nearby strip mine would have significantly impaired the Barrys' enjoyment of their estate and their ability to market, and their ability to market and sell their estate and the remaining tracts of the Barry Fox Hunting Property.

240.   As part of the "diligence period" (and afterward as well), the Strategic Defendants and the Van Sant and Wingard Defendants purported to also receive advice and consultation from AquaFUSION and another consultant for the purpose of supporting the bona fides of a charitable contribution deduction from the donation of a conservation easement to a land trust.   These consultants were employed to buttress the bogus findings of the Van Sant and Wingard Defendants that a mine was a legally, physically, and economically viable option, even though it wasn't.   These consultants were paid by Bear Creek LH Holdings, LLC or another Strategic-affiliated entity.

151

### b.    The Dantin Defendants introduce the Strategic Defendants and the SCE Strategy to Hebert.

241.    Hebert is the Chairman of the Board of Environmental Technical Sales, Inc., a company specializing in water and wastewater treatment.

242.    Chris A. Dantin of Dantin Financial had previously worked as a financial advisor to Hebert in the 1990s.  Chris was well known in the Baton Rouge area, having been a standout football player at LSU in the 1970s.

243.    In the third or fourth quarter of 2014, Dantin met with Hebert at Environmental Technical Sales' offices in Louisiana to pitch the SCE Strategy offered by the Strategic Defendants.  Unbeknownst to Hebert, Dantin was a front-line promoter of SCE Strategy transactions for the Strategic Defendants.  Dantin described how the SCE Strategy worked and said he had fully vetted the Strategy.  Dantin falsely stated that the federal tax benefits were usually $4 in tax savings for every $1 invested.  He falsely represented that the SCE Strategy was a legal tax-planning strategy.  And he said that Strategic had never had any problems with the IRS on these transactions.

244.    Dantin touted Strategic's strong reputation, noting that they had been in business for 15 years, had a "great bunch of lawyers," and really "knew their stuff" on conservation easement transactions.  Dantin also touted some of the team that Strategic had assembled to help ensure that the SCE Strategy transactions satisfied all IRS requirements, including two CPA firms that were well respected by the IRS

EXHIBIT D

and two appraisal firms that worked to ensure that the appraisals needed for the transactions were well supported and thorough.  Dantin said that Strategic was happy to answer any question Hebert might have.

245.   Dantin brought with him marketing brochures from Strategic about the SCE Strategy.   One of the brochures described the Turtle River Syndicate Transaction that Strategic had offered in 2013.  This brochure contained the same misrepresentations and omissions described above in the Turtle River Syndicate Transaction section.

246.   A second brochure described Strategic's business in general.  Among other things, this brochure touted Strategic's experience with conservation tax credits, renewable energy tax credits, film tax credits, and historic tax credits.  The brochure emphasized an "expert team of CPAs, MBAs, attorneys, wealth managers, and investment bankers," as well as the firm's experience "with developing . . . successful projects via proper due diligence and holistic thinking."  Specifically with respect to the SCE Strategy, the brochure stated, "Tax credits align with our internal views on philanthropy and sustainability in that each one provides the opportunity to not only mitigate a client's tax rate and better manage cash flow, but also have a meaningful impact on our environment and society at the same time."  This brochure also provided an "executive summary" that showed the steps of the SCE Strategy but fraudulently omitted a host of details, including that the Strategic Defendants

knew that the appraisals they used were fraudulently prepared with the premise that a hypothetical HBU could provide the fair market value of the conservation easement donation.  The brochure provided a list of key features and tax benefits, including the misleading representation that Strategic's SCE Strategy was "government sponsored," when the Strategic Defendants knew that their transaction did not meet the Tax Code requirements and would be disallowed if audited.

247.   A third brochure provided another overview of "conservation tax credits."   It included several misleading representations, including that "conservation easements have been widely used for decades and are well recognized by the government."  Although this representation was technically correct at the most general level, it was misleading as to Strategic in that it and omitted that Strategic's SCE Strategy transactions did not meet Tax Code requirements.  This brochure touted that a "qualified conservation appraiser" would determine the easement's value, when, in fact, the Strategic Defendants knew that the appraisers they used were not and could not be qualified appraisers.  At the end of this brochure, Strategic included a lengthy and seemingly impressive resume for both Freeman and Novak.

248.   The Strategic Defendants provided these brochures to Dantin via email or mail prior to the meeting with Hebert for the purpose of fraudulently inducing Hebert to undertake SCE Strategy transactions with Strategic.  By presenting these

brochures to Hebert, Dantin adopted the fraudulent misrepresentations contained therein.

249.   Dantin endorsed the SCE Strategy and represented that he would be investing in a transaction too.  This gave Hebert comfort that the SCE Strategy was beneficial and legal.

250.   Towards the end of the meeting or sometime soon thereafter, Dantin asked if Hebert would be willing to host a meeting with other potential investors, including some of Hebert's colleagues, friends, and family members at Hebert's offices.  Strategic representatives would attend that meeting and provide more details about the SCE Strategy and answer any questions that Hebert or other potential investors had.  Hebert agreed to do so.

> **c.**   **The Strategic Defendants and Dantin host a meeting at Hebert's offices to pitch the SCE Strategy to Hebert and others.**

251.   A couple of months after Hebert's meeting with Dantin, Novak and at least one other representative from Strategic traveled to Baton Rouge to host the meeting that Hebert had agreed to.  At Dantin's urging, Hebert got many of his colleagues, friends, and family members to attend the pitch.  Dantin introduced Novak, and Novak or another Strategic representative then led the meeting. Strategic brought additional brochures similar to the ones presented to Hebert by Dantin.  The Strategic representative then described the steps of the SCE Strategy

and how it was implemented.  The basic idea was that a Strategic-affiliated entity would buy real estate, appraise the real estate at its HBU, and promise to conserve the real estate in perpetuity (*i.e.*, not develop it for its HBU).  The entity would then get a tax write-off for the difference between the appraised HBU value and the value of the real estate after a conservation easement was attached to the real estate.  These representations omitted key facts, including that the appraisals would be fraudulently premised on a hypothetical HBU in a manner that was not permitted by the Tax Code.  The representative falsely stated that the federal tax benefits were usually $4 in tax savings for every $1 invested when the Strategic Defendants knew the IRS would disallow the tax benefits if it audited the transaction.  The Strategic representative said the SCE Strategy was a legal tax-planning strategy and that the IRS had never successfully challenged a SCE Strategy transaction implemented by the Strategic Defendants.  He also said that in the unlikely event of an audit, there was money set aside to handle the audit costs and the transaction would likely survive IRS scrutiny.  And if for some reason the IRS was successful in challenging the transaction, Strategic said it would merely result in a slight decrease in the deduction amount (instead of 4-to-1 tax benefits to investment, it would at worst end up at a 3-to-1 ratio).  All of these representations were false or intentionally misleading when made; however, Hebert did not know and could not have reasonably known otherwise.

EXHIBIT D

252.    Based on these fraudulent misrepresentations made by Strategic and the Dantin Defendants at this meeting and the prior ones made by Dantin and Strategic (through Dantin and the brochures), Hebert undertook a SCE Strategy transaction in 2014.

### d.    The Strategic Defendants market the Bear Creek Syndicate Transaction to Hebert.

253.    On or about November 30, 2015, Dantin on behalf of Dantin Financial emailed Hebert about the opportunity to do another SCE Strategy transaction and asked if Hebert wanted to participate.  Because the 2014 transaction had seemingly been successful and based on the prior misrepresentations made to him by Strategic and the Dantin Defendants, Hebert decided to undertake the Bear Creek Syndicate Transaction.

### e.    The Strategic and Bridge Capital Defendants send Promotional Materials to Hebert.

254.    Hebert received Promotional Materials and other solicitations described in detail below from the Strategic and Bridge Capital Defendants in the fourth quarter of 2015 by email and/or U.S. mail.  The Promotional Materials detailed a SCE Strategy made through the Bear Creek Syndicate.

255.    The Promotional Materials were designed to convince potential participants that the SCE Strategy provided a legal and legitimate way to save on taxes through a conservation easement that would be structured and implemented in

157

EXHIBIT D

full compliance with Section 170(h) of the Code. The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Bear Creek Syndicate, thus generating enormous fees for the Defendants and Other Participants.

256. The Strategic and Bridge Capital Defendants sent Hebert a glossy brochure entitled, "Bear Creek Investors, LLC Offering Summary & Case Study," in the fourth quarter of 2015 by email. The brochure falsely informed Hebert and other members of the Class that:

     (a)   The business of the Bear Creek Syndicate was to "hold, mine, and operate real property," even though the Strategic and Bridge Capital Defendants never intended to develop the Property into a mine; and

     (b)   The Strategy would result in "greater free cash," and "philanthropic goodwill from the conservation of natural resources," as well as "mitigate[] [a taxpayer's] overall effective tax rate and tax payments," when the Strategic and Bridge Capital Defendants knew that none of these results would actually occur.

257. The Offering Summary & Case Study also falsely represented that a participant would be entitled to the following tax benefits if they joined the Bear Creek Syndicate, even though the Strategic Defendants knew the IRS would likely audit and disallow the deductions claimed by Plaintiffs and the other Class members:

158

| | | | | | | |
|---|---|---|---|---|---|---|
| **Investment and Benefit Summary** | | | | | | |

| UNITS | INVESTMENT | ALLOCATED FEDERAL DEDUCTION | ESTIMATED CASH VALUE | ESTIMATED CASH RETURN | ESTIMATED NOMINAL RETURN |
|---|---|---|---|---|---|
| **INVESTMENT** | | | | | |
| 190 Class A | ($5,130,000) | $21,744,287 | $9,350,043 | $4,220,043 | 82% |
| **PER UNIT INVESTMENT** | | | | | |
| 1 Class A | ($27,000) | $114,444 | $49,211 | $22,211 | 82% |

258.  On or about December 20, 2016, Michael Viscusi on behalf of Strategic emailed Hebert to let him know that the "Bear Creek Investors project documents will be sent today."  The email instructed him to complete the subscription documents and submit them via DocuSign by December 23, 2016.  He also instructed Hebert to wire the investment funds by the same date.

259.  Later that day, the Strategic and Bridge Capital Defendants sent an email to Hebert.  The email included a DocuSign link for Hebert to review and sign certain documents in a Private Placement Subscription package.  The package of documents provided to Hebert included at least the following documents:

- A Private Placement Memorandum with various transactional agreements attached;

- A Private Placement Offering; and

- A Subscription Agreement.

260.   The Private Placement Memorandum purported to describe the Bear Creek Syndicate Transaction in detail.   The Private Placement Memorandum informed Hebert and other Class members that the Bear Creek Syndicate could choose from one of four options for use of the Bear Creek Property:  (1) establish a mine on the Property, (2) market the Property for sale for mining development, (3) hold the Property for long-term investment, or (4) conserve the Property by contributing a conservation easement to a tax-exempt land trust resulting in a charitable contribution deduction equal to over $24 million for the Syndicate (which would be equal to over four times the total investment) (*i.e.*, the conservation easement option).

> f.     **The Promotional Materials incorporate a Preliminary Gneiss Valuation and Quarry Feasibility Analysis by AquaFUSION.**

261. The Private Placement Memorandum "incorporated in full" a Preliminary Gneiss[34] Valuation and Quarry Feasibility Analysis report dated December 7, 2016.  The report's purpose was to purportedly support the bona fides of developing the Bear Creek Property into a mine.

262.   Eric L. Reisigner, GA P.G., David R. Buss, Ph.D., P.G., and Yvonne Sanders, PE (on behalf of AquaFUSION) prepared the report and sent it via email

---

[34] Gneiss is a type of metamorphic rock that is often used in the construction industry as a building material.

EXHIBIT D

or U.S. mail on or around December 7, 2016, to Strategic or a Strategic-affiliated entity for use by the Bear Creek Syndicate and to the Van Sant and Wingard Defendants.

263. AquaFUSION's report forms the basis for the fraudulent conclusion that the HBU of the Bear Creek Property was as a quarry for granite mining. The report contained numerous undisclosed and gross deficiencies, some of which amount to outright fraud. The Van Sant and Wingard Defendants then relied wholesale, without examination, on those fraudulent representations and deficiencies in their Appraisals. The following are some examples of the fraudulent misrepresentations, omissions, and gross deficiencies contained in the AquaFUSION report:

    (a)    The report falsely and materially represented that "[t]his feasibility analysis demonstrates that a financially viable construction aggregate operation is possible for the Bear Creek Farm Greenfield," when, in fact, mining was not legally permissible (since the required zoning and permitting were not in place and there was no showing of reasonable probability that they soon would be), nor economically feasible under the circumstances.

(b)     The report fails to mention the adjoining and nearby tracts and examine the impact of those tracts on the legal permissibility (such as zoning and permitting) or economic feasibility of the Bear Creek Property.

(c)     The report states that "it is reasonably probable that all necessary state and federal environmental and mining permits could be obtained for a mining operation at this Bear Creek Farms Quarry," but fails to provide any support for that conclusion.  Moreover, the report provides no timeline whatsoever for the permitting and zoning process and assumes without support that the mine will be producing 500,000 tons of granite by Year 2.

(d)     The report assumes that the required infrastructure (such as roads and utilities) is all in place subject only to minor adjustments.  But the report gives no analysis in support of that conclusion, such as (i) that the surrounding country roads could handle the frequency or the weight of trucks transporting limestone or (ii) that utilities sufficient for agricultural purposes would also be sufficient for a quarry.

(e)     The report does not discuss whether it is feasible that the Strategic Defendants or the Syndicate itself could operate a mine, when most mines in the southeastern United States are operated by experienced professionals.

EXHIBIT D

264.   In conclusion, the AquaFUSION report wholly fails to demonstrate that the potential HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future).   Thus, the proposed HBU was purely speculative, despite Defendants' representations to the contrary.

> ### g.   The Promotional Materials include an Initial Appraisal drafted by the Van Sant and Wingard Defendants.

265.   The "options" for use of the property were supported by an Initial Appraisal letter dated December 19, 2016, prepared and sent by the Van Sant and Wingard Defendants to Bear Creek LH Holdings, LLC via U.S. mail and/or email. The Promotional Materials included a summary of the Initial Appraisal and incorporate the Initial Appraisal.   The Van Sant and Wingard Defendants and the Defendants knew and intended that the potential investors in the Bear Creek Syndicate, including Hebert, would rely on this summary, the Initial Appraisal, and the later Qualified Appraisal in deciding to undertake the SCE Strategy, as evidenced by the statement in the summary, "This Restricted Appraisal Report is intended for your discussion and/or use with your partners, tax attorney and accountants . . ." Regardless of its title, and as indicated in the Initial Appraisal, that document is subject to, and allegedly written in accordance with, USPAP.

266. The Initial Appraisal letter provided a valuation of the real estate at its purported HBU of mining. The Initial Appraisal letter falsely and materially stated that the conservation easement had a "Fair Market Value" of $24,329,000, when the Van Sant and Wingard Defendants and the other Defendants knew that this value was grossly overstated and based on a HBU that was never intended to occur.

267. As further support for their valuation, the Van Sant and Wingard Defendants incorporated AquaFUSION's report, for the purpose of purportedly supporting the bona fides of a charitable contribution deduction from the donation of a conservation easement to a land trust. And like the AquaFUSION report, the Initial Appraisal summary and Initial Appraisal contained numerous fraudulent misrepresentations and gross deficiencies, including but not limited to the following:

(a) The Van Sant and Wingard Defendants relied wholesale and without examination on the AquaFUSION report. Thus, the Initial Appraisal incorporates all of the gross inadequacies and frauds found in that report, as summarized above. The Comments to USPAP Standards Rule 2-3 state, "When a signing appraiser(s) has relied on work done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work. The signing appraiser(s) is required to have a reasonable basis for believing that those individuals performing the work are competent. The signing appraiser(s) also must have no reason to doubt that

the work of those individuals is credible." The Van Sant and Wingard Defendants failed to state any basis (let alone a reasonable basis) for uncritically relying on the AquaFUSION report.

(b)      The Initial Appraisal relies on several hypothetical assumptions, including that zoning and permitting could be obtained without ever examining when that might occur and why (and demonstrating it would be soon). In addition, it also relies on several unexplained assumptions, such as that adequate funds exist for the infrastructure needed for a physical plant and a quarry when there is no such showing that such funds existed or that the members of Bear Creek Syndicate would contribute them. There is no evidence that the Van Sant and Wingard Defendants investigated the possibility of permitting or any of these other hypotheticals, in violation of USPAP 4 (which requires diligence on matters that would have a "significant effect" on the results).

(c)      Although the Initial Appraisal defines "fair market value" on pages 39, the Van Sant and Wingard Defendants do not use fair market value in their analysis. Instead, they relied on an improper HBU analysis, which was supported by the false assumption that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU when the owner donates real estate to a conservation organization.

(d)     The Van Sant and Wingard Defendants identify zero comparable mines in Georgia to use in the sales comparison approach.  They identify two operating mines in South Carolina—not raw land like the Bear Creek Property—but quickly conclude that the Sales Comparison approach is a lesser appraisal methodology.  Instead, the Van Sant and Wingard Defendants used the Income Approach so they could achieve the highest possible valuation even though a comparison of the sale of other raw tracts of land would have been more reflective of the true market value (*i.e.*, what a willing buyer and willing seller would agree to) and more in line with USPAP (Standards Rule 1-4), the Tax Code, and IRS regulations.

(e)     To be considered a qualified appraiser, the appraiser must have a demonstrated competency in valuing the type of property being appraised.  In the Initial Appraisal, the Van Sant and Wingard Defendants did not state any experience or education in valuing minerals or mineral properties, yet they purported to value the Bear Creek Property based on an HBU of mining by blindly relying on AquaFUSION's false and flawed conclusions.

(f)     Based on the misrepresentations and deficiencies described above, none of the summary of the Initial Appraisal, the Initial Appraisal, and the later Qualified Appraisal could be considered a "Qualified Appraisal," as that term is defined under Treas. Reg. § 1.170A-17(a)(1).  Those Appraisals

EXHIBIT D

do not conform to generally accepted appraisal standards (USPAP), as required by I.R.C. § 170(f)(11)(E)(i), or Treas. Reg. § 1.170A-1(c)(3)(ii)(I), which requires that the appraisal value be the fair market value of the property. The Van Sant and Wingard Defendants knew this but never disclosed this fact to Hebert or the other Class members.

268.  As discussed subsequently, none of these frauds/deficiencies are corrected or supplemented in the Van Sant and Wingard Defendants' Qualified Appraisal.

269.  In conclusion, the Van Sant and Wingard Appraisals wholly fail to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that, based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future).  Thus, the proposed HBU is purely speculative and cannot form the "before value" component of the valuation.

### h.    Hebert undertakes the Bear Creek Syndicate Transaction.

270.  Based on the Promotional Materials (including the Initial Appraisal) and the Defendants' advice and representations, Hebert purchased an ownership interest in the Bear Creek Syndicate.  Hebert paid $54,000 to purchase an interest in the Bear Creek Syndicate on December 20, 2016.  According to the instructions

given in the Promotional Materials by the Strategic and Bridge Capital Defendants, Hebert wired the money to an escrow account held by the MMM Defendants.

271.   To complete the investment in the Bear Creek Syndicate, the Strategic and Bridge Capital Defendants sent certain transaction documents to Hebert and other Class Members via email or mail in late 2016.  The Strategic and Bridge Capital Defendants instructed Hebert and other Class members to use DocuSign to electronically (and through the wires) fill out and execute the necessary transactional documents.   Hebert and the other Class members completed the transactional documents and executed them using DocuSign as they had been instructed.

### i.   The MMM Defendants issue a legal opinion letter.

272.   In December 2016, the MMM Defendants prepared and issued a draft legal opinion letter by email or U.S. mail to the Bear Creek Syndicate.  In the letter, the MMM Defendants made multiple misrepresentations and omission of material fact, including but not limited to:

| Representation or omission | Reason for falsity |
|---|---|
| "In rendering the opinions set forth below, we have made the following assumptions (and, to our knowledge and based on our review of the Documents, there are no facts inconsistent with these assumptions): … The Appraisal was prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(11) of the Code." | The MMM Defendants knew (or recklessly disregarded the fact) that the Appraisal was grossly and fraudulently inflated and was not prepared in accordance with generally accepted appraisal standards, such as USPAP, within the meaning of Section 170(f)(11)(E)(i)(II) of the Code).  The MMM Defendants knew or (or recklessly disregarded the fact) that the HBU analysis was legally insufficient because it was entirely based on a hypothetical and speculative set of facts not in existence and had numerous other material omissions and deficiencies. |
| "we cannot opine on whether the value determined in the Appraisal reflects the fair market value of the Conservation Easement" | The MMM Defendants knew or (or recklessly disregarded the fact) that the Appraisal was grossly and fraudulently inflated and did not qualify as a |

EXHIBIT D

| | Qualified Appraisal for the reasons stated herein and that the HBU analysis was legally insufficient. |
|---|---|
| "we do not express an opinion as to the dollar amount of any deduction attributable to the grant of the Conservation Easement to the Land Trust" | The MMM Defendants knew (or recklessly disregarded the fact) that the value of the deduction attributable to the grant of the conservation easement to ACC was dependent upon the value of the Property in the Appraisal, which was grossly and fraudulently inflated and which featured a legally insufficient HBU analysis. |
| It was more likely than not that "the Appraiser will be treated as a Qualified Appraiser for purposes of Section 170(f)(11)(E) of the Code." | The MMM Defendants knew (or recklessly disregarded the fact) that the Van Sant and Wingard Defendants were not a Qualified Appraiser due to lack of independence and relevant education and experience in mining, which caused them to improperly rely wholesale on the AquaFUSION report. |

| "in the course of our representation, nothing has come to our attention that would cause us to question the accuracy of the facts assumed for our opinions" | The MMM Defendants knew (or recklessly disregarded the fact), *inter alia*, that the Appraisal was grossly and fraudulently inflated, that the Appraisal's stated HBU of a mine for the Property was neither legally permissible (since they knew that the required zoning and permitting was not in place and there was no showing of reasonable probability that they ever would be) nor economically feasible. The MMM Defendants also knew (or recklessly disregarded the fact) that the HBU analysis was legally insufficient, and that the Van Sant and Wingard Defendants were not independent. |
|---|---|
| The letter makes numerous other assumptions and states "to our knowledge and based upon review of | The MMM Defendants knew (or recklessly disregarded the fact) that these assumptions were either false or unreasonable and that there were |

| the Documents, there are no facts inconsistent with these assumptions." | inconsistent facts that should have been disclosed to the investors. |
|---|---|

273.   These representations and omissions in the letter were not simply opinions. The MMM Defendants knew when they wrote their letter that it contained materially false statements and omitted key facts, including about the near certainty of an audit and disallowance of the claimed deductions as well as the high likelihood of the IRS imposing numerous penalties and interest on Hebert and other members of the Class.

274.   The conclusions in the draft opinion letter were materially false and misleading because the MMM Defendants knew—based on the MMM Defendants' specialized knowledge of tax law and regulations as well as their knowledge of the goals of the conspiracy and RICO enterprise—that there was a substantially greater than 50% chance that the contribution deduction would be audited and disallowed by the IRS.

275.   Hebert and the Class members either directly received and relied on the draft opinion letter (or another version of the tax opinion letter) or reasonably relied on it through summaries of it contained in Promotional Materials, marketing presentations, and the Nelson Mullins' Due Diligence Report.

### j.   Nelson Mullins prepares a "Due Diligence Report" for Hebert and other Class members.

276.   On December 30, 2016, Nelson Mullins issued its "Due Diligence Report."  The following day, an assistant to Edward White of Nelson Mullins sent the Due Diligence Report to Hebert via email.

277.   The stated goal of the Report was to "identify any material issues that may exist with respect to the Transaction's legal agreements and tax structure and propose solutions to the extent any identified risks may be mitigated."  The Report, however, did not do this in many material respects.   Instead, it made misrepresentations and omissions of material fact, including but not limited to:

| Representation or omission | Reason for falsity |
| --- | --- |
| "we did not see anything out of the ordinary in the Appraisal, and the methodology that was used seems reasonable" | Nelson Mullins knew (or recklessly disregarded the fact) that (i) the value of the donation claimed in the Appraisal was grossly and fraudulently inflated, (ii) the Van Sant and Wingard Defendants could not uncritically and without explanation rely on the AquaFUSION report, and (iii) the HBU analysis contained numerous |

EXHIBIT D

| | misrepresentations and material deficiencies. |
|---|---|
| "Nor can we opine on the feasibility or probability of the Property being developed as a mine and quarry in the absence of the conservation easement being placed on the Property" | Nelson Mullins knew (or recklessly disregarded the fact) that it was not legally permissible or economically feasible to develop the Property as a mine and that no legitimate efforts were being made to do so.  Further, Nelson Mullins knew (or recklessly disregarded the fact) that there were significant legal deficiencies in the HBU analysis, including that there was no showing of "closeness in time." |
| "The Appraisal found the 'before' value of the Property to be $24,700,000 and the 'after' value of the Property to be $370,000" | Nelson Mullins failed to disclose that the "before" value of the Property was grossly and fraudulently inflated for the reasons set forth earlier. |
| "the Tax Opinion [referring to the MMM Opinion, although the Report curiously refers to the Tax Opinion | Nelson Mullins knew (or recklessly disregarded the fact) that the Appraisals did not follow applicable appraisal |

EXHIBIT D

| writer only as 'an experienced tax lawyer with a prominent law firm in Atlanta'] indicates that the Appraisal meets the requirements of a 'qualified appraisal' for tax purposes" | standards and grossly inflated the value of the easement. Further, they knew (or recklessly disregarded the fact) that there were significant legal deficiencies in the HBU analysis, including that the Van Sant and Wingard Defendants could not uncritically rely on the AquaFUSION report. |
|---|---|

278.   Although the Report recommended that the MMM Tax Opinion letter include a discussion and analysis of Notice 2017-10, it did not conclude, as Nelson Mullins knew or should have known, that the Notice meant a near certain chance of audit and disallowance by the IRS.  Instead, the Report advised that:

> this potential investment is well documented and appears to be properly structured. While the Notice raises the possibility of an IRS review of the Transaction, many aspects of the Transaction are supported by the Tax Opinion, which was prepared by a tax attorney at a reputable law firm with specific experience structuring conservation easement transactions.

Nelson Mullins knew that the MMM Tax Opinion contained numerous material misrepresentations and was fatally flawed.

279.   Although this Due Diligence Report was supposed to come from an independent law firm and be solely for the benefit of Hebert, it acknowledged that

Nelson Mullins (a) had done worked for Strategic and Bridge Capital on other conservation easement transactions and had issued similar opinion letters for those transactions (*i.e.,* Strategic and Bridge Capital were important and valuable clients of the firm),  and (b) was being paid out of the closing proceeds from the closing of the Transaction.  These two facts destroyed any independence that Nelson Mullins had.  It also meant that Nelson Mullins' fee was contingent on the Bear Creek Syndicate Transaction closing, which fee would not have been paid in its entirety if some or all of the members had decided to back out of the Transaction.  But Nelson Mullins did not explain these significant issues.

> **k.     The Bear Creek Syndicate elects to pursue a conservation easement strategy.**

280.   James Freeman (on behalf of the Strategic Defendants) sent Hebert and other members of the Class a document entitled, "Notice from the Managers of Bear Creek Investors, LLC with Respect to Real Property," on or around December 28, 2016, via email.  The Notice informed the members of the Bear Creek Syndicate that the managers (Freeman and Harold Barry) had determined that the Syndicate should cause the Bear Creek LH Holdings, LLC to pursue a conservation easement strategy as outlined in the Private Placement Memorandum.  The Notice solicited the members' vote on whether to pursue this strategy or, instead, pursue one of the investment strategies outlined in the Private Placement Memorandum.

281.   Based on the recommendations of the Defendants (and especially the Strategic Defendants), Hebert voted electronically (by DocuSign) in favor of pursuing the conservation easement strategy, and so did all of the other members of the Bear Creek Syndicate.  Hebert and the other investors were also requested to approve a document entitled "Action of the Manager and Members of Bear Creek Investors, LLC Taken by Written Consent in Lieu of a Meeting."  The Action document requested authority for the managers to pursue the conservation easement strategy.  Hebert signed and returned the Action document electronically (by DocuSign) and so did all of the other members of the Bear Creek Syndicate.  Thus, the Bear Creek Syndicate then voted to place a conservation easement on the real estate and donate the easement to ACC.

282.   Hebert and other members of the Class were woefully informed prior to their vote to pursue the conservation easement option.  Prior to the election, Hebert and other Class members had never been informed *inter alia* that:

(a)   The Property sold to the members of the Bear Creek Holdings, LLC for over $5 million and now being valued at over $24 million for purposes of the conservation easement had been purchased earlier in December 2016 for only a little over $1.3 million.

EXHIBIT D

(b)     The purported HBU of mining for the Property was neither legally, practically, or economically feasible and was never intended to be pursued by the Defendants;

(c)     The fact that the Bear Creek Syndicate Transaction had been declared a "listed transaction" by the IRS made it a virtually certainty that the Transaction would be audited;

(d)     Even before the Bear Creek Syndicate Transaction had been declared a "listed transaction" by the IRS, there was a high likelihood of an audit;

(e)     That the predictions in the Van Sant and Wingard Defendants' appraisals and the AquaFUSION Analysis that it was reasonably probable that all necessary State and Federal environmental and mining permits could shortly be obtained were false for this reason: (i) the same environmentally sensitive features of the Property that would justify a conservation easement on this parcel (such as discussed in the Deed and the BDR hereinafter) would work against obtaining a mining permit, and (ii) significant homeowner opposition could reasonably be expected to a mine built near their luxury estates, causing the permitting to take much longer or not occur at all.

**l.    The ACC Defendants prepare a BDR.**

283.   On or about December 30, 2016, Keller on behalf of ACC prepared a BDR and provided it to the Bear Creek Syndicate via email or U.S. mail.  The ACC Defendants verified the BDR as accurate.  The purported purpose of the BDR was to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose.  However, unbeknownst to Hebert, the Bear Creek Property lacked a true conservation purpose.  Thus, ACC set out in a vague, conclusory, and misleading manner—as part of the overall fraudulent scheme—those conditions on the Property that would allegedly be preserved by the conservation easement and summarily concluded that these conditions met the conservation purpose of § 170 of the Code.

**m.    The Strategic, MMM, and ACC Defendants jointly prepare the relevant Deeds.**

284.   The Bear Creek Syndicate conveyed the conservation easement to ACC on December 30, 2016.  The Conservation Deed, dated December 30, 2016, was jointly prepared and approved by the Strategic, MMM, and ACC Defendants and sent via U.S. mail and/or email for filing.  The Conservation Easement Deed was verified and signed by Keller of ACC (on behalf of ACC).

285.   Among the numerous rights that the Deed reserved for the grantor was the ability to develop and maintain facilities for the generation of renewable power, which included solar arrays and windmills.  The Deed permitted renewable power

facilities on up to 20 acres of the total ground coverage anywhere on the Property. This broad renewable power reservation violated IRS Regulation § 1.170A-14(g)(1) because it was inconsistent with the conservation purpose of the donation. Future construction of solar arrays and windmills would undoubtedly kill wildlife (especially the birds identified in the BDR) and impact scenic views. The Strategic, MMM, and ACC Defendants knew or recklessly disregarded the fact that this broad reservation could and would result in disallowance of the conservation easement contribution deduction, and, because the 20 acres was not a fixed location on the Property, might also be attacked by the IRS as a "perpetuity issue" that would impact the entire Property. They chose to include it regardless.

**n.    The ACC Defendants provides the Bear Creek Syndicate with a letter confirming that the contribution is "fully tax deductible."**

286.    On December 30, 2016, Keller, on behalf of ACC, sent Bear Creek Holdings, LLC a letter through the U.S. mail and/or email documenting the conveyance, which falsely and materially advised that the contribution to ACC "is fully tax deductible," when ACC knew or should have known that the contribution deduction was based on grossly inflated appraisals and would be disallowed by the IRS. ACC also knew that it had not attempted to question or verify the appraisals, in callous disregard of industry standards.

287.   F&D filed the ACC Defendants' letter with the Bear Creek Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary (Form 8283).

288.   ACC also provided Bear Creek LH Holdings LLC with two additional letters.   The first letter, sent on January 26, 2017, by U.S. mail and/or email, documented a $43,833 "stewardship donation" for the perpetual protection of the donated conservation easement.   The second letter, sent on the same date by U.S. mail and/or email, documented donations totaling $10,663.05 to ACC for its BDR.

**o.     The Van Sant and Wingard Defendants prepare an Appraisal Summary, which is verified by ACC.**

289.   In August 2017, prior to the tax return being prepared and the final Qualified Appraisal being issued, the Van Sant and Wingard Defendants prepared the Appraisal Summary (Form 8283) and sent it to, *inter alia*, Bear Creek LH Holdings, LLC via email or U.S. mail for inclusion in that entity's tax return.   Both Wingard and Van Sant (as the appraisers and on behalf of Van Sant and Wingard) and Keller (on behalf of the ACC Defendants) verified the Appraisal Summary (Form 8283) as accurate and signed it.

290.   The Appraisal Summary showed an astonishing increase in value over a short period of time.   The Appraisal Summary represented that Bear Creek LH Holdings, LLC had acquired the Property by deed on December 22, 2016 for a cost basis of $1,360,344 but that the conservation easement donation (which had

occurred only 8 days after the acquisition of the Property by Bear Creek LH Holdings, LLC) had a fair market value of $24,329,000—a more 17X appreciation in value in a little over a week.[35]  The F&D, the Van Sant and Wingard Defendants, and ACC (with knowledge by the other Defendants) then advised Hebert that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow Hebert to claim the charitable contribution deduction on his individual tax return.

291.   The Appraisal Summary falsely represented the appraised fair market value of the conservation easement, when, in fact, no independent appraiser would have appraised the easement at such a high value.

> **p.    The Van Sant and Wingard Defendants prepare the final Qualified Appraisal.**

292.   The Strategic Defendants selected the Van Sant and Wingard Qualified Appraisal to support a charitable contribution deduction for the Bear Creek Syndicate.

293.   The Van Sant and Wingard Defendants sent the final Qualified Appraisal Report to Bear Creek LH Holdings, LLC on or around September 9, 2017 via U.S. mail or email with the knowledge and intent that it would be shared with

---

[35] The Defendants attempted to get around this issue by tacking on the acquisition date by the previous owner, Harold Barry, who acquired part of the tract in 1987 and part of it in 2006.

and relied upon by members and prospective members of the Bear Creek Syndicate, including but not limited to Hebert as evidenced by, *inter alia*, the statement that "[t]his Qualified Appraisal Report is intended for your discussion and/or use with your partners, tax attorney and accountant in regards to the proposed conservation easement."

294.   This Qualified Appraisal, unlike the summary and the Initial Appraisal, contained the final Appraisal.  However, the Qualified Appraisal had, in form and substance, the same fraudulent misrepresentations and gross deficiencies identified above for the summary letter and Initial Appraisal.

295.   The Qualified Appraisal falsely and materially stated that the conservation easement had a fair market value of $24,329,000.

296.   The Qualified Appraisal falsely and materially represented that the Van Sant and Wingard Defendants were qualified appraisers under IRS regulations and that "my engagement in this assignment was not contingent upon developing or reporting predetermined results."  As part of the fraudulent scheme, the Van Sant and Wingard Defendants had used their flawed HBU analysis to produce a value to roughly coincide with the amount of tax deduction requested by the Defendants and, in fact, their co-conspirator Defendants would not have continued to use the Van Sant and Wingard Defendants if they had not come to the value range requested by the co-conspirators.

297.    The Qualified Appraisal falsely and materially represented that "This report is considered a qualified appraisal as defined in US Treasury Regulation § 1.170A-13(c) [and] as defined in the US Treasury Regulation § 1.170A-13(c)(5), we are qualified appraisers."  The Van Sant and Wingard Defendants, however, knew they were not a qualified appraiser because, among other reasons, (i) they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser," (ii) they lacked experience and education in mining, and (iii) they uncritically relied upon the defective AquaFUSION report.  Moreover, the opinions and conclusions offered by the Van Sant and Wingard Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (although they falsely stated otherwise in the Appraisal).

298.   The certification in the Appraisal also contained numerous false statements, including but not limited to:

EXHIBIT D

| Representation or omission | Reason for falsity |
|---|---|
| "The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions" | The Van Sant and Wingard Defendants, as part of the fraudulent conspiracy, used their flawed HBU analysis to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |
| "I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" | The Van Sant and Wingard Defendants were biased in favor of the appraisal value range set by their co-conspirators, which could only be arrived at by selecting mining as the HBU. |

299.   The Qualified Appraisal again relied wholly on AquaFUSION's report for the Property without giving any reasonable explanation as to why this was permissible, as required by USPAP.

300.   In addition to the fatal flaws, misrepresentations, and omissions discussed above, the Qualified Appraisal had numerous additional flaws, a couple of which are detailed below.

301.   First, as described above, the adjacent tract-holders, and especially the Barrys, would have vigorously objected to any actual mining development on the

Bear Creek Property.  A mining operating in such close proximity to their valuable bucolic estates would have significantly diminished the value and enjoyment of their real estate.  Although the Qualified Appraisal contains purported letters from *some* adjacent landowners supporting the re-zoning, these letters appear highly suspect given the significant negative impacts on the adjacent landowners' properties and the lack of any apparent benefits that those landowners would receive if a mine were developed.  Moreover, not all adjacent landowners submitted such letters, leading to the inference that those landowners did not support a zoning change or mine.

302.   Second, mining development would have faced significant (and likely insurmountable) obstacles from a zoning and permitting perspective.  Coweta County, where the property is located, has adopted a comprehensive land use plan and future development map to guide land use and development in the county.  The protection of natural land, rural character, and water resources are important values for the County.  The property is zoned "Rural Conservation," which means it is meant for agricultural land use and low-density single-family residences.  To re-zone this property for mining use would have required a lengthy public process, including feedback from the community and County departments.  No doubt, the adjacent landowners would have strongly objected to a change in use given the disturbances a mine operation would have caused not only the land itself but also the adjacent roads and watersheds.  The Qualified Appraisal even acknowledges that the property

186

EXHIBIT D

would have to be re-zoned to "Industrial," and that the Coweta County Planning and Zoning Department felt "the likelihood of getting the Department's recommendation for a zoning change [was] unlikely due to existing land patterns and anticipated opposition from neighboring property owners." Although the Qualified Appraisal notes that the Department did not have final say on the matter because a Board of Commissioners made the final decisions on zoning changes in the County, the Qualified Appraisal does not explain why the Commission would likely approve a zoning change in the face of community opposition and the lack of recommendation from the Department.

303.  Indeed, four Georgia counties in close proximity to Coweta County have faced similar zoning changes and mining development proposals in the last four years, and in each instance, the local governing bodies rejected the re-zoning request.

(a)  In 2017, the city of Douglasville (Douglas County) denied a re-zoning to a quarry developer.  The case went no further.

(b)  Meriwether County denied a re-zoning to a developer for a quarry in the Alvaton area.  The landowner filed a civil case against the County and lost.

(c)  In August 2020, Carroll County denied a zoning a compliance certificate and commercial building permit for a quarry developer.  The

landowner filed a civil case against the County, which has not yet been resolved.

(d)     In February 2021, Butts County denied a re-zoning application from a mining developer. The landowner filed a civil case against the County, which has not yet been resolved.

304.   Each of these instances demonstrates that a mining operation and requisite zoning change on the Bear Creek Property would have likely been denied, and even if Bear Creek LH Holdings LLC ultimately succeeded in getting a zoning change, it would have come after a lengthy and expensive court battle.

305.   In sum, these significant challenges make it clear that the Qualified Appraisal's selection of mining as the HBU was dubious and entirely disconnected from reality and, importantly, was not reasonable and probable based on the circumstances.

> **q.    F&D prepares the Syndicate's tax return and corresponding K-1s for the members, which Hebert uses to prepare his tax return.**

306.   In or about September 2017, F&D prepared the tax return for the Bear Creek Syndicate. The tax returns reported a charitable contribution deduction from the donation of the conservation easement. As required by applicable law and IRS regulations, the F&D Defendants attached to the Bear Creek Syndicate's return a copy of the Van Sant and Wingard Appraisal, the Appraisal Summary (Form 8283),

the BDR, and the ACC letter confirming the donation.  Thus, F&D adopted and incorporated the misrepresentations described above.  F&D sent the tax return and its attachments to Bear Creek Syndicate via U.S. mail and/or email in or around September 2017.  F&D filed the tax returns and accompanying documents electronically with the IRS.  F&D knew and intended for the Bear Creek Syndicate to file the tax return with the IRS, which it did and for the members of the Bear Creek Syndicate, including Hebert, to use their pro-rata share of the resulting deduction, which they did.

307.   In addition, F&D prepared a K-1 for each member of the Bear Creek Syndicate, including Hebert, which reported the amount of charitable contribution deduction allocated to each of the members of the Bear Creek Syndicate.  F&D sent the K-1 to Hebert via email or U.S. mail on or around September 11, 2017, shortly after preparing the Bear Creek Syndicate's tax return.  The K-1 prepared for Hebert reported a charitable contribution deduction of $228,887.

308.   Along with the K-1, F&D included a cover letter addressed to Hebert. The letter explained that the information in the K-1 had "been provided to the Internal Revenue Service" with the partnership tax return.  In the letter, F&D instructed Hebert that the "information provided on this schedule should be entered on your tax return, in accordance with the instructions in Schedule K-1, page 2." F&D also listed certain documents (Form 8283, Supplemental Statement to Form

8283, Land Trust Gift Letters, Full Appraisal) that "should be filed with each member's tax return."

309.   Hebert followed F&D's advice (as well as the advice of other Defendants) and reported the charitable contribution deduction on his individual tax return for 2016.

### r.   The 2016 Bear Creek LH Holdings, LLC Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.

310.   On July 20, 2020, the IRS issued a FPAA for the Bear Creek LH Holdings, LLC's tax return for the 2016 tax year.   The FPAA disallowed the charitable contribution deduction from the Bear Creek Syndicate Transaction for a variety of reasons, including that (a) the transaction failed to satisfy the requirements of I.R.C. § 170(h) and corresponding Treasury Regulations and (b) the value of the charitable contribution was not established.   The FPAA imposed a 40% penalty under I.R.C. § 6662(h).

311.   A Tax Court petition was filed by the Bear Creek Syndicate on October 14, 2020, where the case remains pending.

### 4.   Douget engages in the Rock Spring Syndicate Transaction in 2016.

312.   The Strategic Defendants were the chief promoters of the Rock Spring Syndicate Transaction and marketed and coordinated all aspects of the transaction. The individuals and entities listed below were part of Strategic's "team" (and co-

conspirators with the Strategic Defendants) to the Transaction and undertook the

following roles:

| Participant | Role |
|---|---|
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| Defendant Foothills | Accepted the donation of fee simple interest, prepared limited warranty deed for the donation of the fee simple interest, signed the Form 8283, and acknowledged acceptance of the donation. |
| Clark Defendants | Provided appraisals of the property for the fee simple donation, which appraisal relied solely on the conclusions from AquaFUSION's consulting reports regarding the feasibility of developing the property for mining. |
| Defendant Nelson Mullins | Issued a legal opinion letter purporting to support the bona fides of the transaction. Prepare limited warranty deed, conveying property to Foothills. Accepted wire transfers from investors into IOLTA account. |
| Defendant Bennett Thrasher | Provided tax preparation services in connection with the transaction. |

EXHIBIT D

| Defendant AquaFUSION | Prepared a feasibility report supporting the development of the property into an aggregate mine, which was used by the Clark Defendants to support their conclusion that mining was the HBU of the property. |
|---|---|

### a.   Background on the Rock Spring Syndicate Transaction.

313.   The Rock Spring Syndicate Transaction involved a 121-acre tract located in Morgan County, Alabama (the "Rock Spring Property"). This Transaction, unlike the others described herein, generated a charitable contribution tax deduction through the donation of a fee simple interest in the Rock Spring Property as opposed to the donation of a conservation easement. This Transaction, however, was functionally the same as an SCE Strategy involving the donation of a conservation easement in that the lynchpin for both is a fraudulently inflated appraisal based on a bogus HBU.

### b.   The Defendants market the Rock Spring Syndicate Transaction to Douget and some other members of the Class.

314.   Douget owns and operates a child day care franchise called Kids "R" Kids. She attended a conference with fellow franchisees in Key West, Florida on or around October 17, 2016. During the conference, Novak (on behalf of the Strategic Defendants) gave a presentation about the SCE Strategy to recruit potential

investors.  Prior to the conference, Douget had briefly discussed Strategic and their SCE Strategy transactions with her personal accountant.  She had also discussed the SCE Strategy with other franchisees who had invested in prior SCE Strategy transactions with Strategic.  As far as she knew, these other franchisees' SCE Strategy transactions had successfully generated the promised tax deductions and conserved valuable real estate without any adverse action from the IRS.  Consequently, she was inclined to participate in a future transaction but wanted to hear directly from Novak before doing so.

315.   During the meeting, Novak discussed the basic steps of the SCE Strategy and how it was implemented.  He emphasized that his team of professionals and outside appraisers, lawyers, accountants, and consultants had a proven track record of doing SCE Strategy transactions and had substantial expertise and experience in this area.  Novak discussed the appraisals that were included in the transaction and represented that the appraisals were done by reputable appraisers with a proven track record and were heavily scrutinized to ensure accuracy.  He told Douget and the other potential investors that the SCE Strategy was perfectly legal. If the IRS audited the SCE Strategy transactions, he said the transactions were likely to be upheld.  Douget left the meeting confident that the SCE Strategy would be a good tax-planning tool for her.

EXHIBIT D

      c.     **The Strategic and Bridge Capital Defendants send Douget Promotional Materials.**

316.  Douget received Promotional Materials and other solicitations described in detail below from the Strategic and Bridge Capital Defendants in the last quarter of 2016 about participating in the SCE Strategy through the Rock Spring Syndicate, a company formed and managed by Strategic or a Strategic-affiliated entity.

317.  The Promotional Materials were designed to convince potential participants that the SCE Strategy provided a legal and legitimate way to save on taxes through a donation of real estate that would be structured and implemented in full compliance with the Tax Code.  The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Rock Spring Syndicate, thus generating enormous fees for the Defendants and other participants.

318.  At some point in the fourth quarter 2016, the Strategic and Bridge Capital Defendants sent Douget an email attaching a glossy brochure entitled, "Rock Spring Investors, LLC Offering Summary & Case Study."  The brochure falsely informed Douget and other Class members that:

      (a)     The business of Rock Spring, LLC was to "hold, mine and operate real property among other activities," even though the LLC never intended to develop the Rock Spring Property into a mine; and

194

(b)    The Strategy would result in "greater free cash," and "philanthropic goodwill from the conservation of natural resources," as well as "mitigate[] [a taxpayer's] overall effective tax rate and tax payments," when the Strategic Defendants knew that none of these results would actually occur unless the IRS did not audit the Rock Spring Syndicate Transaction.  In other words, the Strategic Defendants caused Douget and the Class members to participate unwittingly in the audit lottery.

319.    The Offering Summary and Case Study also falsely represented that a participant would be entitled to the following tax benefits if they joined the Rock Spring Syndicate even though the Strategic Defendants knew the IRS would likely audit and disallow the deductions claimed by Plaintiffs and the other Class members:

| **Investment and Benefit Summary** | | | | | |
|---|---|---|---|---|---|
| **UNITS** | **INVESTMENT** | **ALLOCATED FEDERAL DEDUCTION** | **ESTIMATED CASH VALUE** | **ESTIMATED CASH RETURN** | **ESTIMATED NOMINAL RETURN** |
| **INVESTMENT** | | | | | |
| 190 Class A | ($5,035,000) | $21,276,329 | $9,148,821 | $4,113,821 | 82% |
| **PER UNIT INVESTMENT** | | | | | |
| 1 Class A | ($26,500) | $111,981 | $48,152 | $21,652 | 82% |

320.    Douget received other Promotional Materials from Michael Viscusi (Senior Associate at Strategic) on behalf of the Strategic and Bridge Capital Defendants via email on or around December 28, 2016.  The email stated that Douget

would receive two additional emails that day:  an email with a ShareFile link to certain due diligence documents and a DocuSign email with a link to the "Subscription Documents."  Viscusi pressed Douget to get the documents signed and her subscription money wired "**today** to ensure a prompt closing."

321.   The package of documents in the referenced email links included a Private Placement Subscription Package, which included at least the following documents:

- A Private Placement Memorandum with various transactional agreements attached;

- A Private Placement Offering; and

- A Subscription Agreement.

322.   The Promotional Materials informed Plaintiffs that the Rock Spring Syndicate could choose from one of four options for use of the subject property: (1) establish a mine on the property, (2) market the property for sale for mining development, (3) hold the property for long-term investment, or (4) conserve the property by donating it to a tax-exempt land trust resulting in a charitable contribution deduction equal to over four times the total investment (*i.e.*, the conservation option).

EXHIBIT D

> **d.** **The Promotional Materials incorporate a Preliminary Valuation of the minerals by AquaFUSION.**

323.   The Promotional Materials also incorporated a draft of a Preliminary Aggregate Valuation and Quarry Feasibility Analysis, dated November 23, 2016, from AquaFUSION.  The report was for the purpose of purportedly supporting the bona fides of a charitable contribution deduction from the donation of the Rock Spring Property to a land trust.

324.   AquaFUSION's report was prepared by Yvonne Sanders, PE, and David R. Buss, PhD, PG of AquaFUSION.  AquaFUSION sent this report via email or U.S. mail on or about November 23, 2016, to *inter alia* the Clark Defendants.

325.   AquaFUSION's report forms the basis for the inaccurate conclusion that the HBU of the Rock Spring Property was as a quarry for mining.

326.   The report contained numerous undisclosed and gross deficiencies, some of which amount to outright fraud.  The Clark Defendants then relied wholesale, without examination, on those fraudulent representations and deficiencies in their appraisals.  Many of the misrepresentations and deficiencies described with respect to AquaFUSION's report for the DeSoto Syndicate exist in the Rock Spring report, including the following examples:

> (a)    The report was materially false and misleading in that it purported to conclude that mining on the property was economically feasible when, in fact, the Defendants and AquaFUSION knew the property would

never be developed for mining because Defendants' plan from the beginning was to use the property for conservation purposes.  The report also falsely and materially represented that "… this feasibility analysis demonstrates that a financially viable construction aggregate operation is possible for the Rock Springs [*sic*] Greenfield Site," when, in fact, mining was not economically feasible under the circumstances or legally permissible at the time because of the lack of permitting.

(b)     The report states that "[i]t is reasonable to be assumed that the necessary permits could be obtained for this proposed mining operation …" But it does not specify exactly how quickly.  Its economic forecast assumes the quarry to be mining in its second year; however, no efforts were made to obtain the permitting necessary for the mining activity.  In fact, there was very little that could have been done in the short period between the November 2016 report and the December donation date of the Rock Spring Property.

(c)     The report does not discuss whether it is feasible that the Strategic Defendants or the Syndicate itself could operate a limestone mine, when most mines in the Southeast are operated by experienced professionals.

(d)     The report fails to explain that the Syndicate hadn't even acquired the Rock Spring Property yet (as of November 23, 2016) and that the whole venture was purely hypothetical and speculative.

EXHIBIT D

327.   In sum, the AquaFUSION report was simply meant to provide the appearance to the IRS and participants in the Rock Spring Syndicate that the HBU for the property was legitimate when, in reality, the Defendants never intended to develop the property for mining purposes.

328.   The AquaFUSION report wholly fails to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that based on objective data (such as volume and duration), there is a real market for the mine (*i.e.*, that the mineral is present in commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future).   Thus, the proposed HBU was purely speculative, despite AquaFUSION's and the other Defendants' representations to the contrary.

     **e.**    **The Promotional Materials include an Initial Appraisal prepared by the Clark Defendants.**

329.   The Promotional Materials included an Initial Appraisal prepared by the Clark Defendants. The Initial Appraisal was dated December 2, 2016—just 9 days after AquaFUSION issued its draft feasibility report.  The Initial Appraisal purported to value the Rock Spring Property's fair market value for a fee simple donation for federal income tax purposes.  The Clark Defendants and the other Defendants knew and intended that the potential investors in the Rock Spring Syndicate, including Douget, would rely on this Initial Appraisal and the later Qualified Appraisal in deciding the undertake the Rock Spring Syndicate

EXHIBIT D

Transaction, as indicated by the statement in the Initial Appraisal, "[t]he intended users are the donors and the IRS …"  Regardless of its title, and as indicated on the first page of the Initial Appraisal, it was subject to, and allegedly written in accordance with, USPAP and the standards and requirements of the IRS.

330.   The Initial Appraisal estimated the value of the fee simple donation of the Rock Spring Property to be $23,560,000 (or $194,710 per acre), valuing the real estate at its purported HBU of limestone mining.  However, the Clark Defendants and the other Defendants knew that this value was grossly overstated and based on a HBU that was speculative in nature and never intended to occur.

331.   As further support for their valuation, the Strategic Defendants and the Clark Defendants incorporated AquaFUSION's mineral feasibility report dated November 23, 2016.  And like the AquaFUSION report, the Initial Appraisal drafted by the Clark Defendants contains numerous fraudulent misrepresentations and gross deficiencies, including but not limited to the following:

(a)   The Clark Defendants relied wholesale and without examination on the AquaFUSION report.  Thus, the Initial Appraisal incorporates all of the gross inadequacies and frauds found in that report.  The Comments to USPAP Standards Rule 2-3 state, "When a signing appraiser(s) has relied on work done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work.  The

EXHIBIT D

signing appraiser(s) is required to have a reasonable basis for believing that those individuals performing the work are competent. The signing appraiser(s) also must have no reason to doubt that the work of those individuals is credible." The Clark Defendants failed to state any basis (let alone a reasonable basis) for uncritically relying on the AquaFUSION report.

(b)      The Initial Appraisal relies on several hypothetical assumptions, including that zoning and permitting could be obtained without ever examining when that might occur and why (and demonstrating it would occur soon). In addition, it also relies on several unexplained assumptions, such as that adequate funds exist for the infrastructure needed for a physical plant and a quarry when there is no such showing that such funds existed or that the members of Rock Spring Syndicate would contribute them. There is no evidence that the Clark Defendants investigated the possibility of permitting or any of these other hypotheticals, in violation of USPAP 4 (which requires diligence on matters that would have a "significant effect" on the results).

(c)      Although the Initial Appraisal defines "fair market value" on pages 2-3, the Clark Defendants do not use fair market value in their analysis. Instead, they relied on an improper HBU analysis, which was supported by the false assumption that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU when the owner donates real estate to a

conservation organization.  To employ the HBU methodology, the Clark Defendants ignored comparable sales of mines in Alabama in violation of USPAP 1, 2, and 3.  Although these comparables were for existing mines, their values could have been adjusted downwards to account for that difference.

(d)    Similarly, under USPAP, an appraiser must consider all approaches to value applicable to an appraisal assignment, then include in the appraiser's report the reason for excluding any approach to value and describe the methods and techniques for supporting the appraiser's opinions and conclusions. USPAP Standards Rule 1-4.  The Clark Defendants failed to do so.  Instead, they state in conclusory fashion that "sales comparables in sufficient quantity or similarity" were not present without identifying any comparables or the reasons these comparables were not similar or sufficient for valuation purposes.

(e)    To be considered a qualified appraiser, the appraiser must have a demonstrated competency in valuing the type of property being appraised.  In the Initial Appraisal, the Clark Defendants did not state any experience or education in valuing minerals or mineral properties, yet they purported to value the Rock Spring Property based on an HBU of mining by blindly relying on AquaFUSION's false conclusions.

(f)     On page 14, the Initial Appraisal indicates that Rock Spring, LLC owns the Property and that the Property was not for sale. But Rock Spring LLC acquired the Property *over two weeks later*.

(g)     Based on the misrepresentations and deficiencies described above, the Initial Appraisal, and later the Qualified Appraisal could not be considered a "Qualified Appraisal," as that term is defined under Treas. Reg. § 1.170A-17(a)(1). The Appraisals do not conform to generally accepted appraisal standards (USPAP), as required by I.R.C. § 170(f)(11)(E)(i), or Treas. Reg. § 1.170A-1(c)(2), which requires that the appraisal value be the fair market value of the property. The Clark Defendants knew this but never disclosed this fact to Douget or the other Class members.

332.   As discussed subsequently, none of these frauds/deficiencies are corrected or supplemented in the Clark Defendants' Qualified Appraisal.

333.   In conclusion, the Clark Appraisals wholly fail to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that, based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future). None of the Clark Defendants' Appraisals demonstrate any of these factors, particularly as to "closeness in time" and the failure to provide

sufficient objective data of the market for the proposed mine.  Thus, the proposed

HBU is purely speculative and cannot form the "before value" component of the

valuation.

> f.  **The Strategic and Bridge Capital Defendants purport to disclose IRS Notice 2017-10 but omit key facts and make numerous misrepresentations.**

334.  The Promotional Materials also included a document entitled,

"Supplement No. 1 Dated December 24, 2016 to Rock Spring Investors, LLC

Confidential Private Placement Memorandum."  This Supplement purported to

disclose IRS Notice 2017-10 to the Rock Spring Syndicate members and potential

members.  The Supplement significantly downplayed the impact of this IRS Notice

on the Rock Spring Syndicate Transactions.

335.  On or around January 13, 2017, Novak (on behalf of the Strategic and

Bridge Capital Defendants) emailed Douget and other Class members about the

impact of IRS Notice 2017-10.  Like the Supplement, this email purported to

disclose the impact of the Notice but significantly downplayed its impact and made

numerous materially false or misleading representations and omissions, including

but not limited to the following:

| Representation | Reason for falsity |
|---|---|
| "Please note that this listed transaction guidance <u>does not</u> invalidate any | The Defendants knew at the time that the Rock Spring Syndicate Transaction |

| | |
|---|---|
| compliant conservation easement donation or change the tax or conservation benefits; rather, the IRS has chosen to designate already highly disclosed charitable contributions as <u>possible</u> 'tax avoidance transactions.' This is based on the IRS incorrectly asserting that anyone conserving property is likely using inflated appraisals, combined with a partisan view this is a direct 'thumbing of the nose' at the President-elect who has openly supported conservation donations." | did not comply with the law or IRS regulations and was, in fact, using inflated appraisals. |
| "As a reminder, this project not only hired an independent, well-experienced appraiser, but also retained a second independent appraiser to perform a peer review of that appraisal. Though not bullet-proof, this two-step, checks-and- | The Clark Defendants were not independent. Moreover, there was no independent peer review of the Appraisals, and to Douget's knowledge, there was no second appraisal done. |

| | |
|---|---|
| balances process helps ensure that the value being claimed in the appraisal in both accurate, supportable, and defendable." | |
| "Further, a reputable law firm provided a tax opinion after their due diligence following by another reputable law firm providing investor comfort letters to further assess and diligence the project." | Nelson Mullins was not independent, and their opinion letter would not protect the investors from the IRS assessing back-taxes, penalties, and interest.    Additionally, to Douget's knowledge, she was not provided an "investor comfort letter." |

336.    The email advised "a wait and see approach," even though the Strategic Defendants knew that this IRS Notice put the Rock Spring Syndicate Transaction on an almost certain path to an audit.  And the Strategic Defendants further knew that if the IRS audited the Transaction the charitable deductions would be disallowed given the fraudulently overstated appraisal and the numerous other defects with the Transaction.  The email also falsely advised that the Notice "may be quickly repealed once the new administration takes office," but stated that if it wasn't, the investors could just file a Form 8886 to disclose the Transaction to the IRS.

EXHIBIT D

337.   Strategic emailed Douget and other Class members again on or about May 9, 2017, to provide an update on the Notice 2017-10 requirements.  The email again downplayed the Notice's effect, this time by soliciting investments in additional transactions in 2017.

### g.   Nelson Mullins issues a legal opinion letter.

338.   In December 2016, Nelson Mullins issued a draft legal opinion letter to the Rock Spring Syndicate that reached the following conclusions based on Nelson Mullins' purported review of the transaction and various assumptions:

> *Under current federal income tax law, and current judicial and administrative interpretations of that law, it is our opinion that (1) each of the Investment Company and Propco should be classified as a partnership for federal income tax purposes and should not be subject to federal income tax as an association taxable as a corporation, (2) each Investor Member should be considered for federal income tax purposes to be a partner in the Investment Company, (3) the Investment Company should be considered for federal income tax purposes to be a partner in Propco, (4) the Investment Company, as a member of Propco, should be entitled to an allocation of the income, gain, loss, deduction (including the Contribution Deduction) and credit of Propco pursuant to the terms of the Propco Operating Agreement, and (5) the Investor Members, as members of the Investment Company, should be entitled to an allocation of the income, gain, loss, deduction (including the Contribution Deduction) and credit of the Investment Company pursuant to the terms of the Operating Agreement.*

These conclusions were materially false and misleading because Nelson Mullins knew—based on Nelson Mullins' specialized knowledge of tax law and regulations as well as its knowledge of the goals of the conspiracy and RICO enterprise—that there was a substantially greater than 50% chance that the contribution deduction would be audited and disallowed by the IRS.  In addition, as discussed hereafter, the

use of generic terms like "Investment Company" and "PropCo" makes the "cookie cutter" nature of their opinion letter even more apparent.

339. Nelson Mullins' letter was littered with other materially false and misleading representations. The letter also omitted numerous key facts. For example, Nelson Mullins assumed that "the Appraisal was prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(II)," when, in fact, Nelson Mullins knew that the Clark Appraisal was based on a predetermined tax deduction target. The letter makes a number of other assumptions on pages 6-8 and states "to our knowledge and based upon review of the Documents, there are no facts inconsistent with these assumptions" when, in fact, Nelson Mullins knew that many of these assumptions were either false or unreasonable and that there were inconsistent facts that should have been disclosed to the investors.

340. These representations in the letter were not simply opinions. Nelson Mullins knew when they wrote the letter that it contained materially false statements and omitted key facts, including about the near certainty of an audit and disallowance of the claimed deductions as well as the high likelihood of the IRS imposing penalties and interest on Douget and other members of the Class.

341. Nelson Mullins intended for Douget and other Class members to rely on the letter because, although it was addressed to the Rock Creek Syndicate, the

letter stated, "[t]his Opinion is rendered only for the benefit of the Investment Company and the Investor Members …"

342.  Douget and the Class members either directly received and relied on the draft opinion letter (or another version of the tax opinion letter) or reasonably relied on it through summaries of it contained in Promotional Materials and marketing presentations.

343.  Nelson Mullins also knew that it could not act as an independent legal opinion writer because it had previously written numerous legal opinion letters and due diligence reports for the Strategic-affiliated syndicates and clients of the Strategic Defendants (including the Plaintiffs and putative Class Members here). Indeed, Nelson Mullins had attempted to disclose these conflicts of interest in the due diligence report provided to Hoover for the DeSoto Syndicate Transaction. However, Nelson Mullins did not make any such disclosure in its legal opinion letter for the Rock Spring Syndicate Transaction, nor could such a disclosure have been effective at waiving the conflict given that Nelson Mullins was knowingly hiding key facts from its clients for the benefit of the Strategic Defendants and other co-conspiring Defendants.

344.  Nelson Mullins copied large portions of the prior opinion letters drafted by the MMM Defendants without doing any independent analysis of the analysis or the conclusions in those letters.  Indeed, much of the Nelson Mullins letter for the

Rock Spring Syndicate Transaction is identical to MMM letters for other Strategic-sponsored SCE Strategy transactions, including the one for the Bear Creek Syndicate Transaction.  Nelson Mullins did not disclose this fact to Douget or other Class members, who reasonably believed that Nelson Mullins had conducted their own, independent due diligence for the Rock Spring Syndicate Transaction.  The fees charged by Nelson Mullins for its letter are unreasonable in light of the fact that Nelson Mullins did not have to reinvent the wheel for this letter since it copied most of it from prior MMM letters.

### h.    Rock Spring Holdings acquires the Rock Spring Property

345.   On or around December 22, 2016, the Strategic Defendants (through Rock Spring, LLC, a Strategic-affiliated entity) facilitated the acquisition of the Rock Spring Property.  Rock Spring, LLC acquired the Rock Spring Property as a capital contribution from an entity called Isabell Development, LLC.   This acquisition occurred months after the Strategic Defendants and other Defendants had marketed the Rock Spring Syndicate Transaction and only 7 days before Rock Spring, LLC donated the Property to Foothills.

### i.    Douget undertakes the Rock Spring Syndicate Transaction.

346.   Based on the Promotional Materials (including the Initial Appraisal) and the Defendants' advice and representations, Douget purchased 1.5 units in the Rock Spring Syndicate on or around December 29, 2016.   According to the

instructions given in the Promotional Materials by the Strategic and Bridge Capital

Defendants, Douget wired $39,750 to an IOLTA account held by Nelson Mullins.

> **j.    The Strategic Defendants, Nelson Mullins, and Foothills prepare the Limited Warranty Deed, conveying the Rock Spring Property to Foothills.**

347.    The same day that Douget acquired her interest in the Rock Spring

Syndicate, the Syndicate conveyed the Rock Spring Property to Foothills.  The

Limited Warranty Deed was jointly prepared and approved by the Strategic

Defendants, Nelson Mullins, and Foothills and sent via U.S. mail and/or email for

filing.  The Deed included a validation signed by Freeman on behalf of Rock Spring,

LLC, falsely stating that the appraised market value of the donation was

$23,560,000.  The Strategic Defendants, Nelson Mullins, and Foothills knew when

the Deed was prepared and filed that the appraised market value was false.  Unlike

the SCE Strategy transactions that involved donations of conservation easements,

the Limited Warranty Deed for the Rock Spring Syndicate Transaction did not

include recitals about the conservation purpose of the donation and did not restrict

the Property's use to conservation purposes.

> **k.    Foothills confirms the fee simple donation.**

348.    On February 23, 2017, Foothills sent to Rock Spring, LLC a letter

through the U.S. mail and/or email documenting the conveyance.  Foothills knew

that it had not attempted to question or verify the appraisals, in callous disregard of

industry standards. Foothills sent a second letter documenting a $20,000 cash donation by Rock Spring, LLC.

### l. The Clark Defendants prepare an Appraisal Summary, which Foothills verifies.

349.   In May or June 2017 prior to the tax return being prepared and the final Qualified Appraisal being issued, the Strategic Defendants, Clark Defendants, and Foothills jointly prepared the Appraisal Summary (Form 8283).  Both Clark (as the appraiser and on behalf of the Clark Defendants) and Foothills verified the Appraisal Summary as accurate and signed it.  The Appraisal Summary showed an astonishing increase in value over a short period of time.  The Appraisal Summary represented that Rock Spring, LLC had acquired the property by deed on December 22, 2016 for a cost basis of $839,554 but that the fee simple donation (which had occurred only 7 days after the acquisition of the property by Rock Spring, LLC) had a fair market value of $23,560,000—a 28X appreciation in value in a week.[36]   The Clark Defendants and Foothills (with knowledge by the other Defendants) then advised Douget that the Appraisal Summary would substantiate the charitable contribution deduction and allow her to claim the deduction on her individual tax return.

---

[36] The Defendants attempted to get around this issue by tacking on the acquisition date by the previous owner, Isabella Development, LLC, who acquired the property on May 24, 2013.

350. The Appraisal Summary falsely represented that the appraised fair market value of the fee simple donation was $23,560,000, when, in fact, no independent appraiser would have appraised the donation at such a high value.

351. In May or June 2017, the Appraisal Summary was sent via U.S. mail and/or email to Rock Spring, LLC or its accountants for filing with the Rock Spring, LLC and Rock Spring Syndicate's tax returns.

### m. The Clark Defendants prepare the final Qualified Appraisal Report.

352. The Clark Defendants sent the final Qualified Appraisal to Rock Spring, LLC on or around August 10, 2017, via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Rock Spring Syndicate, including but not limited to Douget, as evidenced by, *inter alia*, the statement that "[t]he intended users are the donors and the IRS for the purpose of estimating the fair market value of a 121-acre tract donated to [Foothills]."

353. This Qualified Appraisal, unlike the one included in the Promotional Materials, contained the full and final Appraisal. The Qualified Appraisal had, in form and substance, the same fraudulent misrepresentations and gross deficiencies identified above in the Initial Appraisal.

354. The Qualified Appraisal falsely and materially repeated that the fee simple interest in the Rock Spring Property had a fair market value of $23,560,000.

EXHIBIT D

355.   The Qualified Appraisal falsely and materially represented that Clark was a qualified appraiser under Section 170(f)(11)(E)(ii) and that "the attached report is a 'qualified appraisal report' as that term is defined in applicable Internal Revenue Service Regulations (Section 170(f)(11)(E)(ii)) and was prepared for your use," when, in fact, the Clark Defendants knew Clark was not a qualified appraiser because, among other things, he lacked experience and education in mining, he uncritically relied upon the AquaFUSION report, and he was a person whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser."   Moreover, the opinions and conclusions offered by the Clark Defendants in the Qualified Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Qualified Appraisal).

356.   The certification in the Qualified Appraisal also contained numerous false statements, including but not limited to:

| Representation or omission | Reason for falsity |
|---|---|
| "The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is [*sic*] my personal, unbiased professional analysis, opinion, and conclusion" | The Clark Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |
| "I have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved" | The Clark Defendants were biased in favor of an appraisal value within a predetermined range set by their co-conspirators. |
| "My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.  Further, my fee has not been based in whole or in part upon | The Clark Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |

215

| a percentage of the appraised value of the property, nor has the fee in any way been contingent upon the appraised value" | |

357.   Further, both the Qualified Appraisal and the AquaFUSION report state that "it is reasonably probable that all necessary State and Federal environmental and mining permits could be obtained for this [site]."  This conclusion is without support and fails to take into account that if there are truly environmentally sensitive features of the Rock Spring Property such as to justify a donation to a land trust, the permitting process might be much longer and permitting may not occur at all.

### n.   Bennett Thrasher prepares the Syndicates' tax return and corresponding K-1s for the members, which Douget uses to prepare her tax return.

358.   In or about August 2017, Bennett Thrasher prepared the tax return for the Rock Spring Syndicate.  The tax return reported a charitable contribution deduction of over $23,560,000 from the donation of the fee simple interest.

359.   As required by applicable law and IRS regulations, Bennett Thrasher attached to the Rock Spring Syndicate's return a copy of the Clark Defendants' Qualified Appraisal, the Appraisal Summary (Form 8283), and the Foothills letter confirming the donation.  Thus, Bennett Thrasher adopted and incorporated the misrepresentations described above.  Bennett Thrasher sent the tax return and its

attachments to Rock Spring Syndicate via U.S. mail and/or email at some point in August or September 2017. Bennett Thrasher filed the tax returns and accompanying documents electronically with the IRS. Bennett Thrasher knew and intended for the Rock Spring Syndicate to file the tax return with the IRS, which it did, and for the members of the Rock Spring Syndicate, including Douget, to use their pro-rata share of the resulting deduction, which they did.

360. In addition, Bennett Thrasher prepared a Schedule K-1 for each member of the Rock Spring Syndicate, including Douget, which reported the amount of charitable contribution deduction allocated to each of the members of the Rock Spring Syndicate. Bennett Thrasher sent corresponding K-1s to Douget via email or U.S. mail on or around August 30, 2017, shortly after preparing the Rock Spring Syndicate's tax return. The K-1 prepared for Douget reported a charitable contribution deduction of $168,114.

361. Along with the K-1, Bennett Thrasher included a cover letter addressed to Douget. The letter explained that the information in the K-1 had "been provided to the Internal Revenue Service" with the partnership tax return. In the letter, Bennett Thrasher instructed Douget that the "information provided on this schedule should be entered on your tax return, in accordance with the instructions in Schedule K-1, page 2." Bennett Thrasher also listed certain documents (Form 8283, Supplemental Statement to Form 8283, Land Trust Gift Letters, Full Appraisal) that

"should be filed with each member/partner's tax return." Curiously, this list included "Baseline Documentation Report" and "Deed of Conservation Easement," both of which were not prepared for the Rock Spring Syndicate Transactions because the Transaction did not involve the donation of a conservation easement. This material error was likely caused by the cookie-cutter nature of the SCE Strategy and Bennett Thrasher's involvement in numerous SCE Strategy transactions. The letter references Notice 2017-10 and advises Douget to file a Form 8886 to meet IRS listing requirements; however, the letter fails to warn Douget that the Notice meant a near certain chance of audit and disallowance of the deduction by the IRS.

362. Douget followed the advice of Bennett Thrasher (as well as the advice of other Defendants) and reported the charitable contribution deduction of $168,114 on her individual tax returns for 2016. She also filed the Form 8886 prepared by the Strategic Defendants and Bennett Thrasher.

      **o.    The Strategic Defendants send a photo book of the Rock Spring Property, which contains additional misrepresentations.**

363. On or about October 3, 2017, Mike Fields, on behalf of the Strategic Defendants, sent via U.S. mail a photo book of the Rock Spring property to Douget and other members of the Class who had participated in the Rock Spring Syndicate. In addition to the colorful pictures, the book contained these misrepresentations and omissions:

(a)    That a "desk audit review of the [Clark Defendants'] appraisal was performed….conclud[ing] the appraisal is reasonable and in compliance with the IRS and US Treasury guidelines."  This alleged review has never been identified, and Douget never received a copy, despite this alleged second appraisal being frequently touted by the Strategic Defendants.

(b)    Although the book touts that "Conservation Easement and fee simple conservation donations have been widely used for decades and are well recognized by many government authorities," no mention is made of IRS Notice 2017-10 and its likely impact—that this conservation donation and all others were almost certain to be audited.

364.   The photo book was intended as a "deal gift" for participating in the Rock Spring Syndicate Transaction but it was also intended to serve as a marketing document for future transactions for both Douget and any colleagues, friends, or family members who might be interested in a SCE Strategy.  Indeed, the cover letter accompanying the photo book invited Douget to "speak with us regarding . . . upcoming 2017 projects."

> **p.    The 2016 Rock Spring, LLC tax return is audited, and the IRS disallows the charitable contribution deduction at the partnership level.**

365.   On August 7, 2020, the IRS issued an FPAA for the Rock Spring, LLC's tax return for the 2016 tax year.  The FPAA disallowed the charitable

contribution deduction from the Rock Spring Syndicate for a variety of reasons, including that (a) the transaction satisfied the requirements of I.R.C. § 170 and corresponding Treasury Regulations and (b) the value of the charitable contribution was not established.  The FPAA imposed a 40% penalty under I.R.C. § 6662(h).

366.   The Rock Spring Syndicate and Rock Spring, LLC filed a Petition in Tax Court on November 9, 2020, where the case remains pending.

### 5.   Agnew engages in the Vista Hill Syndicate Transaction in 2015.

367.   The Strategic Defendants were the chief promoters of the Vista Hill Syndicate Transaction and marketed and coordinated all aspects of the transaction. The individuals and entities listed below were part of Strategic's "team" (and co-conspirators with the Strategic Defendants) to the Transaction and undertook the following roles:

| Participants | Role |
| --- | --- |
| Bridge Capital Defendants | Acted as placement agent for the transaction. |
| Defendant Triangle Land Conservancy | Accepted the donation of the conservation easement, provided the baseline documentation report for the property, prepared deeds of conservation easement, signed the Form 8283, and acknowledged acceptance of the donation. |

220

EXHIBIT D

| Van Sant and Wingard Defendants | Provided an appraisal of the property for the conservation easement donation, which appraisal relied solely on the conclusions from McCalip's consulting report regarding the valuation of mineral resources and the purported feasibility of developing the property for mining. |
|---|---|
| The Clark Defendants | Provided a review appraisal prepared by the Van Sant and Wingard Defendants to further support the purported bona fides of the appraised value of the conservation easement. |
| Defendant Bryan Cave | Provided legal opinion letter purporting to support the tax bona fides of the transaction. |
| PCLG Defendants | Provided alleged due diligence and issued a "comfort letter" for the individual investors purporting to support the tax bona fides of the transaction and identify any issues that needed to be corrected. |

EXHIBIT D

| Defendant Conexus CPA Group[37] | Provided tax preparation services in connection with the transaction. |
| Defendant McCalip & Company | Prepared report on valuation of aggregate resources, which was used by the appraisers to support the conclusion by the appraisers that mining was the HBU of the property. |
| Dantin Defendants | Referred Agnew to Strategic, helped to convince him to do the deal. |

### a. Background on the Vista Hill Property.

368. The Vista Hill Syndicate Transaction involved 112.46 acres of real estate in Chatham County, North Carolina (the "Vista Hill Property"). The Vista Hill Property started out as a portion of a larger parent tract with 607.13 acres. Bobby Branch and his wife acquired the larger parent tract in 2011. They acquired 513.419 acres of the parent tract for $1,438,000 or approximately $2,800 per acre and another 93.7 acres of the parent tract for $800,000 or approximately $8,500 per acre. The Branches' total acquisition costs for the parent tract were cumulatively $2,238,000 or approximately $3,686 per acre. The Branches transferred the parent

---

[37] Based on the facts currently known, it is also likely that Conexus prepared tax returns for the adjoining tracts described later in this section.

EXHIBIT D

tract to Bonlee Investment Properties, LLC as evidenced by a general warranty deed dated July 27, 2012.

369.   The Strategic Defendants ultimately subdivided this parent tract into five different syndicates:   Vista Hill (112.46 acres), Tick Creek Holdings, LLC (108.35 acres), Big Hill Partners (96.71 acres), Green Valley Investments (141.65 acres), and Bonlee Investments (54.25 acres).   A conservation easement on the 54 acres owed by Bonlee Investments was deeded at the end of 2012.   In 2014, the Strategic Defendants did SCE Strategy transactions for Tick Creek Holdings, LLC; Big Hill Partners; and Green Valley Investments.   Thus, even before the Vista Hill Syndicate Transaction, much of the surrounding land was subject to a conservation easement.

370.   Bonlee Investment Properties, LLC contributed the remaining 112.46 acres to the Vista Hill Syndicate for a recorded value of $314,894 or approximately $2,800 per acre as evidenced by a general warranty deed dated June 16, 2015, and the Vista Hill Operating Agreement.

371.   The overvaluation of the Vista Hill Property by Defendants is stark when put into context with other valuations of the Property and surrounding properties:

EXHIBIT D

| Date of Valuation | Description | Per Acre Value |
|---|---|---|
| *March 2016* | *Appraised value of the Vista Hill Property as reported on Form 8283.* | *$200,875* |
| 2020 | Assessed value of the Vista Hill Property by Chatham County Tax Department for 2020. | $3,028 |
| June 16, 2015 | Contribution price (Bonlee Investments to Vista Hill Syndicate). | $2,800 |
| 2011 | Acquisition of parent tract by Bobby Branch. | $3,686 |
| 2012-2017 | Average of 16 comparable sales of raw land within 10-mile radius of subject. | $3,266 |

**b.    The Strategic and Dantin Defendants market the SCE Strategy to Agnew and some other members of the Class.**

372.   Agnew is a vice president of Environmental Technical Sales, Inc. ("ETEC"), a company specializing in water and wastewater treatment.  In the third or fourth quarter 2014, Chris Dantin of Dantin Financial organized a meeting at ETEC's offices in Louisiana to discuss the SCE Strategy marketed by the Strategic Defendants.  Unbeknownst to Agnew, Dantin was a front-line promoter of SCE Strategy transactions for the Strategic Defendants.  The meeting attendees included Dantin, a representative or representatives of Strategic, other principals of ETEC,

and some other potential investors that Agnew did not know.  Some of the ETEC

principals brought their personal CPAs to the meeting, although Agnew didn't.

373.   Dantin introduced the Strategic representative.  The representative then

described the steps of the SCE Strategy and how it was implemented.  The basic idea

was that a Strategic-affiliated entity would buy real estate, appraise the real estate at

its HBU, and promise to conserve the real estate in perpetuity (i.e., not develop it for

its HBU).  The entity would then get a tax write-off for the difference between the

appraised HBU value and the value of the real estate after a conservation easement

was attached to the real estate.  These representations omitted key facts, including

that the appraisals would be fraudulently premised on a hypothetical HBU in a

manner that was not permitted by the Tax Code.  The representative falsely stated

that the federal tax benefits were usually $4 in tax savings for every $1 invested

when the Strategic Defendants knew the IRS would disallow the tax benefits if it

audited the transaction.  The Strategic representative falsely said the SCE Strategy

was a legal tax-planning strategy and that the IRS had never successfully challenged

a SCE Strategy transaction implemented by the Strategic Defendants.  He also said

that in the unlikely event of an audit, there was money set aside to handle the audit

costs and the transaction would likely survive IRS scrutiny.   All of these

representations were false when made; however, Agnew did not know and could not

have reasonably known otherwise.

EXHIBIT D

374. Dantin endorsed the SCE Strategy and represented that he would be investing in a transaction too. This gave Agnew comfort that the SCE Strategy was beneficial and legal.

375. Based on the representations made by Strategic and the Dantin Defendants at the meeting, Agnew undertook a SCE Strategy transaction in 2014.

### c.   The Strategic Defendants market the Vista Hill Syndicate Transaction to Agnew.

376. In or around the third or fourth quarter of 2015, John Howard of Strategic called Agnew, told him about the opportunity to do another SCE Strategy transaction, and asked if Agnew wanted to participate. Because the 2014 transaction had seemingly been successful and based on the prior misrepresentations made to him by Strategic and the Dantin Defendants, Agnew decided to undertake the Vista Hill Syndicate transaction.

### d.   The Strategic and Bridge Capital Defendants send Agnew Promotional Materials.

377. Agnew received Promotional Materials and other solicitations described in detail below from the Strategic and Bridge Capital Defendants in the third or fourth quarter 2015 by email and/or U.S. mail. The Promotional Materials detailed a SCE Strategy made through the Vista Hill Syndicate.

378. The Promotional Materials were designed to convince potential participants that the SCE Strategy provided a legal and legitimate way to save on

226

taxes through a conservation easement that would be structured and implemented in full compliance with Section 170(h) of the Code. The sole purpose of the Promotional Materials, which the Defendants jointly prepared, was to convince potential participants to participate in the SCE Strategy through the Vista Hill Syndicate, thus generating enormous fees for the Defendants and Other Participants.

379. The Strategic and Bridge Capital Defendants sent Agnew a glossy brochure entitled, "Vista Hill Investments, LLC Offering Summary & Case Study," in the third or fourth quarter 2015 by email or mail. The brochure falsely informed Agnew and other members of the Class that:

(a) The business of the Vista Hill Syndicate was to "hold, mine, and operate real property," even though the Strategic and Bridge Capital Defendants never intended to develop the property into a mine; and

(b) The Strategy would result in "greater free cash," and "philanthropic goodwill from the conservation of natural resources," as well as "mitigate[] [a taxpayer's] overall effective tax rate and tax payments," when the Strategic and Bridge Capital Defendants knew that none of these results would actually occur.

380. The Offering Summary & Case Study also falsely represented that a participant would be entitled to the following tax benefits if they joined the Vista

Hill Syndicate, even though the Strategic Defendants knew the IRS would likely

audit and disallow the deductions claimed by Plaintiffs and the other Class members:

| Investment and Benefit Summary | | | | | | |
|---|---|---|---|---|---|---|
| UNITS | INVESTMENT | ALLOCATED FEDERAL DEDUCTION | ALLOCATED STATE TAX CREDIT | ESTIMATED CASH VALUE | ESTIMATED CASH RETURN | ESTIMATED NOMINAL RETURN |
| INVESTMENT | | | | | | |
| 95 Class A | ($4,750,000) | $20,945,638 | $0 | $9,425,537 | $4,675,537 | 98% |
| PER UNIT INVESTMENT | | | | | | |
| 1 Class A | ($50,000) | $220,480 | $0 | $99,216 | $49,216 | 98% |

381. In October or November 2015, the Strategic and Bridge Capital

Defendants sent an email to Agnew. The email included a DocuSign link for Agnew

to review and sign certain documents in a Private Placement Subscription package.

The package of documents provided to Agnew included at least the following

documents:

- A Private Placement Memorandum with various transactional agreements attached;

- A Private Placement Offering; and

- A Subscription Agreement.

382. The Private Placement Memorandum purported to describe the Vista

Hill Syndicate Transaction in detail. The Private Placement Memorandum informed

Agnew and other Class members that the Vista Hill Syndicate could choose from

one of four options for use of the subject property: (1) establish a mine on the

property, (2) conserve the property by contributing a conservation easement to a tax-exempt land trust allegedly resulting in a charitable contribution deduction of $22,505,000 for the Syndicate (which would be equal to almost five times the total investment) (*i.e.*, the conservation easement option), (3) invest in one or more real estate projects or real estate funds offered by a Strategic-affiliated company, or (4) use the proceeds to invest in other real estate projects.  The representation about the expected tax deduction was false when made because the Defendants knew the Vista Hill Syndicate Transaction would not withstand IRS scrutiny in part because of the fraudulently overstated appraisals.

> ### e.   The Promotional Materials incorporate a Valuation of Aggregate Resources prepared by McCalip.

383.   The Private Placement Memorandum incorporated McCalip's Valuation of Aggregate Resources report dated July 9, 2015.  The report's purpose was to purportedly support the bona fides of developing the Vista Hill Property into an aggregate mine.

384.   Jerry McCalip (on behalf of McCalip) prepared the report and sent it via email or U.S. mail on or around July 9, 2015, to Bobby Branch for use by the Vista Hill Syndicate.  McCalip sent the report via email or U.S. mail to the Strategic Defendants before the Promotional Materials (which reference the report) were prepared.  The report was transmitted via email or U.S. mail by the Strategic

Defendants or directly by McCalip to the PCLG Defendants for those Defendants to review it prior to issuing a due diligence report.

385.   McCalip's report forms the basis for the materially false conclusion that the HBU of the Vista Hill Property was as an aggregate mine.  The report contains a number of undisclosed deficiencies, if not outright frauds, which were then relied on wholesale without examination by the Van Sant and Wingard Defendants:

(a)   The report fails to examine the impact of the adjoining and nearby tracts—some which had conservation easements already attached to them—on the legal permissibility (such as zoning and permitting) or economic feasibility of the hypothetical mine.  It is doubtful that the Vista Hill Syndicate could have obtained permits if the newly "eased" tracts nearby truly had conservation purposes.

(b)   The report lacks support to justify the purported market demand expectations.   The only support is a generalized discussion of increased demand due to general population growth.

(c)   The report aggressively concludes that the proposed mine could capture 5.7% of the Raleigh-Durham market in the first year and 8.3% by the fifth year even though there were numerous existing mines operated by experienced mining companies within the nearby area.

(d)     The discount rate used (12-14%) is too low for a raw tract of land. This rate is typical of a producing mine without start-up risk.

(e)     The adjustment for operating risk (4%) is too low based on the hypothetical nature of the mining proposal.   An appropriate risk factor adjustment would have been 25-55% given the state of the project.

386.   In conclusion, the McCalip report wholly fails to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future).   Thus, the proposed HBU was purely speculative, despite Defendants' representations to the contrary.

### f.     The Promotional Materials include an Initial Appraisal drafted by the Van Sant and Wingard Defendants.

387.  The   Private   Placement   Memorandum   attached   various   other transactional documents, including a summary of an Initial Appraisal drafted by the Van Sant and Wingard Defendants dated September 29, 2015.  This Initial Appraisal purported to support the "options" for use of the Vista Hill Property.  The Van Sant and Wingard Defendants and the other Defendants knew and intended that the potential investors in the Vista Hill Syndicate, including Agnew, would rely on this summary, the Initial Appraisal, and the later Qualified Appraisal Report in deciding

EXHIBIT D

to undertake the SCE Strategy.  Regardless of its title, and as indicated on the first page of the summary of the Initial Appraisal, that document is subject to, and allegedly written in accordance with, USPAP.  The Initial Appraisal and Qualified Appraisal likewise state that they were written in accordance with USPAP.

388.   The Initial Appraisal summary falsely represented that the Van Sant and Wingard Defendants had estimated the value of a conservation donation of 112.46 acres of the Chatham County property to be $22,498,000 based on a purported HBU of aggregate mining.   However, the Van Sant and Wingard Defendants and the other Defendants knew that this appraisal was grossly overstated and based on a HBU that was never intended to occur.

389.   As further support for their valuation, the Van Sant and Wingard Defendants incorporated McCalip's valuation of aggregate resources report dated July 9, 2015, for the purpose of purportedly supporting the bona fides of a charitable contribution deduction from the donation of a conservation easement to a land trust. And like the McCalip report, the Initial Appraisal summary and Initial Appraisal contained numerous fraudulent misrepresentations and gross deficiencies, including but not limited to the following:

(a)    The Van Sant and Wingard Defendants relied wholesale and without examination on the McCalip report.   Thus, the Initial Appraisal incorporates all of the gross inadequacies and frauds found in that report.  The

Comments to USPAP Standards Rule 2-3 state, "When a signing appraiser(s) has relied on work done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work. The signing appraiser(s) is required to have a reasonable basis for believing that those individuals performing the work are competent. The signing appraiser(s) also must have no reason to doubt that the work of those individuals is credible."  The Van Sant and Wingard Defendants failed to state any basis (let alone a reasonable basis) for uncritically relying on the McCalip report.

(b)      The Initial Appraisal relies on several hypothetical assumptions, including that zoning and permitting could be obtained without ever examining when that might occur and why (and demonstrating it would be soon).  In addition, it also relies on several unexplained assumptions, such as that adequate funds exist for the infrastructure needed for a physical plant and a quarry when there is no such showing that such funds existed or that the members of Vista Hill Syndicate would contribute them.  There is no evidence that the Van Sant and Wingard Defendants investigated the possibility of permitting or any of these other hypotheticals, in violation of USPAP 1-1(b) (which requires diligence on matters that would have a "significant effect" on the results).

233

(c)     Although the Initial Appraisal defines "fair market value" on pages 39, the Van Sant and Wingard Defendants do not use fair market value in their analysis.  Instead, they relied on an improper HBU analysis, which was supported by the false assumption that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU when the owner donates real estate to a conservation organization.

(d)     The Van Sant and Wingard Defendants identify zero comparable mines in North Carolina to use in the sales comparison approach.  They identify two operating mines in South Carolina—not raw land like the Vista Hill Property—but quickly conclude that the Sales Comparison approach is a lesser appraisal methodology.  Instead, the Van Sant and Wingard Defendants used the Income Approach so they could achieve the highest possible valuation even though a comparison of the sale of other raw tracts of land would have been more reflective of the true market value (i.e., what a willing buyer and willing seller would agree to) and more in line with USPAP (Standards Rule 1-4), the Tax Code, and IRS regulations.

(e)     To be considered a qualified appraiser, the appraiser must have a demonstrated competency in valuing the type of property being appraised.  In the Initial Appraisal, the Van Sant and Wingard Defendants did not state any experience or education in valuing minerals or mineral properties, yet they

purported to value the Vista Hill Property based on an HBU of mining by blindly relying on McCalip's false and flawed conclusions.

(f)     Based on the misrepresentations and deficiencies described above, none of the summary of the Initial Appraisal, the Initial Appraisal, and the later Qualified Appraisal could be considered a "Qualified Appraisal," as that term is defined under Treas. Reg. § 1.170A-17(a)(1).  Those Appraisals do not conform to generally accepted appraisal standards (USPAP), as required by I.R.C. § 170(f)(11)(E)(i), or Treas. Reg. § 1.170A-1(c)(3)(ii)(I), which requires that the appraisal value be the fair market value of the property. The Van Sant and Wingard Defendants knew this but never disclosed this fact to Agnew or the other Class members.

390.   As discussed subsequently, none of these frauds/deficiencies are corrected or supplemented in the Van Sant and Wingard Defendants' Qualified Appraisal.

391.   In conclusion, the Van Sant and Wingard Appraisals wholly fail to demonstrate that the asserted HBU of mining is (i) legally permissible, (ii) reasonably probable at a period close in time, and (iii) that, based on objective data (such as volume and duration), there is a real market for the mine (*i.e*, that the mineral is present in a commercially exploitable amount and there is a market for

the mineral in the reasonably foreseeable future).  Thus, the proposed HBU is purely speculative and cannot form the "before value" component of the valuation.

### g.   Agnew undertakes the Vista Hill Syndicate Transaction.

392.   Based on the Promotional Materials (including the Initial Appraisal) and the Defendants' advice and representations, Agnew paid $50,000 to purchase an interest in the Vista Hill Syndicate in October or November 2015.   In accordance with the instructions given in the Promotional Materials by the Strategic and the Bridge Capital Defendants, Agnew wired the funds to an IOLTA account held by Schulten Ward Turner & Weiss, a law firm hired to advise the Strategic Defendants.

393.   To complete the investment in the Vista Hill Syndicate, the Strategic and Bridge Capital Defendants sent certain transaction documents to Agnew and other Class Members via email or U.S. mail in late 2015.  The Strategic and Bridge Capital Defendants instructed Agnew and other Class Members to use DocuSign to electronically (and through the wires) fill out and execute the necessary transactional documents.  Agnew completed the transactional documents and executed them on October 27, 2015, using DocuSign as he had been instructed.

### h.   Bryan Cave issues a legal opinion letter.

394.   In December 2015, Jerome A. Breed on behalf of Bryan Cave issued a draft legal opinion letter by email or U.S. mail to the Vista Hill Syndicate.  Bryan Cave also sent its draft legal opinion letter (or some version thereof) via email or

U.S. mail to the Strategic Defendants before the Promotional Materials (which reference the opinion letter) were created as well as to the PCLG Defendants before those Defendants created the due diligence report. In the opinion letter, Bryan Cave made multiple misrepresentations and omission of material fact, including but not limited to:

| Representation | Reason for falsity |
|---|---|
| "This opinion letter has been prepared in accordance with the requirements for a marketed opinion." | Bryan Cave knew that its letter did not comply with Circular 230 requirements because the letter improperly relied on facts Bryan Cave knew to be false or facts that it recklessly disregarded (including the grossly overstated Appraisal) and it knew that, if audited, the transaction was not more likely than not to be upheld. |
| "Based on the foregoing, it is our opinion that the contribution of the Easement by the Company to TLC will qualify for the Qualified Conservation Contribution provided by Code 170(h) | Bryan Cave knew (or recklessly disregarded the fact) that the Appraisal was grossly and fraudulently inflated and was not prepared in accordance with generally accepted appraisal |

237

| | |
|---|---|
| and will not be reduced pursuant to Code Section 170(c)." | standards within the meaning of Section 170(f)(11)(E)(i)(II) of the Code. |
| "We offer no opinion as to the dollar amount of any Qualified Conservation Contribution with respect to the donation of the Easement." | Bryan Cave knew (or recklessly disregarded the fact) that the Appraisal was grossly and fraudulently inflated and was not prepared in accordance with generally accepted appraisal standards within the meaning of Section 170(f)(11)(E)(i)(II) of the Code. |
| "Based upon the foregoing, it is our opinion that the material federal income tax benefits attributable to an investment in the Company in the aggregate should be realized by the Class A Members." | Bryan Cave knew (or recklessly disregarded the fact) that the IRS would likely audit and disallow the charitable contribution deductions. |
| "In providing the opinions expressed herein, we have relied as to the accuracy and truthfulness of various questions of fact material to our opinion, and upon the accuracy and truthfulness of the | Bryan Cave knew (or recklessly disregarded the fact) that, *inter alia*, the Appraisal was grossly and fraudulently inflated, that the Appraisal's stated HBU of a mine was neither legally |

238

| representations and warranties made in the Operating Agreement and the other Documents, and, except as otherwise stated herein or as required by Circular 230, have not undertaken any independent investigation to determine the existence or absence of such facts and no inference to the contrary should be drawn from our representation. However, in the course of our representation, nothing has come to our attention that would cause us to question the accuracy thereof." | permissible nor economically feasible. Bryan Cave also knew (or recklessly disregarded the fact) that the HBU analysis was legally insufficient, and that the Van Sant and Wingard Defendants were not independent. |
|---|---|

395.   The letter fraudulently attempts to disclaim any reliance by investors by stating, "This opinion is provided solely for the benefit of the addressee [Vista Hill Syndicate] in connection with the transactions described above and may neither be used nor relied upon by any other Person, including the Class A Members, without our prior written consent."  In direct contradiction to this statement, Bryan Cave knew and intended for the members of the Vista Hill Syndicate to rely on their letter.  The letter specifically says that it was a "marketed opinion letter," because

Bryan Cave knew or had reason to know that "a person other than [Bryan Cave] w[ould] use or refer to the advice in promoting, marketing, or recommending a partnership, other entity, or plan or arrangement to a taxpayer." In this case, Bryan Cave knew and intended that the Strategic and Bridge Defendant would and did reference the opinion letter in the Promotional Materials and in marketing presentations as a way of providing a further veneer of legitimacy to the SCE Strategy. Bryan Cave further knew and intended for a second law firm (in this case the PCLG Defendants) to review the opinion letter and provide a due diligence report directly to investors evaluating Bryan Cave's opinion letter conclusions and analyses. This attempted disclaimer language also violates Circular 230, which was not disclosed. At the very least, Bryan Cave acted wholly contrary to and waived this purported disclaimer through the actions described above.

396.    The representations and omissions in the letter were not simply opinions. Bryan Cave knew when it wrote the letter that the letter contained materially false statements and omitted key facts, including about the near certainty of an audit and disallowance of the claimed deductions as well as the high likelihood of the IRS imposing penalties and interest on Agnew and other members of the Class.

397.    Agnew and the Class members either directly received and relied on the December draft of the Bryan Cave tax opinion letter (or another version of the tax opinion letter) or reasonably relied on it through summaries of it contained in

Promotional Materials, marketing presentations, and the PCLG Defendants' Due Diligence Report (described later).

### i. The Strategic and ACC Defendants prepare and approve the Conservation Easement Deed.

398.  The Conservation Easement Deed, dated on or about December 3, 2015, was jointly prepared and approved by at least the Strategic Defendants and Triangle Land Conservancy.  The Conservation Easement Deed was verified and signed by Bobby Branch as manager of the Vista Hill Syndicate (as the grantor) and Sandy Sweitzer of Triangle Land Conservancy (as the grantee).  The Deed granted a conservation easement on the entire Property (all 112.46 acres) to Triangle Land Conservancy.

399.  The Deed violated Section 1.170A-14(g)(6)(ii) by failing to protect the conservation purpose in perpetuity.  The regulations interpreting this requirement recognize that subsequent changes in the property's conditions can make it impossible or impracticable to continue the conservation purposes.  In such a case, the land trust is allowed to extinguish the easement by judicial proceeding as long as the proceeds are used by the land trust in a manner consistent with the original conservation purpose. Here, the Deed allowed for new improvements to be excluded from the calculation of the donee's proceeds.  The Tax Court has now granted summary judgment on this issue in favor of the IRS.

EXHIBIT D

### j. Triangle Land Conservancy provides the Vista Hill Syndicate with a letter confirming the donation and falsely representing that the donation is "tax-deductible."

400.  On December 4, 2015, Sandy Sweitzer, on behalf of Triangle Land Conservancy, provided the Vista Hill Syndicate with a letter documenting the conveyance and advising the Syndicate that its contribution to Triangle Land Conservancy "is tax-deductible to the extent allowed by law."  Triangle Land Conservancy knew that they had not attempted to question or verify the Van Sant and Wingard Defendants' appraisal, in gross disregard of industry standards. Triangle Land Conservancy also knew or should have known that the Deed that they drafted with the help of the Strategic Defendants would not withstand IRS scrutiny because of the defective proceeds-clause language.

### k. The PCLG Defendants prepare Due Diligence Reports for Agnew and other members of the Vista Hill Syndicate.

401.  PCLG, and in particular its partners Kowan and Cordon, had a longstanding relationship with the developers of the SCE Strategy: the MMM Defendants.  In fact, Cordon (one of the attorneys at PCLG who was involved with the SCE Strategy) worked at MMM for several years before leaving to join PCLG in 2014.  Based on these relationships and their reputations within the SCE industry, PCLG, Kowan, Cordon, and other PCLG attorneys such as Honeywill, authored numerous due diligence reports and other documents in connection with

implementing SCE Strategies between 2013 and 2016. They performed these services for at least dozens of syndicates during this timeframe.

402. Back on October 22, 2015, PCLG attorney Honeywill, in consultation with PCLG partners Kowan and Cordon, sent a "Due Diligence Report" on PCLG's behalf directly to Agnew and Class members who had participated in the Vista Hill Syndicate via email. There can be no question that the PCLG Defendants were acting as an attorney for Agnew and Class members because the Due Diligence Report was addressed to them and began with "per your request." Honeywill has impeccable credentials—he graduated Order of the Coif from the University of North Carolina School of Law and received an LL.M. from NYU. Despite purporting to represent Agnew's interests in evaluating the bona fides of the Vista Hill Syndicate Transaction, the PCLG Defendants were actually co-conspirators in the tax shelter scheme and provided yet another veneer of legitimacy to the Transaction.

403. The stated goal of the Due Diligence Report was to "identify any material issues that may exist with respect to the Transaction's legal agreements and tax structure and propose solutions to the extent any identified risks may be mitigated." The PCLG Defendants purported to have reviewed and evaluated various transactional documents, including Bryan Cave's Tax Opinion, Van Sant and Wingard's Appraisal, McCalip's report, the Deed, and the BDR. But crucially,

243

the Due Diligence Report states that these documents were in "draft form" at the time and the PCLG Defendants "assumed the documents that are ultimately executed will be substantially similar . . ."  This means that the PCLG Defendants had heaped assumption on top of assumption to come to its fraudulent conclusions in violation of IRS Circular 230, which governed these tax opinion letters.  For example, the Bryan Cave draft opinion letter had assumed that various aspects of the Appraisal were true and correct, and the PCLG Defendants, in turn, accepted the assumptions in the Bryan Cave draft opinion letter as true without independent investigation of the underlying facts.  Moreover, because the Bryan Cave draft opinion letter was dated as of December 2015, the PCLG Defendants either reviewed a much earlier draft or falsely stated that they had reviewed a draft opinion letter that did not yet exist.

404.  The Due Diligence Report also states that the PCLG Defendants reviewed an "Appraisal Review" by the Clark Defendants, which purported to "corroborate the findings, methodologies, valuation estimates, and other conclusions reached in the [Van Sant and Wingard Defendants'] Appraisal."  However, to the best of Agnew's recollection, he never received the Appraisal Review.

405.  The Due Diligence Report failed in material ways to do what it purported to do.  Instead, it made numerous misrepresentations and omissions of material fact, including but not limited to the following:

EXHIBIT D

| Representation or omission | Reason for falsity |
|---|---|
| "this Transaction appears to satisfy the statutory and regulatory requirements" | The PCLG Defendants knew (or recklessly disregarded the fact) that the transaction did not satisfy IRS requirements. |
| "we do not see anything out of the ordinary in the Appraisal, and the methodology that was used seemed reasonable" | The PCLG Defendants knew (or recklessly disregarded the fact) that the value of the donation claimed in the appraisal was grossly and fraudulently inflated by the improper HBU calculation. |
| "The Appraisal found the 'before' value of the Property to be $22,700,000 and the 'after' value of the Property to be $202,000" | The PCLG Defendants failed to disclose that the "before" value of the Property was grossly and fraudulently inflated. |
| "the findings in the Geology Report and Market Study seem reasonable, well supported, and reinforce the proposition that a granite mining operation is the highest and best use of the Property" | The PCLG Defendants knew (or recklessly disregarded the fact) that it was not legally permissible or financially feasible to develop the property as a mine. |

EXHIBIT D

| | |
|---|---|
| "We believe a thorough tax opinion is a critical component to a syndicate easement transaction due to the numerous technical tax issues that may exist.  In this case, the Tax Opinion, which was issued by an experienced tax attorney with a prominent law firm in Washington D.C. [referring to Bryan Cave], analyzes all material tax issues arising out of the Transaction and reaches a 'should' level of confidence with respect to its conclusion for such issues." | The PCLG Defendants knew that the Bryan Cave opinion letter was a sham, based on unreasonable and fraudulent assumptions, and contained numerous legal defects.  The PCLG Defendants further knew that Bryan Cave could not issue a "should" opinion letter in this case given these shortcomings. |
| "the Tax Opinion [referring to the Bryan Cave opinion letter], indicates that the Appraisal meets the requirements of a 'qualified appraisal' for tax purposes" | The PCLG Defendants knew (or recklessly disregarded the fact) that the Appraisal would not be considered as such by the IRS because the Appraisal did not follow applicable appraisal standards and grossly inflated the value of the easement.  The PCLG Defendants |

|  | further knew that Bryan Cave's conclusion was based entirely on the circular reasoning that the Van Sant and Wingard Defendant's Qualified Appraisal was a qualified appraisal because those appraisers said so. |
| --- | --- |

406.    Although the Due Diligence Report was supposed to come from an independent law firm, it failed to acknowledge that the PCLG Defendants had done work for Strategic and Bridge Capital on other conservation easement transactions and had issued similar opinion letters for those transactions (*i.e.,* Strategic and Bridge Capital were important and valuable clients of the firm).

407.    In addition, PCLG, Kowan, and Cordon sponsored and operated a series of SCE fund of funds commonly referred to as the "Emerald Funds." These Emerald Funds invested in SCE deals sponsored by a number of promoters, including the Strategic Defendants. One of the entities used to invest in the Emerald Funds was the PCLG-sponsored Emerald Acquisitions 2014 LLC. This entity owned a 9.29% stake in an entity called Big Hill Partners LLC. The Big Hill Partners LLC transaction was identical to the Vista Hill Syndicate Transaction as well as the Green Valley Investors LLC and the Tick Creek Holdings LLC transactions. Bobby Branch was the tax matters partner for Big Hill Partners LLC, Green Valley

247

Investors LLC, Tick Creek Holdings LLC, and Vista Hills (hereinafter the "Bobby Branch Syndicates"). Each of the Bobby Branch Syndicates owned subparcels of one larger tract. On September 20, 2019, following the issuance of FPAAs, Bobby Branch filed tax court petitions for each of these entities. Since the PCLG Defendants prepared a Due Diligence report on the Vista Hill Syndicate while at the same time having an ownership stake in Big Hill Partners, PCLG, Kowan, Cordon and Honeywill were interested parties. The PCLG Defendants could not opine that the Vista Hill Syndicate Transaction violated the tax code without admitting that their own investments violated the tax code. PCLG, Kowan, Cordon, and Honeywill therefore had a disabling conflict of interest rendering them unable to offer an opinion of any kind whatsoever, even if they had they disclosed their interest to Agnew.

408.    The PCLG Defendants' lack of independence destroyed any penalty protection the Report might have purported to offer Agnew and the Class members.

### l.    Triangle Land Conservancy prepares a Baseline Documentation Report.

409.    On December 3, 2015, Laura Stroud on behalf of Triangle Land Conservancy prepared and provided a BDR to the Vista Hill Syndicate, which was verified as accurate by Triangle Land Conservancy. The purported purpose of the BDR was to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose. Triangle Land Conservancy

EXHIBIT D

set out the conditions on the property that would allegedly be preserved by the conservation easement and falsely misrepresented that these conditions met the conservation purpose of § 170(h) of the Code.

410.   Triangle Land Conservancy was paid at least $35,000 (as represented in the Private Placement Memorandum) for preparing the BDR.

> **m.    The Van Sant and Wingard Defendants prepare an Appraisal Summary, which is verified by Triangle Land Conservancy.**

411.   On or about December 1, 2015, the Van Sant and Wingard Defendants prepared the Appraisal Summary (Form 8283).  Wingard and Van Sant on behalf of Van Sant and Wingard, LLC (as the appraisers) and Sandi Sweitzer (on behalf of Triangle Land Conservancy) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Van Sant and Wingard Defendants and the Triangle Land Conservancy represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the Property to protect the Property.

412.   The Appraisal Summary represented that the Vista Hill Syndicate had acquired the property by deed in April 2011 and had a cost basis of $712,631 but that the conservation easement donation (which had occurred only 6 months after the acquisition of the property by the Vista Hill Syndicate) had a fair market value

of $22,498,000—a 31X appreciation in value in 6 months.[38] The Van Sant and Wingard Defendants and Triangle Land Conservancy (with knowledge by the other Defendants) then advised Agnew that the Appraisal Summary (Form 8283) would substantiate the charitable contribution deduction and allow him to claim the charitable contribution deduction on his individual tax returns.

413.   The Appraisal Summary falsely represented that the appraised fair market value of the conservation easement was $22,498,000, when, in fact, no independent appraiser would have appraised the easement at such a high value.

> **n.     The Van Sant and Wingard Defendants prepare the final Qualified Appraisal.**

414.   The Van Sant and Wingard Defendants prepared the final Qualified Appraisal and sent it to Bobby Branch as manager of the Vista Hill Syndicate on or around March 24, 2016, via U.S. mail or email.  The Van Sant and Wingard Defendants knew and intended that the Qualified Appraisal would be shared with and relied upon by members of the Vista Hill Syndicate, including in connection with tax filings, as evidenced by the statement in the Introduction, "This Qualified Appraisal Report is intended for your discussion and/or use with your partners, tax attorney and accountants in regards to the proposed conservation easement . . ."

---

[38] The Defendants attempted to get around this issue by tacking on the acquisition date by a previous owner who acquired the property in 2011 and by being vague about whether it was they or the previous owner who had paid the $712,631.

Wingard and Van Sant jointly prepared the Qualified Appraisal Report and signed it on behalf of Van Sant and Wingard, LLC.  The Strategic Defendants then selected the Van Sant and Wingard Defendants' Qualified Appraisal to support a charitable contribution deduction for the Vista Hill Syndicate.

415.   This Qualified Appraisal, unlike the one included in the Promotional Materials, contained the full Qualified Appraisal, rather than simply the summary cover letter.

416.   The Qualified Appraisal falsely and materially stated that the Vista Hill Property had a fair market value of $22,700,000 prior to the placement of the conservation easement.  The Qualified Appraisal also falsely and materially stated that the fair market value of the conservation easement donation was $22,498,000— an incredible $200,053 per acre when the Property had sold for a fraction of that in the recent past.  In fact, no independent appraiser would have appraised the Property or the easement at such high values.

417.   The Qualified Appraisal further falsely and materially represented that the Van Sant and Wingard Defendants "engagement in this assignment was not contingent upon developing or reporting predetermined results," when, in fact, the Van Sant and Wingard Defendants had agreed to produce an appraisal value to roughly coincide with the amount of tax deduction sought by the Strategic Defendants.  The Van Sant and Wingard Defendants knew that if they prepared an

EXHIBIT D

appraisal reflecting the true fair market value of the Vista Hill Property, the Strategic Defendants would not have continued to use the Van Sant and Wingard Defendants as appraisers for future SCE Strategy transactions (*See* USPAP Scope of Work Rules, on Acceptability—"An appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased").

418.   The Qualified Appraisal falsely and materially represented that the report "is considered a qualified appraisal as defined in US Treasury Regulation § 1.170A-13(c)" and that "[a]s defined in the US Treasury Regulation § 1.170A-13(c)(5), we are qualified appraisers …"   The Van Sant and Wingard Defendants knew they were not a qualified appraiser because, among other reasons, they were persons whose relationship with the co-conspirators "would cause a reasonable person to question the independence of such appraiser."   Moreover, the opinions and conclusions offered by the Van Sant and Wingard Defendants in the Appraisal did not follow applicable codes of professional conduct including USPAP (as falsely stated in the Appraisal) because they worked backwards from the value requested.

419.   The Qualified Appraisal again relied wholesale and without examination on McCalip's report for the Property.   Thus, the Qualified Appraisal incorporates the false representations and errors found in the McCalip report.   The Van Sant and Wingard Defendants failed to state a basis (let alone a reasonable basis) for their decision to rely on the McCalip report.

420.    The Qualified Appraisal also falsely parrots McCalip's conclusions that "it is reasonably probable that all necessary permitting will be obtained." This fails to take into account that if there are truly environmentally sensitive features of the Property such as to justify a conservation easement on this parcel, the permitting process might be much longer and permitting may not occur at all. Moreover, the conclusion hides the fact that the Strategic Defendants had previously granted conservation easements on at least three adjacent tracts, which would have been a significant obstacle in the permitting process.

421.    The Qualified Appraisal contains a host of other USPAP violations, including:

(a)    There is no support for the conclusion on page 5 that, "It is assumed that all required licenses, consents, permits . . . have been or can be obtained or renewed . . ."

(b)    The statement that "Final extraordinary assumptions, are, as of the effective date of value, all applicable permitting relative to the operation of the rock quarry has been obtained from the North Carolina Department of Environmental Quality," when no such permits had been obtained and the Van Sant and Wingard Defendants could have and should have verified this assumption before using it.

EXHIBIT D

(c)     The Qualified Appraisal concludes that the hypothetical mining operations were financially feasible when a former quarry site existed adjacent the Vista Hill Property, but the operator "vacated the area due to having quarries in other, more concentrated areas."  If that quarry had been financially viable, one would have expected the quarry to have been sold to a willing buyer instead of simply vacated.

(d)     Although the Qualified Appraisal defined "fair market value" on pages 40-41, the Van Sant and Wingard Defendants cited but dismissed two comparable sales of the mineral interests of operating quarries in South Carolina in violation of the USPAP Ethics Rule (specifically, the Section on Conduct) and USPAP Scope of Work Rule, so that they could instead use the more accommodating Income Approach.

422.  The certification in the Appraisal also contained numerous false statements, including but not limited to:

EXHIBIT D

| Representation or omission | Reason for falsity |
|---|---|
| "The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial and unbiased professional analyses, opinions and conclusions" | The Van Sant and Wingard Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |
| "I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment" | The Van Sant and Wingard Defendants were biased in favor of an appraisal value within a predetermined range set by their co-conspirators, which could only be arrived at by selecting mining as the HBU. |
| "my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the | The Van Sant and Wingard Defendants were conspiring with the other Defendants to come to an appraisal value within a predetermined range needed for the SCE Strategy to work. |

255

EXHIBIT D

| occurrent of a subsequent event directly related to the intended use of this appraisal" | |

### o.   Conexus prepares the Syndicate's tax return and corresponding K-1s for the members, which Agnew uses to prepare his tax return.

423.   In or about April 2016, Conexus prepared the tax return for the Vista Hill Syndicate.  The tax return reported a charitable contribution deduction from the donation of the conservation easement.  As required, Conexus attached to the Vista Hill Syndicate's return a copy of the Van Sant and Wingard Defendants' Appraisal, the Appraisal Summary (Form 8283), the BDR, and the Triangle Land Conservancy letter confirming the donation.  Thus, Conexus adopted and incorporated the misrepresentations described above.

424.   In addition, Conexus prepared a K-1 for each of the participants in the Vista Hill Syndicate, including Agnew, which reported the amount of charitable contribution deduction allocated to each of the members of the Vista Hill Syndicate. Conexus sent or caused to be sent Agnew's K-1s via email or U.S. mail on or about April 6, 2016.  The charitable contribution that was allocated to Agnew was more than 4 times the amount he paid into the Vista Hill Syndicate.  The K-1 prepared for Agnew reported the charitable contribution deduction.  Conexus advised Agnew to report this charitable contribution deduction on his individual tax returns for 2015.

425.   Along with the K-1, Conexus included a cover letter addressed to Agnew.  The letter explained that the information in the K-1 had "been provided to the Internal Revenue Service" with the partnership tax return.  In the letter, Conexus instructed Agnew that the "information provided on this schedule should be entered on your tax return, in accordance with the instructions in Schedule K-1, page 2." Conexus also listed certain documents (Form 8283, Supplemental Statement to Form 8283, Appraisal, BDR, Deed, Charitable Organization's Letter of Acknowledge of Receipt) that "must be attached with the Filing of Your Federal & State Tax Returns."  Consequently, Conexus instructed Agnew to incorporate the fraudulent misrepresentations, omissions, and gross errors in those documents into his individual tax return.

426.   Agnew followed the advice of Conexus (as well as the advice of other Defendants) and reported the charitable contribution deduction on his individual tax returns for 2015.

### p.   The Strategic Defendants send a photo book of the Vista Hill Property, which contains additional misrepresentations.

427.   On or about September 8, 2016, Novak on Strategic's behalf sent via U.S. mail a photo book of the Vista Hill Property to Agnew and other members of the Class who had participated in the Vista Hill Syndicate Transaction.  In addition to the colorful photos, the book contained these misrepresentations and omissions:

EXHIBIT D

(a)    That a "desk audit review of the [Van Sant and Wingard Defendants'] appraisal was performed … conclude[ing] that the appraisal is reasonable and in compliance with the IRS and US Treasury guidelines." Despite this alleged second appraisal being frequently touted by the Strategic Defendants, the alleged review by the Clark Defendants was never sent to Agnew and was from an author whose lack of independence (and other misdeeds discussed herein) make him far from being an appropriate reviewer.

(b)    Although the book touts that "[conservation easement]s have been widely used for decades and are well recognized by many government authorities," the book fails to mention IRS Notice 2017-10 and its likely impact—that this conservation easement and all others done by the Defendants were almost certain to be audited.

428.   The photo book was intended as a "deal gift" for participating in the Vista Hill Syndicate Transaction but it was also intended to serve as a marketing document for future transactions for both Agnew and any colleagues, friends, or family members who might be interested in a SCE Strategy.  In fact, the Strategic Defendants included a cover letter with the photo book that specifically invited Agnew to "to remember to communicate with us during the third quarter of this year in order to identify an available project for 2016 that is suitable for you, should you wish to participate."  The Strategic Defendants noted that their SCE Strategy

transactions had sold out in 2015 and that they anticipated "even greater demand in 2016."

429.   The cover letter to the photo book also touted certain "benefits and 'best practice' structural elements" that were materially false, including:

| Purported benefit | Reason for falsity |
|---|---|
| "Appraisals provided by well-qualified appraisers, subjected to a rigorous peer review process." | The appraisers were not qualified to value mineral interests, were not Qualified Appraisers as defined by the Tax Code and applicable regulations, and were not subjected to any kind of peer review process (let alone a rigorous one). |
| "Tax opinion letters from well-respected law firms." | There was only one true tax opinion letter (the other was just a review of the first law firm's work). And although the law firms were well-respected, the Strategic Defendants failed to disclose that the law firms were not independent and had included numerous false |

| | representations and errors in their work product. |
|---|---|
| "Ability to obtain an investor Comfort Letter from outside, independent legal tax counsel." | The PCLG Defendants were not independent because they had previously done work for the Strategic Defendants and counted on repeat business from issuing "comfort letters" for other SCE Strategy transactions. |
| "Operating reserve accounts to cover certain unforeseen future partnership expenses." | Although the Strategic Defendants had structured the Vista Hill Syndicate Transaction to have a reserve of cash for any potential audit, the Strategic Defendants misled Agnew by stating that these were "unforeseen" when, in fact, they knew the Transaction would most likely be audited. |

**q.    The 2016 Vista Hill Syndicate tax return is audited, and the IRS disallows the charitable contribution deduction at the partnership level.**

430.    Thereafter, Vista Hill Syndicate, via its Tax Matters Partner Bobby Branch, received an IRS Notice indicating that Vista Hill Syndicate's partnership tax return for the 2015 tax year was selected for audit.

431.    On June 24, 2019, the IRS made its final determination, via the issuance of an FPAA, that Vista Hill Syndicate's partnership tax return for the 2015 tax year suffered from *inter alia* the following defects: (i) failure to make a charitable contribution in compliance with all of the requirements of Code § 170 and corresponding regulations, thus leading to disallowance of the *entire* $22,700,000 deduction for the conservation easement; and (ii) a gross valuation misstatement (resulting in a 40% penalty) or alternatively a substantial valuation misstatement (resulting in a 20% penalty.  The members of the Vista Hill Syndicate, including Agnew, were not notified of the FPAA by the Strategic Defendants or Bobby Branch until sometime thereafter.

432.    The Tax Matters Partner has filed a lawsuit in Tax Court to contest the IRS's conclusions, which remains pending.  Agnew, however, has proactively paid a deposit for a portion of the back-taxes assessed by the IRS.  The IRS is still pursuing payment for interest and penalties.

EXHIBIT D

### r.   The Tax Court grants partial summary judgment based on a lack of conservation purpose.

433.   On May 27, 2021, the Tax Court granted partial summary judgment in favor of the IRS based on its finding that the "proceeds clause" in the deed of easement does not protect the purported conservation purpose in perpetuity, as required by the Tax Code and applicable regulations.

## E.   The SCE Strategy was fraudulent and fatally flawed.[39]

434.   The IRS has concluded that the SCE Strategy was a fraudulent process that was fatally flawed from the outset.  To effectuate their scheme, the Defendants fraudulently concealed the absence of a true conservation purpose, the improper methodology that led to gross overvaluations of the properties based on an implausible HBU, and other facts known to the Defendants that would not be known to their investors.  The Defendants also prepared documents for the structure and implementation of the SCE Strategy that were strewn with material misrepresentations, omissions, and errors (as discussed previously and in detail below) and, thus, failed to meet the specific requirements set out in the Code, applicable regulations, and relevant governing standards (such as USPAP in the case

---

[39] In addition to asserting these arguments and other deficiencies with the SCE Strategy discussed herein, the IRS has also more recently challenged conservation easement transactions on the grounds that  the partnerships created for the SCE Strategies lacked both business purpose and economic substance and were therefore "shams" under Federal tax law.  Such arguments are made, for example, in the *Agee* criminal case mentioned *supra*.

EXHIBIT D

of appraisals). The critical documents involved in these frauds included but were not limited to the Appraisals, Conservation Easement Deeds, and BDRs.  As purported experts in their respective fields, as well as the organizers and promoters of the transactions, each of the Defendants and Other Participants was aware or should have been aware of the plethora of misrepresentations, omissions, and errors that existed in virtually every aspect of the SCE Strategy.

**1.    The SCE Strategy used sham appraisals—based on an implausible HBU—that violated USPAP, the Code, and applicable regulations in numerous respects.**

435.    The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement (*i.e.,* the willing-buyer-willing-seller test).  Here, however, the appraisers—hand-selected by the Defendants (often repeatedly and often for purpose of reviewing the work of other repeat offenders as well)—ignored traditional fair market value analysis using comparable properties and instead used a discounted cash flow analysis of an implausible HBU.

436.   In doing so, the appraisers committed a number of USPAP violations that were also outright frauds, including by: intentionally ignoring and failing to disclose existing comparable properties; intentionally failing to consider all approaches to value applicable to an appraisal assignment, and failing to explain the reason for excluding them; failing to disclose and ignoring that the subject property

itself was part of a larger tract of land, all of which was (as subdivided) being used for SCE Strategy transactions (and as the appraiser for those other tracts as well, they clearly knew this); intentionally failing to disclose and ignoring the impact of those "brother and sister tracts" both on HBU and conservation purpose; failing to disclose that, in some cases, the Syndicates had not actually even acquired the subject property yet; failing to disclose the historical cost and uses of the property at issue; and wholly failing to demonstrate that the asserted HBU (e.g., mining) was (i) legally permissible, (ii) reasonably probable at a period close in time and (iii) based on objective data (such as volume and duration), there is a real market for the HBU (*e.g.,* as to mining, that the mineral is present in a commercially exploitable amount and there is a market for the mineral in the reasonably foreseeable future).

437.   In addition, the Defendants and Other Participants, including the SCE Appraisers and the Appraisal Defendants themselves, misrepresented to the Plaintiffs and the Class that the SCE Appraisers were professional appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the fair market value for each subject property.  In fact, however, the Appraisers failed to disclose and ignored their own lack of independence and lack of experience/education in the industry on which the HBU was based (e.g., mining). To make up for this, the Appraisers relied solely on reports by consultants in the

respective industry (e.g., mining) without any critical examination or analysis, in violation of USPAP's requirement that they provide a reasonable basis for relying on that underlying work.

438.   In addition, the appraisals rely on hypothetical and unexplained assumptions, such as (in a mining scenario) that zoning and permitting could be obtained without ever examining when that might occur and why (and demonstrating it would be soon) and that adequate funds exist for the infrastructure needed for a physical plant when there is no such showing that such funds existed or that the investors would contribute them.

439.   Instead, to satisfy the Defendants, and particularly the Strategic Defendants, the SCE Appraisers were grossly negligent and intentionally deceitful in each of the Appraisals by making these inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements.   These inflated values, in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy.

440.   With these numerous errors, the SCE Appraisers, including but not limited to the Appraisal Defendants, overstated the fair market value of the conservation easements by millions of dollars, which in turn resulted in the Plaintiffs and the Class unknowingly and grossly overstating their tax deduction.

EXHIBIT D

441.   In light of the SCE Appraisers' purported professional experience and education, they knew or should have known that the manner in which they performed the Appraisals and, ultimately, valued the conservation easements was contrary to the regulations promulgated by the IRS, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements they appraised.

442.   In sum, the SCE Appraisers knowingly performed and prepared the Appraisals for use by the Defendants in marketing and selling the SCE Strategy to participants (*i.e.*, Plaintiffs and the Class) and knowingly allowed the Defendants to improperly guide and direct the SCE Appraisers in performing and preparing the Appraisals for this purpose.  The SCE Appraisers knew that the Syndicates and the SCE Strategy participants would attach their Appraisals to the tax returns of the Syndicates and participants, as required by the Code, to substantiate the charitable contribution deductions reported by the Syndicates and ultimately claimed by the Plaintiffs and the Class Members on their individual tax returns.

## 2.   The Conservation Easement Deeds violated the Code's and Regulations' specific requirements.

443.   The Conservation Easement Deeds were fraudulent because there was no valid conservation purpose, as required.

444.   The Conservation Easement Deeds were prepared by the Defendants with full knowledge of the explicit requirements of the Code and related Regulations

EXHIBIT D

as to what constituted a legal and legitimate conservation easement donation. Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related Regulations, the Defendants failed to prepare the Conservation Easement Deeds to conform to the Code and applicable Regulations because there was not a legitimate conservation purpose. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for the Plaintiffs and the Class.

445.    Further, in order for a conservation easement donation to comply with the Code, the valid conservation purpose must be perpetually protected, as required by Treas. Reg. Section 1.170A-14(g)(6)(i).  Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed.  Here, the Conservation Easement Deeds for the Syndicates involved in the Plaintiffs' SCE Strategy transactions permitted retained uses by the landowners that were inconsistent with these stated conservation purposes and, thus, on this basis alone, failed to satisfy the perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively for conservation purposes.  For example, the Conservation Easement Deed in both the DeSoto Syndicate Transaction and the Bear Creek Syndicate Transaction included a broad reservation of the right to construct renewable energy facilities on up to 20 acres of surface land,

EXHIBIT D

which is clearly inconsistent with the alleged conservation purposes of preserving animals and protecting scenic views. Further, because the 20 acres was not a fixed location on the property, Defendants were also well aware that the conveyance might also be attacked by the IRS as a "perpetuity" issue that impacted the whole property and caused the easement to fail *in its entirety* (even if it were not inconsistent with the alleged conservation purposes).

446.   A conservation easement donation can also fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, the Land Trusts) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation. In drafting many of the Conservation Easement Deeds for the SCE Strategy, the Defendants made critical errors by deviating from the specific requirements of the IRS regulation and providing that the Land Trusts would get too little of the sales proceeds in the event of a sale. This resulted in another failure to meet the perpetuity requirement.

447.   The Defendants all worked closely together to draft the language of the Conservation Easement Deeds. They were aware that the Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction. And Defendants were no doubt aware (or should have been aware) of

both the requirement for a valid conservation purpose and of the perpetuity requirement under the Code and the various ways discussed above by which this requirement could be violated.  The Plaintiffs and the Class relied on the Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

### 3. The BDRs were grossly deficient to cover up the fraudulent lack of a conservation purpose.

448.   Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.  But here there was no valid conservation purpose, and thus the BDRs were themselves fraudulent and used in furtherance of the fraudulent scheme.

449.   The BDRs prepared by the Land Trusts for SCE Strategy transactions from 2013 through 2019 (with the direct assistance and guidance of the other Defendants) were deficient in numerous respects and failed to satisfy the IRS's requirements.   These deficiencies include (1) relying on Appraisals that the Defendants knew were a sham to support the conservation value of the subject property and (2) failing to sufficiently substantiate and document an exclusive conservation purpose.  For example, the DeSoto BDR lacks sufficient detail to fully

269

present the natural and man-made features of the property and verify any conservation purpose being served. It thus wholly fails in its intended purpose to document the condition of the land at the time the Deed was signed or to reflect the public benefit and conservation purposes of the conservation easement. It is clear it was just a "boilerplate" document, mentioning certain enumerated conservation purposes in a conclusory manner, designed to further the fraudulent scheme. Indeed, to do so, its authors failed to ever disclose the expected uses of the adjoining properties, which were well known to the Defendants because they were promoting those properties as SCE Strategy transactions as well.

450. Based on the Defendants' expertise in their related fields and knowledge of the sham nature of the Appraisals and the numerous problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for the Defendants' failure to properly prepare the BDRs other than an intentional act of deceit—to cover up the lack of a true conservation purpose. Defendants knew these deficiencies would result in the Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid and disallow.

## IV.
## CONSPIRACY ALLEGATIONS

451. As set out more fully throughout this Complaint, each of the Defendants and the Other Participants (collectively, the "Co-Conspirators") involved in the SCE

EXHIBIT D

Strategy executed by Plaintiffs and the Class conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees (the "Co-Conspirators' Arrangement").   The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. Further, the amount of fees earned by the Co-Conspirators was not tied to or reflective of the amount of time and effort they expended in providing professional advice and services.   The Co-Conspirators designed and structured the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

452.   Each of the Co-Conspirators had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy, as discussed, above but especially in sections III.C.3 and III.D.  Each of their roles was related to the common purpose of misrepresenting the basis, terms, and consequences of the SCE Strategy or obscuring the defects in it and were directed to the Plaintiffs and members of the Class.   The Defendants shared relationships with each other that included referring and sharing clients as well as producing work product for other Defendants to use when creating promotional materials, producing reports, creating transactional documents, and filling out IRS forms and deeds.   These relationships also had a longevity of several years and

involved a similarity in actions and omissions throughout that time period. The Defendants' coordination therefore rises far beyond the level of mere coincidence and plausibly indicates an agreement by the Defendants to act in concert and thereby join the fraudulent conspiracy alleged herein.

453. The Co-Conspirators each had a financial, business, and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes. Further, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a significant pecuniary interest in the advice and professional services they rendered.

454. The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team—with each team member assigned certain roles and responsibilities—to develop, market, sell, and implement the SCE Strategy.

455. Here, the Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy. In addition, the Co-Conspirators authorized, ratified, and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators. Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy.

EXHIBIT D

456.   The Strategic Defendants spearheaded the recruitment and organization of the team members necessary to carry out the development, promotion, sale, and implementation of the SCE Strategy.   The Strategic Defendants and the Local Promoters also utilized their connections and networks to identify potential clients as "targets" for the SCE Strategy.

457.   In accordance with the pre-planned scheme, the Strategic Defendants effectively owned and/or controlled all PropCos, InvestCos, and Managers.  Despite this common ownership and control, the Strategic Defendants either directly or through an affiliate paid fees to each of these entities.

458.   As part of this pre-planned scheme, MMM and/or Nelson Mullins, Strategic and Bridge Capital Defendants worked together to form each of the Syndicates used in the SCE Strategy.  At times, however, each of them also formed Syndicates independently of the others.

459.   The Strategic Defendants also recruited the SCE Appraisers for their critical role in the SCE Strategy.  Although each of the SCE Appraisers purported to act independently and provide a good faith valuation of the parcels at issue in accordance with applicable professional standards, each of the SCE Appraisers were aware that the Co-Conspirators would use the Appraisals in the promotion, sale, and implementation of the SCE Strategy.  Thus, the SCE Appraisers were in no way independent and willingly joined into the Co-Conspirators' Arrangement.

460.   As part of the pre-planned scheme, the Strategic Defendants also recruited the Land Trusts to accept the donation of the easements and/or fee simple interests in connection with the SCE Strategy.

461.   The Land Trusts knew that the purpose of these donations was to implement the SCE Strategy.  The Land Trusts also knew that the SCE Strategy, as structured and implemented, would not and could not serve its intended purpose of providing a legitimate and legal tax deduction, but nonetheless stood willing and ready to fulfill their role in the Co-Conspirators' Arrangement and benefited by receipt of the contributed properties.

462.   The Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, PCLG Defendants, Land Trusts, and Return Preparers worked closely with the other Defendants regarding all aspects of the design and development of the SCE Strategy, the structuring of each Syndicate and transaction, tax compliance, and the purported due diligence on the SCE Strategy and each SCE Strategy transaction in which they participated with the Strategic Defendants.  These Defendants also drafted and/or approved the SCE Strategy transaction documents beginning with the purchase of property from Landowners, continuing with the Promotional Materials provided to potential participants, and all the documents necessary to complete the SCE Strategy and execute the donations to the Land Trusts, including the Conservation Easement Deeds, BDRs, Appraisals, Appraisal

EXHIBIT D

Summaries (Form 8283), Syndicate tax returns, and the K-1s issued to each Plaintiff and member of the Class.

## V.
## CLASS ACTION ALLEGATIONS

463.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class Members," the "Class") defined below against all Defendants:

> All Persons, from January 1, 2012 to the present, inclusive, (i) who have been assessed back-taxes, penalties, and/or interest (via a settlement with the IRS, an amended tax return renouncing the SCE deduction accepted by the IRS, a final Tax Court decision, or a Notice of Computational Adjustment from the IRS) or (ii) for which the IRS has made its final determination (via a Statutory Notice of Deficiency or FPAA) that the Person (or the entity through which they participated in the SCE Strategy) is liable for back-taxes, penalties, and/or interest, as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed sold, implemented, or managed by the Strategic Defendants.[40]   Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions; federal governmental entities; the Other Participants; and the Other Participants' parents, subsidiaries, affiliates, partners, and employees.

464.   Plaintiffs believe the Class consists of over 1,000 Class Members geographically dispersed throughout the United States such that joinder is

---

[40] As set forth in the first paragraph of this Complaint, the Complaint uses the term SCE Strategy broadly to encompass both conservation easement-structured transactions and fee simple-structured transactions.

EXHIBIT D

impracticable. These Class Members may be identified from information and records maintained by the Defendants or third parties.

465.   The Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

466.   The claims of the Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Defendants.

467.   The Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same unlawful acts as each class member.

468.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

469.   The claims and remedial theories pursued by the Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

470.   There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

EXHIBIT D

(a)    Whether the Defendants and the Other Participants defrauded Plaintiffs by advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter, the SCE Strategy and then implementing same;

(b)    Whether the Defendants and the Other Participants defrauded Plaintiffs and the Class by representing that they had obtained a Qualified Appraisal from a Qualified Appraiser and that the valuation of the subject property and conservation easement donation provided therein was legitimate;

(c)    Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

(d)    Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the charitable contribution deductions from the SCE Strategy would comply with Section 170(h) of the Code and therefore would reduce the taxable income of Plaintiffs and the Class;

(e)    Whether the Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the SCE

277

EXHIBIT D

Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(f)     Whether the Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

(g)     Whether the Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Georgia's RICO statute ("Georgia RICO"), codified at O.C.G.A. §16-4-1, *et seq.,* based on the unlawful acts alleged herein and incorporated by reference;

(h)     Whether the Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in or proximately caused and continues to directly cause injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

(i)     Whether the Defendants' and Other Participants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and/or wire fraud; and

278

(j)     Whether the Defendants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

471.   The Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which could establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. The Plaintiffs also allege questions of law and fact applicable to the Class that predominate over individual questions and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

EXHIBIT D

472.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

473.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

474.   The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex litigation, including class litigation, involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

475.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

476.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

EXHIBIT D

# VI.
# ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

477.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and O.C.G.A. § 16-14-6(c).

478.   At all times relevant hereto, each of Plaintiffs and the Defendants and Other Participants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

479.   As used in this section and "Causes of Action" section, the "RICO Defendants" are the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D. These are Defendants against whom Plaintiffs make substantive RICO claims.   Plaintiffs, however, make RICO conspiracy claims against all Defendants.

## A.   Enterprise

480.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

481.   In this case, the enterprise ("Enterprise") for RICO and Georgia RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that associated for the shared goal of soliciting persons to participate in the fraudulent SCE Strategy for the purpose of generating and sharing

fees and commissions derived from the SCE Strategy and alleged tax liability reduction it purported to provide.

482.   These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy qualified as a bona fide conservation easement entitling Plaintiffs and members of the Class to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.   In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code and the SCE Strategy, as structured, could not support the promised tax benefits.   The SCE Strategy and the Co-Conspirators' Arrangement to design, promote, sell, and implement it by means of the numerous fraudulent acts and omissions set out herein, were devised solely to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the Class). The Defendants and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

483.   Defendants sought out as clients those persons, like Plaintiffs and other Class members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants and Other Participants then capitalized on the Co-Conspirators' Arrangement to convince the clients, by means of the

EXHIBIT D

numerous fraudulent acts and omissions set out herein, to execute the SCE Strategy, for the primary purpose of providing significant revenue for Defendants. Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

484.   The Defendants and the Other Participants engaged in a common fraudulent plan, transaction, and course of conduct, as described herein, in connection with the design, promotion, sale and implementation of the SCE Strategy.   The Defendants and the Other Participants knowingly or recklessly engaged in acts, transactions, practices, and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

485.   In connection with their involvement in the SCE Strategy, the Defendants and Other Participants shared a purpose, relationship, and longevity sufficient to permit them to pursue the Enterprise's purpose.   Specifically, the purpose of the Enterprise was for Defendants and the Other Participants to generate and share fees and commissions generated from the SCE Strategy.   They

accomplished this purpose by, among other things, rendering services to Plaintiffs in connection with designing, promoting, selling, and implementing the SCE Strategy irrespective of whether the SCE Strategy complied with applicable laws, rules, and professional standards.

486.   As described more fully in above but especially in sections III.C.3 and III.D., the Strategy Defendants shared relationships with each of the other Defendants and Other Participants.   These relationships enabled all of the Defendants and Other Participants to, among other things, (1) promote the SCE Strategy to new clients, (2) organize and operate the LLC entities necessary to implement the SCE Strategy, (3) advise Plaintiffs on the steps necessary to implement the SCE Strategy, (4) advise Plaintiffs on the tax treatment and purported benefits of the SCE Strategy, (5) obtain appraisals for the property interests donated as part of the SCE Strategy, (6) prepare tax returns, K-1s, and other tax forms for the SCE Strategy, and (7) advise Plaintiffs on how to respond to IRS scrutiny of the SCE Strategy.   The Enterprise also had longevity.   It lasted from at least 2013-2020, during which time the Enterprise committed, among other things, the predicate acts described more fully in Section III above.

487.   While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

488.   Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

489.   Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

### B.   Operation of the RICO Enterprise

490.   Each of the Defendants were vital to the implementation of the SCE Strategy and played an important role in the success of the Enterprise.  The RICO Defendants either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise; thus, each had some part in directing the enterprise's affairs, not just their own, as detailed above in Section III.

491.   Each of the RICO Defendants were involved in either or both of the following: (i) in marketing the SCE Strategy to Plaintiffs and the Class or (ii) in providing incomplete and misleading legal opinions, tax returns, appraisals and other documents designed to promote or implement the SCE Strategy. Further, they were not merely performing ordinary business services.  Rather, the RICO Defendants were part of the operation and direction of the Enterprise because they performed tasks they do not ordinarily perform.  These tasks include, among other things,

285

providing false or misleading information for (or omitting material information from) promotional pitches of the Syndicates; inserting false conservation purposes into the BDRs and other documents; commissioning and preparing fraudulent business plans for development or mining; commissioning and preparing grossly inflated appraisals; signing IRS Appraisal Summaries and other IRS filings that reflect these grossly inflated appraised values; and prioritizing fees and director compensation over land conservation.  A further description of the role each played is set forth above in Section III.

492.   The Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of the SCE Strategy because the IRS has made it clear to professional advisors, including the Defendants, that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented, as further set out in detail herein.  Defendants' conduct was not consistent with ordinary lawful business practices because Defendants' conduct violated IRS guidance, federal law, and professional standards such as USPAP appraisal standards.   Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

493.   Unfortunately, the IRS has disallowed the charitable deductions at the partnership (*i.e.*, the Syndicate) level and made clear its intent to also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties.  Moreover, Plaintiffs and the Class have incurred and will continue to incur substantial amounts of accounting and legal fees in connection with the audits and tax court proceedings regarding their individual tax returns and their related partnership tax returns.

494.   Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like the Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions for themselves.  Plaintiffs trusted they were being advised, counseled and directed by those professionals who represented themselves as experts who were highly experienced with these types of transactions.  However, Defendants and their co-conspirators received large amounts of fees and commissions for personal use/gain, while at all times assuring Plaintiffs that they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

C.     **Predicate acts**

495.   With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and

their co-conspirators and with knowledge that such conduct was unlawful.  Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

496.  With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.  In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay, or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

497.  With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as Defendants herein, to violate 18 U.S.C. §1962(c) and O.C.G.A. §16-4-4(b), all in violation of 18 U.S.C. §1962(d) and Georgia law.  Each Defendant agreed and conspired with each other Defendant and their co-conspirators to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants and their co-conspirators were not entitled.

498.  The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants and

EXHIBIT D

their co-conspirators designed to defraud the Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.  The acts that caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

499.   In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq*. *See also* O.C.G.A. §16-4-3(5)(C).

500.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

501.   Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

**D.     Violations of 18 U.S.C. §§ 1341 and 1343.**

502.   Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

EXHIBIT D

503.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

504.   The Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 and acts taken by mail and/or wire in support of these violations are too numerous to list.  Defendants and Other Participants engaged in predicate act violations as early as 2012 and Plaintiffs will obtain evidence of such violations through discovery in this case.  However, by way of illustration but not limitation, Plaintiffs provide representative *examples* below of predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations of which they currently have knowledge. Defendants' *additional* predicate acts are *further* detailed above, particularly in Section III.D.[41]

505.   **Strategic Defendants**:

---

[41] Although the predicate acts detailed in this section are some examples of predicate acts engaged in by the RICO Defendants, all of the Defendants engaged in predicate acts as described in section III.  The predicate acts by non-RICO Defendants described in section III support the RICO conspiracy claims against those Defendants.

(a)     December 17, 2013, email from Freemen on behalf of the Strategic Defendants to Christina Briboneria of Oxygen asking whether the Greiner Plaintiffs were accredited investors as detailed above, which email was incident to an essential part of the scheme (namely marketing the SCE Strategy).

(b)     December 17, 2013, email from Freemen on behalf of the Strategic Defendants to Christina Briboneria of Oxygen falsely representing that a $28,500 investment from the Greiner Plaintiffs in the Turtle River Syndicate would yield them a $120,000 deduction as detailed above.

(c)     December 26, 2013, email from Brooke Freeman on behalf of the Strategic Defendants to the Greiner Plaintiffs, which attached the First Supplement to the Turtle River Private Placement Memorandum, dated December 23, 2013, which contained false statements as described hereinabove and included an Initial Appraisal by the Van Sant and Wingard Defendants dated December 15, 2013, which contained false statements as described hereinabove.

(d)     Deed of Conservation Easement for the Turtle River Property, dated December 31, 2013, that was jointly prepared by the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, and GALT and was sent on or about December 31, 2013, via U.S. mail and/or email for filing,

EXHIBIT D

which Deed failed to protect the conservation purpose in perpetuity as required by § 170(h)(5)(A) of the Code.

(e)     In or around the third or fourth quarter of 2015, John Howard of Strategic called Agnew, told him about the opportunity to do another SCE Strategy transaction, and ask if Agnew wanted to participate.

(f)     Deed of Conservation Easement for the Vista Hill Property, dated December 3, 2015, that was jointly prepared/approved by the Strategic Defendants and Triangle Land Conservancy and was sent in or about December 2015, via U.S. mail and/or email for filing, which Deed failed to protect the conservation purpose in perpetuity as required by § 170(h)(5)(A) of the Code.

(g)     On or about September 8, 2016, Novak on Strategic's behalf sent via U.S. mail a photo book of the Vista Hill Property and a cover letter to Agnew and other members of the Class who had participated in the Vista Hill Syndicate Transaction, which contained misrepresentations and omissions as set forth above.

(h)     In the fourth quarter of 2016, the Strategic and Bridge Capital Defendants sent Douget an email attaching a glossy brochure entitled, "Rock Spring Investors, LLC Offering Summary & Case Study" which contained misrepresentations as set forth above.

EXHIBIT D

(i)     Email from Michael Viscusi on behalf of the Strategic and Bridge Capital Defendants to Douget via email on or about December 28, 2016, which contained Promotional Materials for the Rock Spring Syndicate and a ShareFile link to certain due diligence documents and a DocuSign email with a link to the "Subscription Documents," which Promotional Materials contained misrepresentations and omissions as set forth above.

(j)     On or around January 13, 2017, Novak (on behalf of the Strategic and Bridge Capital Defendants) emailed Douget and other Class members about the impact of IRS Notice 2017-10, which email contained misrepresentations and omissions as set forth above.

(k)     In December 2016, the Strategic Defendants, Nelson Mullins, and Foothills prepared a Limited Warranty Deed for Rock Spring and sent it via U.S. mail and/or email for filing, which Limited Warranty Deed contained a misrepresentation as set forth above.

(l)     On or about October 3, 2017, Mike Fields, on behalf of the Strategic Defendants, sent via U.S. mail a photo book of the Rock Spring Property to Douget and other members of the Class who had participated in the Rock Spring Syndicate, which photo book contained misrepresentations and omissions as set forth above.

(m)   On or about November 2, 2016, Novak held a conference call with Hoover and Hoover's CPA, during which call Novak, on behalf of himself and Strategic, made misrepresentations and omissions as set forth above.

(n)   Novak sent an email to Hoover on December 12, 2016 (on behalf of Strategic and Bridge) that attached a glossy brochure entitled, "DeSoto Investors, LLC Offering Summary," which brochure contained a number of misrepresentations as set forth above.

(o)   On December 12, 2016, the Strategic and Bridge Capital Defendants sent an email to Hoover that included a DocuSign link for him to review and sign certain documents in a Private Placement Subscription package for the DeSoto Syndicate, which contained an electronic link to documents including a Private Placement Memorandum that contained misrepresentations and omissions as set forth above.

(p)   On or around December 26, 2016, Novak (on behalf of the Strategic and Bridge Capital Defendants) emailed Hoover and other Class members a supplement to the Private Placement Memorandum for the DeSoto Property, which email and Supplement purported to disclose to the DeSoto Syndicate members IRS Notice 2017-10 and contained misrepresentations and omissions as set forth above.

EXHIBIT D

(q)    In or about the third or fourth quarter of 2014, the Strategic Defendants provided brochures to Dantin via email and/or U.S. mail prior to the meeting with Hebert for the purpose of inducing Hebert to undertake SCE Strategy transactions with Strategic.

(r)    In the fourth quarter of 2015, the Strategic and Bridge Capital Defendants sent Promotional Materials for Bear Creek to Hebert via email and/or U.S. Mail, which Promotional Materials contained misrepresentations and omissions as set forth above.

506.   **Bridge Capital Defendants**:

(a)    Deed of Conservation Easement for the Turtle River Property, dated December 31, 2013, that was jointly prepared by the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, and GALT and was sent on or about December 31, 2013, via U.S. mail and/or email for filing, which Deed failed to protect the conservation purpose in perpetuity as required by § 170(h)(5)(A) of the Code.

(b)    In October or November 2015, the Strategic and Bridge Capital Defendants sent an email to Agnew that included a DocuSign link for Agnew to review and sign certain documents in a Private Placement Subscription package for Vista Hill which included, inter alia, a false representation regarding the expected tax deduction.

295

(c)      In the fourth quarter of 2016, the Strategic and Bridge Capital Defendants sent Douget an email attaching a glossy brochure entitled, "Rock Spring Investors, LLC Offering Summary & Case Study" which contained misrepresentations as set forth above.

(d)      Email from Michael Viscusi on behalf of the Strategic and Bridge Capital Defendants to Douget via email on or about December 28, 2016, which contained Promotional Materials for the Rock Spring Syndicate and a ShareFile link to certain due diligence documents and a DocuSign email with a link to the "Subscription Documents," which Promotional Materials contained misrepresentations and omissions as set forth above.

(e)      On or around January 13, 2017, Novak (on behalf of the Strategic and Bridge Capital Defendants) emailed Douget and other Class members about the impact of IRS Notice 2017-10, which email contained misrepresentations and omissions as set forth above.

(f)      On December 12, 2016, the Strategic and Bridge Capital Defendants sent an email to Hoover that included a DocuSign link for him to review and sign certain documents in a Private Placement Subscription package for the DeSoto Syndicate, which contained an electronic link to documents including a Private Placement Memorandum that contained misrepresentations and omissions as set forth above.

(g)     On or around December 26, 2016, Novak (on behalf of the Strategic and Bridge Capital Defendants) emailed Hoover and other Class members a supplement to the Private Placement Memorandum for the DeSoto Property, which email and supplement purported to disclose to the DeSoto Syndicate members IRS Notice 2017-10 and contained misrepresentations and omissions as set forth above.

(h)     In the fourth quarter of 2015, the Strategic and Bridge Capital Defendants sent Promotional Materials for Bear Creek to Hebert via email and/or U.S. Mail, which Promotional Materials contained misrepresentations and omissions as set forth above.

507. **MMM Defendants**:

(a)     Deed of Conservation Easement for the Turtle River Property, dated December 31, 2013, that was jointly prepared by the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, and GALT and was sent on or about December 31, 2013, via U.S. mail and/or email for filing, which Deed failed to protect the conservation purpose in perpetuity as required by § 170(h)(5)(A) of the Code.

(b)     In December 2016, the MMM Defendants prepared and sent a draft legal opinion letter by email or U.S. mail to the DeSoto Syndicate, which

EXHIBIT D

draft legal opinion letter contained misrepresentations and omissions as set forth above.

(c)     May 12, 2017, memorandum from the MMM Defendants to the Turtle River Members, which was sent to the members on May 12, 2017, via U.S. mail and/or email, which fraudulently failed to disclose and concealed the Strategic and MMM Defendants' knowledge that the claimed value for the conservation easement was fraudulently inflated.

(d)     In December 2016, the MMM Defendants prepared and issued a draft legal opinion letter by email and/or U.S. mail to the Bear Creek Syndicate, which draft legal opinion letter contained misrepresentations and omissions as set forth above.

(e)     Conservation Deed for the Bear Creek Property, dated December 30, 2013, that was jointly prepared by the Strategic Defendants, MMM Defendants, and ACC Defendants and was sent on or about December 30, 2013, via U.S. mail and/or email for filing, which deed permitted a use that was inconsistent with the conservation purpose of the donation.

508.   **Nelson Mullins**:

(a)     In December 2016, Nelson Mullins sent a draft legal opinion letter to the Rock Spring Syndicate via email and/or U.S. Mail that contained misrepresentations and omissions as set forth above.

(b)     In December 2016, the Strategic Defendants, Nelson Mullins, and Foothills prepared a Limited Warranty Deed for Rock Spring and sent it via U.S. mail and/or email for filing, which Limited Warranty Deed contained a misrepresentation as set forth above.

(c)     On December 29, 2016, Nelson Mullins issued their "Due Diligence Report" for participants in the DeSoto Syndicate via email or U.S. mail, which report contained misrepresentations and omissions as set forth above.

(d)     On December 30, 2016, Nelson Mullins issued their "Due Diligence Report" for participants in the Bear Creek Syndicate, which was sent to Hebert via email the next day, and which report contained misrepresentations and omissions as set forth above.

509.   **Langford Defendants**:

(a)     In or about April 2014, the Langford Defendants prepared the tax return for the Turtle River Syndicate, sent the tax return and its attachments to the Turtle River Syndicate via U.S. mail and/or email at some point in or about April 2014, and filed the tax return with the IRS electronically.

(b)     Turtle River Syndicate's K-1's for each of its members which were prepared by the Langford Defendants in or about April 2014 and sent by the Langford Defendants to the Turtle River Syndicate's manager in or about

April 2014 via one or more U.S. mailings and/or emails with the knowledge and intent that they would be forwarded to the members of the Turtle River Syndicate, including but not limited to Spratt and the Greiner Plaintiffs, which included misrepresentations as described hereinabove.

510.   **Bennett Thrasher**:

(a)    In or about August 2017, Bennett Thrasher prepared the tax return for the Rock Spring Syndicate, sent the tax return and its attachments to the Rock Spring Syndicate via U.S. mail and/or email at some point in August or September 2017, and filed the tax return with the IRS electronically, which tax return contained misrepresentations and omissions as set forth above.

(b)    On or around August 30, 2017, Bennett Thrasher prepared a Schedule K-1 and a cover letter for each member of the Rock Creek Syndicate and sent them to each member of Rock Creek, including Douget, via email or U.S. mail, which K-1s and cover letters contained misrepresentations and omissions as set forth above.

(c)    On or about June 23, 2017, Bennett Thrasher prepared the tax return for the DeSoto Syndicate, sent the tax return and its attachments to the DeSoto Syndicate via U.S. mail and/or email at some point in June or July

EXHIBIT D

2017, and filed the tax return with the IRS electronically, which tax return contained misrepresentations and omissions as set forth above.

(d)     In or around June 2017, Bennett Thrasher prepared a Schedule K-1 for each member of the DeSoto Syndicate and sent them to each member of DeSoto, including Hoover, via email or U.S. mail, which K-1s contained misrepresentations and omissions as set forth above.

511.   **Van Sant and Wingard Defendants**:

(a)     December 15, 2013, U.S. mailing and/or email from the Van Sant and Wingard Defendants to Turtle River Properties, LLC via U.S. mail and/or email containing a fraudulently inflated Initial Appraisal for the Turtle River Property.

(b)     Qualified Appraisal Report regarding Turtle River prepared by the Van Sant and Wingard Defendants and sent by the Van Sant and Wingard Defendants to the Turtle River Syndicate on or about January 24, 2014 via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Turtle River Syndicate, including but not limited to the Spratt and the Greiner Plaintiffs, which contained fraudulent statements and omissions as detailed hereinabove;

(c)     Appraisal Summary (Form 8283) for Turtle River signed by Defendants Van Sant and Wingard, which was sent by the Van Sant and

EXHIBIT D

Wingard Defendants to the Turtle River Syndicate and/or its accountant, Langford, on or about April 2, 2014, via U.S. mail and/or email and which contained false statements as set forth hereinabove.

(d)  In or about September 2015, the Van Sant and Wingard Defendants sent a summary of an Initial Appraisal for the Vista Hill Property to Strategic via U.S. mail and/or email, which contained false representations as set forth above and which summary was included in the Private Placement Memorandum for Vista Hill.

(e)  Appraisal Summary (Form 8283) for Vista Hill signed by Defendant Wingard, which was sent by the Van Sant and Wingard Defendants to the Vista Hill Syndicate on or about December 1, 2015, via U.S. mail and/or email and which contained false statements as set forth hereinabove.

(f)  Qualified Appraisal Report regarding Vista Hill prepared by the Van Sant and Wingard Defendants and sent by the Van Sant and Wingard Defendants to the Vista Hill Syndicate's manager on or about March 24, 2016, via U.S. mail or email, which contained fraudulent statements and omissions as detailed hereinabove.

(g)  On or about December 19, 2016, the Van Sant and Wingard Defendants sent an Initial Appraisal letter for the Bear Creek Property to Bear Creek Holdings, LLC via U.S. mail and/or email, which contained false

EXHIBIT D

representations as set forth above and a summary of which was included in the Private Placement Memorandum for Bear Creek.

(h)     Appraisal Summary (Form 8283) for Bear Creek signed by Defendants Wingard and Van Sant, which was sent by the Van Sant and Wingard Defendants to, inter alia, Bear Creek Holdings in or about August 2017 via U.S. mail and/or email and which contained false statements as set forth hereinabove.

(i)     Qualified Appraisal Report regarding Brae Creek prepared by the Van Sant and Wingard Defendants and sent by the Van Sant and Wingard Defendants to the Bear Creek Holdings on or about September 9, 2017, via U.S. mail or email, which contained fraudulent statements and omissions, and had flaws, as detailed hereinabove.

512.   **Clark Defendants**:

(a)     On or about December 2, 2016, the Clark Defendants sent an Initial Appraisal for the Rock Spring Property to, *inter alia*, Strategic via email and/or U.S. Mail, which Initial Appraisal was included in the Promotional Materials for Rock Spring and contained misrepresentations and omissions as set forth above.

(b)     In May or June 2017, the Strategic Defendants, Clark Defendants, and Foothills jointly prepared the Appraisal Summary (Form

EXHIBIT D

8283), which was sent via U.S. Mail and/or email to Rock Springs, LLC or its accountant for filing, which Appraisal Summary contained misrepresentations and omissions as set forth above.

(c)     On or around August 10, 2017, the Clark Defendants sent a final Qualified Appraisal to Rock Spring, LLC, via U.S. mail or email with the knowledge and intent that it would be shared with and relied upon by members and prospective members of the Rock Spring Syndicate, including but not limited to Douget, which Qualified Appraisal contained misrepresentations and omissions as set forth above.

(d)     On or about December 9, 2016, the Clark Defendants sent a summary of an Initial Appraisal for the DeSoto Property to Strategic vie email and/or U.S. Mail, which summary contained misrepresentations and omissions as set forth above.

(e)     On or about December 12, 2016, the Clark Defendants sent an Initial Appraisal for the DeSoto Property to Strategic vie email and/or U.S. Mail, which Initial Appraisal contained misrepresentations and omissions as set forth above;

(f)     On or about May 18, 2017, the Clark Defendants and ACC Defendants jointly prepared the Appraisal Summary (Form 8283) for DeSoto, which was sent via U.S. Mail and/or email to DeSoto or its accountant for

filing, which Appraisal Summary contained misrepresentations and omissions as set forth above.

(g)     On or around June 15, 2017, the Clark Defendants prepared and sent the al Qualified Appraisal Report to DeSoto Holdings, via U.S. mail or email, which report contained misrepresentations and omissions as set forth above.

513.   **ACC Defendants**:

(a)     On December 29, 2016, Keller, on behalf of ACC, provided DeSoto Holdings via email and/or U.S. Mail with a letter documenting the conveyance and advising DeSoto Holdings that its contribution to ACC "is fully tax deductible" despite knowing that this statement was false.

(b)     On December 30, 2016, Keller on behalf of ACC prepared and provided a BDR to DeSoto Holdings via email and/or U.S. Mail, which report contained misrepresentations, omissions, and deficiencies as set forth above.

(c)     On or about May 18, 2017, the Clark Defendants and ACC Defendants jointly prepared the Appraisal Summary (Form 8283) for DeSoto, which was sent via U.S. Mail and/or email to DeSoto or its accountant for filing, which Appraisal Summary contained misrepresentations and omissions as set forth above.

(d)      On December 30, 2016, Keller on behalf of ACC prepared and provided a BDR to the Bear Creek Syndicate via email and/or U.S. Mail, which report contained misrepresentations, omissions, and deficiencies as set forth above.

(e)      Conservation Deed for the Bear Creek Property, dated December 30, 2013, that was jointly prepared by the Strategic Defendants, MMM Defendants, and ACC Defendants and was sent on or about December 30, 2013, via U.S. mail and/or email for filing, which deed permitted a use that was inconsistent with the conservation purpose of the donation.

(f)      On December 30, 2016, Keller, on behalf of ACC, provided DeSoto Holdings via email and/or U.S. Mail with a letter documenting the conveyance and advising Bear Creek Holdings that its contribution to ACC "is fully tax deductible" despite knowing that this statement was false.

(g)      ACC also provided the Bear Creek PropCo with two additional letters.  The first letter, sent on January 26, 2017, by U.S. mail and/or email, documented a $43,833 "stewardship donation" for the perpetual protection of the donated conservation easement and the second letter, sent on the same date by U.S. mail and/or email, documented donations totaling $10,663.05 to ACC for its Baseline Documentation Report.

514.   **<u>GALT</u>**:

(a)   Conservation Easement Baseline Documentation Report prepared by GALT that GALT sent to the Turtle River Syndicate via U.S. mail and/or email on or about December 31, 2013, in which GALT falsely represented that the conditions on the Turtle River Property met the conservation purpose of § 170(h) of the Code.

(b)   Deed of Conservation Easement for the Turtle River Property, dated December 31, 2013, that was jointly prepared by the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, and GALT and was sent on or about December 31, 2013, via U.S. mail and/or email for filing, which Deed failed to protect the conservation purpose in perpetuity as required by § 170(h)(5)(A) of the Code.

(c)   Appraisal Summary (Form 8283) for Turtle River signed by GALT on April 9, 2014, which made false representations that the conservation easement donation was qualified under § 170(h) of the Code and regarding the fair market value of the property, which GALT sent to the Turtle River Syndicate and./or its accountants, the Langford Defendants, on April 9, 2014, via U.S. mail and/or email for filing with Turtle River's tax return.

515.   **Credo**:

(a)   October 29, 2013, email from Dan Lucas on behalf of Defendant Credo to Spratt and other Credo clients soliciting participants in SCE Strategy

syndicates promoted by the Strategic Defendants, which email was incident to an essential part of the scheme.

(b)     At least two December 2013 telephone calls between Dan Lucas on behalf of Defendant Credo and Spratt in which Lucas falsely told Spratt that Spratt could benefit from the tax deductions offered by the SCE Strategy, pressured Spratt to agree to the Turtle River Syndicate and pressured Spratt to invest or lose out, and explained, falsely, that the tax benefits from the Turtle River Syndicate would occur because the property would continue to be appraised at higher values and return tax benefits over time.

(c)     December 26, 2013, email from Dan Lucas on behalf of Defendant Credo to Spratt urging him to purchase an interest in the Turtle River Syndicate as detailed above, which email was incident to an essential part of the scheme (namely marketing the SCE Strategy).

(d)     Spratt's 2013 tax return, which was prepared by Credo and claimed the deductions from Spratt's K-1, which Credo knew to be false and which Credo sent to Spratt via U.S. mail and/or email and which Credo filed with the IRS via efile.

516.   **Oxygen**:

(a)     Fall 2013 phone call between Christina Briboneria on behalf of Oxygen and the Greiner Plaintiffs during which Briboneria falsely represented

that the Strategic conservation easements were a "completely legitimate strategy" and that Oxygen had "fully vetted" Strategic.

(b)     December 20, 2013, email from Christina Briboneria on behalf of Oxygen to the Greiner Plaintiffs attaching a Land Conservation Easement Strategy illustration which Oxygen prepared which falsely represented that the Greiner Plaintiffs' $28,500 investment in Turtle River would yield a deduction of $120,650.

(c)     Greiner Plaintiffs' 2013 tax return, which was prepared by Oxygen and claimed the deductions from the Greiners K-1, which Oxygen knew to be false and which Oxygen sent to the Greiners via U.S. mail and/or email on or about April 24, 2014, and which Oxygen filed with the IRS via e-file.

517. **AquaFUSION**:

(a)     On or about November 23, 2016, AquaFUSION sent a draft of a Preliminary Aggregate Valuation and Quarry Feasibility Analysis for the Rock Spring Property to, *inter alia*, the Clark Defendants via email and/or U.S. Mail, which report contained misrepresentations and omissions as set forth above.

(b)     On or about November 30, 2016, AquaFUSION sent its Preliminary Greenfield Property Aggregate Valuation and Quarry Feasibility

Analysis for the DeSoto Property via U.S. Mail and/or email to, *inter alia*, the Clark Defendants, which report contained misrepresentations and omissions as set forth above.

(c)     On or about December 7, 2016, AquaFUSION sent its Preliminary Gneiss Valuation and Quarry Feasibility Analysis for Bear Creek to the Strategic Defendants and the Van Sant and Wingard Defendants via email and/or U.S. Mail to, *inter alia*, the Van Sant and Wingard Defendants, which report contained misrepresentations and omissions as set forth above.

518.  **F&D**:

(a)     In or about September 2017, F&D prepared the tax return for the Bear Creek Syndicate and filed it electronically with the IRS, which tax return contained misrepresentations and omissions as set forth above.

(b)     In or about September 2017, F&D prepared a K-1 for each member of the Bear Creek Syndicate, including Hebert, which F&D sent to Hebert via email or U.S. mail with a cover letter on or around September 11, 2017, and which K-1 and cover letter contained misrepresentations and omissions as set forth above.

519.  Each of the documents that Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and members of the Class served one of two roles in the Enterprise (if not both).  First, many of these documents, standing alone, were

fraudulent.   Defendants and their co-conspirators knew the tax treatment contemplated by their communications was inaccurate.   Second, all of these documents were used to advance the fraudulent scheme that Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.

520.   Defendants' and their co-conspirators' efforts in executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).

521.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and 1343.   These various communications are related to the purpose of misrepresenting the basis, terms and consequences of the SCE Strategy and were directed to the Plaintiffs and members of the Class; further, the similarity in the misrepresentations over a period of time plausibly indicates participation by the Defendants in the fraudulent enterprise.   These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the definition of racketeering activity under O.C.G.A. §16-

4-3(5)(C).   Defendants' and their co-conspirators' fraudulent statements and omissions are detailed above, especially in Section III.

522.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing. The Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

523.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material.   Plaintiffs and the Class were injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

524.   The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.   In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the

Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

525.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy and subsequently filing tax returns based on the Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

526.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

527.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' and their co-conspirators' overt acts and racketeering activities.

**E.   Pattern of racketeering activity**

528.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

529.  As set forth above, the Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and O.C.G.A. §16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute).  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

530.  The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to

misrepresent the nature of the transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs.

531.   Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended for at least 8 years (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicate offenses are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes. Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

532.   As to open-ended continuity for example, the Strategic Defendants have continued to promote their conservation easement transactions.  For example, Defendant Novak sent an email dated September 27, 2016, on behalf of the Strategic Defendants to prior investors in Strategic conservation easement projects, seeking their participation in conservation easement projects in 2016.  The email stated, "[a]s you are likely aware, our projects sold out much earlier than anticipated in 2015, and we expect an even greater demand in 2016" and that "[o]ur first projects are anticipated to begin closing in mid-late October, with additional closings taking place monthly through the balance of the year."  Strategic also sent an email dated

April 10, 2020, to Spratt and other Strategic clients stating that "[t]he Strategic Group is a boutique investment firm that focuses primarily on investment strategies that also provide tax benefits as a source of returns" and that they were looking for "landowners looking to conserve their land to promote 'green, sustainable, and socially responsible' land ownership"—*i.e.*, to agree to sell their land to be used in a syndicated conservation easement. As of the date of filing of Plaintiffs' Complaint, Defendant Novak's biography on the Strategic Defendants' website, https://thestrategicgroup.com/our-team/, states that he "specializes in niche areas of tax planning and works directly with high-net-worth investors, family offices, and their trusted advisors. His expertise focuses on tax-deferred 1031 exchanges, Delaware Statutory Trust (DSTs), tax-deferred Opportunity Zone funds, **conservation easements**, and numerous federal and state-sponsored tax mitigation strategies." (emphasis added).

533.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint. More specifically, Defendants' misrepresentations and material omissions described in this Complaint, expressed both directly and indirectly with the Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and members of the Class, induced Plaintiffs and members of the Class both to enter

EXHIBIT D

into the transactions and professional relationships that make up the SCE Strategy and to take positions with the IRS regarding the tax and financial implications of the SCE Strategy.  But for Defendants' misrepresentations and omissions, Plaintiffs and members of the Class would not have entered into the SCE Strategy and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategy.  And as a direct result of entering into the SCE Strategy and taking positions with the IRS that the Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back taxes, penalties, and interest imposed by the IRS.

### VII.
### PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY, THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

534.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

535.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

EXHIBIT D

536.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

537.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein shortly before the filing of this lawsuit.

538.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE Strategy complied with all applicable tax laws and regulations and would be accepted by the IRS.  In making these representations and providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.  In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants at an earlier date.  Defendants and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

539.   Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with

Defendants rendering faulty advice and continued through the filing of this Complaint.

540.    In the alternative, Plaintiffs claims are timely filed under the fraudulent concealment and/or continuing tort/continuous representation doctrines.

## VIII.
## CAUSES OF ACTION

### COUNT I.
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)

**(By All Plaintiffs and the Class against the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D)**

541.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.  As used in this Causes of Action section, the "RICO Defendants"[42] are the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D.

542.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities

---

[42] These are Defendants against whom Plaintiffs make substantive RICO claims. Plaintiffs, however, make RICO conspiracy claims against all Defendants.

319

of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

543. Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

544. Plaintiffs incorporate, as if fully set forth herein, their allegations that the RICO Defendants have engaged in a pattern of racketeering activity.

545. The RICO Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, the RICO Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, the RICO Defendants must have a system that allows the RICO Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the RICO Defendants this access.

546. With respect to the activities alleged herein, the RICO Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

EXHIBIT D

547.   In carrying out the overt acts and fraudulent scheme described above, the RICO Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, *et seq*. as set forth more fully above.

548.   Therefore, the RICO Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

549.   As a proximate result of RICO Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described above.

## COUNT II.
## VIOLATIONS OF RICO 18 U.S.C. §1962(D)
## BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)

### (<u>By All Plaintiffs and the Class against All Defendants</u>)

550.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

551.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).  18 U.S.C. § 1962(d)

provides, "It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

552.   At all relevant times, each Defendant was a "person" as that term is defined in 18 U.S.C. § 1961(3) because they were an "individual or entity capable of holding a legal or beneficial interest in property."

553.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

554.   Plaintiffs incorporate, as if fully set forth herein, their allegations that the RICO Defendants have engaged in a pattern of racketeering activity.  Moreover, many of the other Defendants agreed to or did, in fact, commit two RICO predicate acts as set forth above.

555.   Defendants agreed on the overall objective of the Enterprise and knew about and agreed to facilitate the commission of predicate acts in furtherance of the Enterprise's goals. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

556.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have possessed greater power, have been able

EXHIBIT D

to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

557.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, including but not limited to the Other Participants.

558.   As demonstrated in detail above, the RICO Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

559.   The Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

(a)   Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

(b)   Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

(c)   Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

EXHIBIT D

560.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also, they were aware that the ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

561.   As a proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT III.
## VIOLATIONS OF GEORGIA RICO

**(By All Plaintiffs and the Class against the Strategic Defendants, Bridge Capital Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, ACC Defendants, GALT, AquaFUSION, Credo, Oxygen, and F&D)**

562.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

563.   O.C.G.A. §§ 16-14-4(a) and (b) provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money" and "it shall be unlawful for any person employed by or associated with any enterprise

**EXHIBIT D**

to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

564.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

565.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

566.   The RICO Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, the RICO Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, the RICO Defendants needed a system that allowed the RICO Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the RICO Defendants this access.

567.   With respect to the activities alleged herein, the RICO Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

EXHIBIT D

568.   In carrying out the overt acts and fraudulent scheme described above, the RICO Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

569.   Therefore, the RICO Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of Georgia RICO.

570.   As a proximate result of the RICO Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described above in an amount in excess of $5 million.

## COUNT IV.
## CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. §16-14-4(C))

### (By All Plaintiffs and the Class against All Defendants)

571.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

572.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

573.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

574.   Plaintiffs incorporate, as if fully set forth herein, their allegations that the RICO Defendants have engaged in a pattern of racketeering activity. Moreover,

EXHIBIT D

many of the other Defendants agreed to or did, in fact, commit two RICO predicate acts as set forth above.

575.   Defendants agreed on the overall objective of the Enterprise and knew about and agreed to facilitate the commission of predicate acts in furtherance of the Enterprise's goals. The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through a pattern of racketeering activity.

576.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

577.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

578.   As demonstrated in detail above, the RICO Defendants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

579.   The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have generated and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully above.

580.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate the Georgia racketeering statute, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

581.   As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein in an amount in excess of $5 million.

## COUNT V.
## PROFESSIONAL MALPRACTICE

**(By All Plaintiffs and the Class Against the Strategic Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, Credo, Oxygen, Conexus, PCLG Defendants, Bryan Cave, Dantin Defendants, and F&D)**

582.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

583.  As professional advisors who provided professional services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, as set forth herein, the Strategic Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, Credo, Oxygen, Conexus, PCLG Defendants, Bryan Cave, Dantin Defendants, and F&D (collectively, the "Professional Defendants") owed Plaintiffs and the members of the Class a duty to comply with their respective applicable standards of care and the applicable provisions of their respective codes of professional responsibility.

584.  In any event, regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Professional Defendants.

585.  The Professional Defendants failed to meet those applicable standards of care.

586.  The Professional Defendants' failures to meet the applicable standards of care constitute negligence.

587.  The Professional Defendants' actions rise to the level of gross negligence.

EXHIBIT D

588.   Plaintiffs and the members of the Class seek punitive/exemplary damages against the Professional Defendants, jointly and severally.

589.   The Professional Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

590.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 Million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI.
## NEGLIGENCE
### (By All Plaintiffs And the Class Against the Bridge Capital Defendants, ACC Defendants, GALT, AquaFUSION, Triangle Land Conservancy, Foothills, and McCalip)

591.   Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

592.   As advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Bridge Capital Defendants, ACC Defendants, GALT, AquaFUSION, Triangle Land Conservancy, Foothills, and McCalip (the "Negligence Defendants") owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care. Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Negligence Defendants.

593.   The Negligence Defendants failed to meet their applicable standards of care. The Negligence Defendants' failure to meet their respective standards of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

594.   The Negligence Defendants' failures to meet the applicable standards of care constitute negligence.

595.   The Negligence Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.   In reasonable reliance on the Negligence Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other

Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

596.   The Negligence Defendants' actions rise to the level of gross negligence.   Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Negligence Defendants, jointly and severally.

597.   The Negligence Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

598.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5

EXHIBIT D

million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VII.
## NEGLIGENT MISREPRESENTATION

### (By All Plaintiffs and the Class Against
### All Defendants, in the Alternative to the Fraud Claim)

599.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

600.   During the course of their representation of, and in communications directed to, Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed above and especially in section III, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.  In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

601.   Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that

EXHIBIT D

their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

602.   As advisors who provided services, advice, and representations to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Defendants owed Plaintiffs and the members of the Class a duty to correctly state all facts regarding the SCE Strategy.  Regardless of privity, Plaintiffs and the members of the Class are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

603.   Plaintiffs and members of the Class reasonably relied upon the Defendants' misrepresentations and advice.

604.   The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2) paid substantial fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE

Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

605.   The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

606.   As a proximate cause of the foregoing, Plaintiffs and the Members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

EXHIBIT D

## COUNT VIII.
## BREACH OF FIDUCIARY DUTY AND DISGORGEMENT

**((By All Plaintiffs and the Class against the Strategic Defendants, MMM Defendants, Nelson Mullins, Langford Defendants, Bennett Thrasher, Van Sant and Wingard Defendants, Clark Defendants, Credo, Oxygen, Conexus, PCLG Defendants, Bryan Cave, Dantin Defendants, and F&D)**

607.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

608.   As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the Professional Defendants (as defined in Count V above) became fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in these Defendants and these Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, these Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  These Defendants breached these duties and caused Plaintiffs and members of the Class harm and injury, including but not limited to their failures to disclose their conflicts of interest.

609.   The Professional Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.  In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class:  (1) paid substantial

sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants and Other Participants for professional advice and services; (3) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) failed to file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

610.   The Professional Defendants' conduct set forth herein proximately and directly caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

611.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

612.   Further, as a result of the Professional Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

613.   Accordingly, the Professional Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount far in excess of $5 million.  In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT IX.
## FRAUD

### (By All Plaintiffs and the Class Against All Defendants)

614.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

615.   In order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants and the Other Participants, Defendants directly and indirectly—through the Other Participants—made numerous knowingly false affirmative misrepresentations and

EXHIBIT D

intentional omissions of material fact to Plaintiffs and members of the Class, as set forth above, and especially in section III.

616.   The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and the Other Participants.   In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and pay substantial fees to the Defendants and Other Participants.

617. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants, lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code, and filed federal and state tax returns

that reflected charitable contribution deductions in connection with the SCE Strategy.

618. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to file a qualified amended return, and incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

619. As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) incurred professional fees and expenses in connection with the IRS and Tax Court disputes.

EXHIBIT D

620.   As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X.
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

### (By All Plaintiffs and the Class Against All Defendants)

621.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

622.   As described more fully through this Complaint, each of the Defendants aided and abetted the breaches of fiduciary duty of each of the other Defendants and Other Participants against whom Count XIII above is pleaded.   Each aiding Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

623.   Each of the aiding Defendants acted to procure the breach of the other Defendants' fiduciary duties through improper conduct and without privilege.   Each of the aiding Defendants did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty.   Each of the aiding Defendants also acted purposely and with malice and the intent to injure.   Each of the Defendants' wrongful conduct

procured the breach of the primary wrongdoer's fiduciary duty and each of the aiding

Defendants' tortious conduct proximately caused damage to the Plaintiffs.

624.   As a direct and proximate result of Defendants' conduct set forth

herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid

substantial sums to participate in the SCE Strategy, (2) paid significant fees to the

Defendants and Other Participants, (3) have been exposed to liability to the IRS for

substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could

have been provided had the SCE Strategy been properly structured and implemented

in compliance with Section 170(h) of the Code; and (5) have and will continue to

incur substantial additional costs to rectify the situation.

625.   As a direct and proximate cause of Defendants' conduct set forth

herein, Plaintiffs have suffered injury and damages.  Plaintiffs and members of the

Class have been injured in an actual amount to be proven at trial, but in excess of $5

million and should be awarded actual and punitive damages in accordance with the

evidence, plus attorneys' fees, interest, and costs.

626.   Further, as a result of these Defendants' aiding and abetting the breach

of fiduciary duties by others, including but not limited to their failures to disclose

their conflicts of interest, they should be required to disgorge all payments received

by them from any party including Plaintiffs, any member of the Class, any other

Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

## COUNT XI.
## RESCISSION

### (In the Alternative, By All Plaintiffs and the Class Against All Defendants)

627.   Plaintiffs and members of the Class reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

628.   In connection with the SCE Strategy transactions, Plaintiffs, members of the Class, and the Syndicates were provided by certain Defendants (the "Rescission Defendants") with documents purporting to disclaim or limit the rights of Plaintiffs and members of the Class (collectively "Purported Disclaimers").   In deciding to engage in the SCE Strategy transactions, Plaintiffs and members of the Class relied on numerous, material, knowingly false, affirmative representations and intentional omissions of material fact the Rescission Defendants made directly or indirectly to Plaintiffs and members of the Class, as set forth hereinabove and especially in section III.   Had the Rescission Defendants not made those misrepresentations or omissions, Plaintiffs and members of the Class would not have engaged in the SCE Strategy transactions.   The Rescission Defendants made those misrepresentations and omissions with the intent that Plaintiffs and members of the Class would rely on them.   Further, the concealment is of intrinsic qualities of the

EXHIBIT D

features of the SCE Strategy (such as, highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE satisfied Code 170 and regulations promulgated thereunder) which the Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to Federal tax consequences, under well-established law had no duty to seek to discover.  Alternatively, the Recission Defendants had a duty to disclose these matters.

629.  Thus, the Rescission Defendants fraudulently induced Plaintiffs and members of the Class to enter into the SCE Strategy transactions in furtherance of the conspiracy between and among the Rescission Defendants, the Other Defendants, and the Other Participants.

630.  Plaintiffs and members of the Class seek rescission of all agreements and all documents they received in connection with entering into the SCE Strategy transactions, including the Purported Disclaimers.   In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs. Collectively, there is more than $5 million at issue.

631.  Plaintiffs had no duty to rescind before filing, nor to restore any consideration because it would be unreasonable to require them to do so, if not impossible, given disposition of all of the assets of the PropCos/LLCs and the years of tax returns already filed and under audit.

EXHIBIT D

## COUNT XII.
## CIVIL CONSPIRACY

### (By All Plaintiffs and the Class Against All Defendants)

632.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

633.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement the SCE Strategy.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class.   In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

634.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and Members of the Class and to breach fiduciary duties owed to Plaintiffs and Members of the Class all for the purpose of convincing Plaintiffs and members of the Class to participate in the

345

SCE Strategy and pay substantial fees.  The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs and members of the Class.

635.   The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

636.   There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on and to breach fiduciary duties owed to Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continues to cause damages to Plaintiffs and members of the Class as previously set forth herein.

637.   As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented

EXHIBIT D

in compliance with Section 170(h) of the Code; and (5) have and will continue to incur substantial additional costs to rectify the situation.

638. Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## IX.
## PRAYER FOR RELIEF

639. Based upon the foregoing, Plaintiffs request that Defendants be summoned to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

    (a)    actual, consequential, and incidental damages;

    (b)    rescission and disgorgement as sought herein;

    (c)    pre- and post-judgment interest at the highest legal rate allowed by law;

    (d)    all attorneys' fees and costs in pursuing this matter;

    (e)    punitive and/or enhanced damages in an amount to be determined at trial; and

    (f)    such other and further relief, both at law and in equity, to which Plaintiffs and the Class may show themselves to be justly entitled.

347

Dated: June 25, 2021

Respectfully submitted,

/s/ *Jeven R. Sloan*

David R. Deary (admitted *pro hac vice*)
davidd@lfdrlaw.com
W. Ralph Canada, Jr. (admitted *pro hac vice*)
ralphc@ldsrlaw.com
Jeven Sloan (GA Bar No. 652727)
jevens@ldsrlaw.com
Wilson E. Wray, Jr. (admitted *pro hac vice*)
wilsonw@ldsrlaw.com
John McKenzie (admitted *pro hac vice*)
johnm@ldsrlaw.com
Donna Lee (admitted *pro hac vice*)
donnal@ldsrlaw.com
Tyler M. Simpson (admitted *pro hac vice*)
tylers@ldsrlaw.com
**LOEWINSOHN DEARY SIMON RAY LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile

Edward J. Rappaport (GA Bar No. 594841)
erappaport@saylorlaw.com
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone

*Attorneys for Plaintiffs*

EXHIBIT D

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on June 25, 2021, a true and correct copy of the foregoing document was filed with the Clerk of the Court by using the CM/ECF system and service on the original Defendants was effectuated using that CM/ECF system.  For the new Defendants, Plaintiffs will serve a copy of this Amended Complaint through a process server or other method authorized by the Federal Rules of Civil Procedure.

/s/ *Jeven R. Sloan*
Jeven R. Sloan

EXHIBIT D